# Exhibit A

**In The Matter Of:**
*Dustin Erwin v.*
*Christopher McDermott, et al.*

*Frank Caswell*
*February 28, 2012*

195 State Street • Boston, MA 02109
Nationwide - Worldwide
888.825.3376 - 617.399.0130
www.court-reporting.com



O'BRIEN & LEVINE
Court Reporting Services
*Making Your Case*

Original File Frank Caswell 2-28-12.txt
WEB-U-Script® with Word Index

Dustin Erwin v.
Christopher McDermott, et al.

Frank Caswell
February 28, 2012

Page 33

1   Vegas that Tsoumas is tapped into?
2   A.  Actually our agent is from Florida.
3   Q.  Now, when you do your management work, are
4       you on site?
5   A.  Yes.
6   Q.  What percentage of your business time is
7       spent on-site in the Brockton location?
8   A.  Seven days. I'm there probably seven to
9       nine hours a day.
10  Q.  Were you there on or about August 10th, 2008?
11  A.  Yes.
12  Q.  Were you present when there was an incident
13      involving my client, Dustin Erwin?
14  A.  I was not.
15  Q.  So, in other words, you had already left. Is
16      that the case?
17  A.  Yes.
18  Q.  Do you know the names of the people that were
19      on duty that night?
20  A.  I supplied them.
21  Q.  You mean, when you sent these bartender
22      weekly work schedule documents?
23  A.  And the payroll management, whatever.
24  Q.  Can I see Exhibit 2, please?

Page 34

1   A.  (Witness complies.)
2   Q.  So if I look at Exhibit 2, break it down a
3       little bit, Exhibit 2K is rub girls -- excuse me.
4       That's 2R. 2S is bartenders. 2T is service and
5       hostess. Do you see that?
6   A.  Yes.
7   Q.  When you say you supplied the names, is that
8       what you mean? You gave me those documents?
9   A.  I supplied also part of the payroll, I think.
10  Q.  Well, those checks to three different people
11      that --
12  A.  No. The ADP payroll that pertains to
13      management. Everyone that was on that.
14  Q.  Let's back up. We also have this exhibit,
15      2M, which is Invoice for Detail, Keating, Scibetta,
16      McDermott, do you see that?
17  A.  Yes.
18  Q.  There is Christopher McDermott. He got a
19      check for $248?
20  A.  Yes.
21  Q.  He was a bouncer or a security guard that
22      night?
23  A.  No.
24  Q.  Who is McDermott?

Page 35

1   A.  He's a police officer.
2   Q.  Well, he was serving as a security agent that
3       night?
4   A.  He was serving as a -- paid by the City of
5       Brockton -- police officer on detail.
6   Q.  At the Foxy Lady?
7   A.  Correct.
8   Q.  Do you recall seeing him that evening?
9   A.  No.
10  Q.  Who was the manager on duty that night?
11  A.  John Ferraro.
12  Q.  How do I spell his last name?
13  A.  F-E-R-R-A-R-O.
14  Q.  Is his identifying information in this packet
15      somewhere?
16  A.  His name, no. That would be on the payroll I
17      gave.
18      MR. BERMAN: I don't have a payroll. I
19      should tell you that I got everything yesterday from
20      your office and the payroll information you're talking
21      about wasn't included.
22  Q.  Was it asked for, payroll?
23  A.  Maybe not. We're not going to be that
24      technical at least right now. Mr. Berman and I have

Page 36

1   slightly different views about how these things are
2   done. That's okay. That is what makes lawyering
3   interesting. All I want to know right now is if you
4   know the name of the guy, and the answer is John
5   Ferraro.
6   A.  Correct.
7   Q.  He is still with you?
8   A.  Yes.
9   Q.  Do you know where he lives?
10  A.  Abington.
11  Q.  Do you know his exact address?
12  A.  I do not.
13  Q.  Do you know his date of birth?
14  A.  I do not.
15  Q.  How long has he been with you?
16  A.  12 years.
17  Q.  So he's not going anywhere, as far as you
18      know, today?
19  A.  No.
20  Q.  I am correct. As far as you know, he has no
21      plans to leave the jurisdiction?
22  A.  Correct.
23  Q.  As far as you know, he has no plans to leave
24      your employ?

Page 37

1  A. He does not.
2  Q. What is the entity that employs him?
3  A. The Foxy Lady -- Frank's of Brockton, Inc.
4     d/b/a Foxy Lady.
5  Q. Is that how his paychecks are cut?
6  A. I believe it is.
7  Q. Do you use an outside payroll service?
8  A. Yes, ADP.
9  Q. And they cut them in the name of Frank's of
10    Brockton, Inc., as far as you recall?
11 A. Yes.
12 Q. They still do?
13 A. Yes.
14 Q. They did in August of 2008?
15 A. Yes.
16 Q. Is it Ferraro on the restaurant side or
17    entertainment side?
18 A. Entertainment.
19 Q. Is he a full-time employee?
20 A. Yes.
21 Q. Does he report directly to you?
22 A. Yes.
23 Q. Is he the guy who is in charge when you're
24    not there?

Page 38

1  A. Yes. Well, he or his underling assistant
2     manager.
3  Q. Assuming he is on site and you're not, he's
4     the guy in charge?
5  A. Correct.
6  Q. He's the highest in the hierarchy below you
7     on the entertainment side?
8  A. On the entertainment side, yes.
9  Q. Is he the guy that is responsible for
10    procuring the security service?
11 A. Yes.
12 Q. Do you know if he is the guy that contacted
13    Brockton to have the security guards there on or about
14    August 8, 2010?
15 A. The detail?
16 Q. You call it a detail. That's fine. The
17    detail.
18 A. That's what they call it. They don't ask me
19    if I want a security officer. They ask if I want a
20    detail.
21 Q. Is it fair to say that was really an ongoing
22    thing; you had a detail every Saturday night?
23 A. Every Thursday, Friday, Saturday and a day of
24    a football game at Gillette.

Page 39

1  Q. Did the town require that you hire details as
2     a condition of the licensing?
3     MR. BERMAN: Brockton is a city.
4     (Discussion off the record.)
5  Q. So the city of Brockton -- where I worked for
6     three years, as you may not know, as an assistant
7     district attorney. Physically I worked there. I
8     didn't work for the town, 32 Belmont Street -- the City
9     of Brockton required you to have a detail as a
10    condition of licensing?
11 A. Yes.
12 Q. So essentially that is a routine that is in
13    place?
14 A. Except when there are holidays or games that
15    John will call up and ask for a detail.
16 Q. You want an extra couple of guys because
17    we're going to be crowded kind of thing?
18 A. No, that's not the case. It's Thursday,
19    Friday and Saturday is a given. The night before a
20    holiday depending what type of holiday it is, what time
21    of year it is, we will warrant whether or not we will
22    need to have a detail, also what time a football game
23    takes place and where it takes place will determine
24    whether or not we need a detail for that. It's an

Page 40

1  ongoing communication that they have between the detail
2  department and the general manager, John Ferraro other
3  than it's a given on Thursday, Friday and Saturday.
4  Q. Is there any correspondence back and forth
5     between the general manager, Mr. Ferraro, or the town,
6     as far as you know?
7     MR. BERMAN: City.
8  A. Pertaining to what?
9  Q. Pertaining to the hiring of details.
10 A. No.
11 Q. I'm asking you. You tell me.
12 A. No.
13 Q. Are there any documents at all other than the
14    checks that go out to the individual officers?
15 A. No.
16 Q. You're sure?
17 A. Yes.
18 Q. Does the Foxy Lady and/or any of the
19    technically named entities that comprise this control
20    group have any written protocol with respect to
21    security at the Foxy Lady?
22 A. With detail or with anyone?
23 Q. With anyone.
24 A. Well, no, the answer to that is no.