# Exhibit B

# In The Matter Of:

*Dustin Erwin v.*
*Christopher McDermott, et al.*

___

*Christopher McDermott*
*March 19, 2012*

___



**O'BRIEN & LEVINE**
Court Reporting Services
*Making Your Case*

195 State Street • Boston, MA 02109
*Nationwide - Worldwide*
888.825.3376 - 617.399.0130
*www.court-reporting.com*

Original File Christopher McDermott 3-19-12.txt
Min-U-Script® with Word Index



COPY

```
 1   Q.   Is that a -- what is it?  You tell me.
 2   A.   It's a bachelor of science, criminal justice.
 3   Q.   2001?
 4   A.   Approximately.
 5   Q.   Do you have any postgraduate education?
 6   A.   No.
 7   Q.   You are currently a Brockton police officer?
 8   A.   Yes.
 9   Q.   What's your rank?
10   A.   Patrolman.
11   Q.   How long have you been a Brockton police
12  officer?
13   A.   Approximately 16 years.
14   Q.   You have been a patrolman the whole time?
15   A.   No.  For the first four years, I was patrol.
16  Currently I'm assigned to the detective division.
17   Q.   So your rank is patrolman, but you are a
18  detective?
19   A.   Yes.
20   Q.   For the most part, you work in plain clothes
21  now?
22   A.   Yes.
23   Q.   And you have been on the force for 16 years?
24   A.   Yes.
```

1  defendant in this action.
2       I'm just going to ask you some very few
3  questions. You came on duty about 10:00 p.m. on the
4  night of August 9th of 2008; is that correct?
5     A.  Yes.
6     Q.  And, at some point, you were told that
7  Mr. Erwin was being asked to leave; is that correct?
8     A.  Yes.
9     Q.  Were you asked to assist in getting Mr. Erwin
10 out the door initially when he left?
11    A.  No.
12    Q.  Who escorted him to the door, if anyone?
13    A.  I don't remember.
14    Q.  In fact, it's possible he wasn't even
15 escorted to the door; is that right?
16         MR. PADOLSKY:  Objection.
17    A.  I don't remember seeing anybody.
18    Q.  So it's possible that he simply left on his
19 own accord and nobody had to escort him?
20    A.  Yes.
21    Q.  At some point, he was out the door and he was
22 on the handicap ramp; is that right?
23    A.  Yes.
24    Q.  In fact, if an employee of the Foxy Lady

74

```
 1   nightclub had escorted Mr. Erwin to the door, he would
 2   have escorted him to the regular entrance rather than
 3   the handicap ramp; is that right?
 4              MR. PADOLSKY:  Objection.
 5              MR. SINSHEIMER:  Objection.
 6   A.   I don't know.
 7   Q.   I mean, the handicap ramp is for handicap
 8   people; is that correct?
 9   A.   Yes, it is.
10   Q.   And most people who come in use the regular
11   entrance?
12              MR. PADOLSKY:  Objection.
13   A.   I can't answer how most people could enter.
14   Q.   By the way, you referred to a certain street
15   as Oak Street.  Do you mean Oak Street extended?
16   A.   I believe it's Oak Street.
17   Q.   Oak Street is a street that crosses Route 93,
18   isn't it?  I mean, Route 24.
19   A.   It goes under 24, yes, it does.
20   Q.   In fact, it's the northern most artery in
21   Brockton that crosses Route 24; isn't that right?
22   A.   I believe it is, yes.
23   Q.   And when Oak Street is west of Route 24,
```

1  doesn't Oak Street make a fairly sharp left turn
2  assuming that you're still headed in a westerly
3  direction?
4     A.  Yes, it does.
5     Q.  In fact, the street that takes over is called
6  Oak Street extended, isn't it?
7     A.  I'm not sure at what point it becomes Oak
8  Street extension from Oak Street.
9     Q.  Now, after Mr. Erwin was outside the door,
10 you made some observations; isn't that correct?
11    A.  Yes.
12    Q.  Did any employee of the Foxy Lady ask you to
13 make these observations?
14    A.  No.
15    Q.  What you observed, first of all, was that
16 Mr. Erwin was standing on the handicap ramp; is that
17 right?
18    A.  Yes.
19    Q.  And he was using foul language; is that
20 right?
21    A.  Yes.
22    Q.  What was the level of his voice when he was
23 using this language? Was he speaking in a low tone of
24 voice, a conversational tone of voice? Was he yelling?

76

1  A.  He was loud.
2  Q.  Would you have considered just his standing
3  there and using loud, foul language in a public place
4  to be disorderly conduct?
5  A.  Initially, no.
6  Q.  When did you decide that his conduct was
7  disorderly?
8  A.  When after repeated attempts or requests for
9  him to leave, he wouldn't.  He became louder and he
10 continued using profanity.
11 Q.  He also at some point came up and kicked the
12 door, didn't he?
13 A.  I said that.  I'm not 100 percent sure if he
14 kicked it or just grabbed it, but he did approach the
15 door aggressively.
16 Q.  Now, after he grabbed the door or kicked the
17 door, whatever he did, did you involve any employees of
18 the Foxy Lady in anything you did?
19 A.  No.
20 Q.  Did they come out to ask you to do anything?
21 A.  No.
22 Q.  Officer McDermott, if you were a Brockton
23 police officer on duty but not doing any special detail
24 at the Foxy Lady, and you had observed Mr. McDermott

```
 1   shouting profanity at the top --
 2              MR. SINSHEIMER:  I think you meant
 3   Mr. Erwin.
 4        Q.   Mr. Erwin -- excuse me -- shouting
 5   profanities at the top of his voice and going up and
 6   grabbing the door, would you have made some effort to
 7   find out what was going on?
 8              MR. SINSHEIMER:  Objection.
 9        A.   Yes, I would.
10        Q.   And that is because one of your duties as a
11   police officer is to prevent the commission of crimes?
12        A.   Yes.
13        Q.   And let's assume that you received a phone
14   call or the police department received a phone call
15   from the owner of a nightclub -- any nightclub -- that
16   there was a person standing outside the door.  He had
17   been asked to leave, and he was now shouting
18   obscenities and wouldn't leave.  Would the police have
19   been dispatched for that?
20        A.   Yes.
21        Q.   By the way --
22              MR. SINSHEIMER:  I want to object to
23   that question.  Maybe it's a little late, but move to
24   strike that question and answer.  Sorry.
```

78

1  Q. At some point, the altercation with Mr. Erwin
2  proceeded from the ramp to the parking lot; is that
3  right?
4  A. Yes.
5  Q. When that happened, did any employee of the
6  Foxy Lady come out to give you any direction?
7  A. No.
8  Q. In fact, did any employee of the Foxy Lady
9  come out at all?
10 A. Not that I saw.
11 Q. And from there, it proceeded to the
12 Walgreen's parking lot; is that right?
13 A. Yes.
14 Q. While you were in the Walgreen's parking lot,
15 did any employee of the Foxy Lady try to give you any
16 direction?
17 A. No.
18 Q. Did you observe any employee of the Foxy Lady
19 at that point?
20 A. No.
21 Q. And then from there, the action proceeded to
22 the parking lot between Walgreen's and Bickford's; is
23 that right?
24 A. Approximately, yes.

```
 1      Q.   When that happened, was any employee of the
 2   Foxy Lady out there trying to tell you what to do?
 3      A.   No.
 4      Q.   Did you observe any employee at the Foxy Lady
 5   out there?
 6      A.   No.
 7      Q.   You said earlier that there were
 8   circumstances where you might -- maybe you didn't quite
 9   mean this -- where you would take orders from an
10   employee of the Foxy Lady.
11               Would it be fair to say, in fact, if the
12   manager of the Foxy Lady came to you and said, Chris,
13   we have a problem inside the club, there is somebody
14   who is trying to mangle someone else.  You would then
15   come into the club?
16               MR. PADOLSKY:  Objection.
17      A.   Yes.
18      Q.   But it wasn't because he ordered you to do
19   it.  It was part of your duties as a police officer on
20   duty?
21               MR. SINSHEIMER:  Objection.
22               MR. PADOLSKY:  Objection.
23      A.   Yes.
24      Q.   When you are paid for your special details at
```

80

Christopher McDermott - March 19, 2012

```
 1   the Foxy Lady, how do you get that check?
 2        A.   From the City of Brockton.
 3        Q.   And would it be fair to say you have nothing
 4   to do with collecting that money?
 5                  MR. PADOLSKY:  Objection.
 6        A.   Correct.
 7        Q.   And, has any member, has any employee of the
 8   Foxy Lady ever tried to pay you other than the payments
 9   made to the City of Brockton for your work as a special
10   police officer?
11        A.   No.
12        Q.   By the way, the night of August 9th and the
13   morning of August 10, 2008, you were the only Brockton
14   police officer on duty; is that right?
15        A.   At the Foxy Lady?
16                  MR. PADOLSKY:  Objection.
17        Q.   Yes.
18        A.   Yes.
19        Q.   And you understood that the Foxy Lady wanted
20   you to be there for the whole time that -- from 10:00
21   to the closing at 2:30; is that right?
22        A.   Yes.
23        Q.   When you pursued Mr. Erwin into the parking
24   lot, you were, in fact, absenting yourself from the
```

```
 1   Foxy Lady's premises; isn't that correct?
 2             MR. PADOLSKY: Objection.
 3        A.   I don't understand that question.
 4        Q.   When you followed Mr. Erwin into the parking
 5   lot and then you followed him into the Walgreen's lot
 6   and then into the lot between Walgreen's and
 7   Bickford's, you cannot be on the premises of the Foxy
 8   Lady where you usually are?
 9        A.   Correct.
10             MR. BERMAN: No further questions.
11             MR. SINSHEIMER: I gather you're not
12   going to question your own client?
13             MR. PADOLSKY: I will not be questioning
14   my own client.
15                    REDIRECT EXAMINATION
16   BY MR. SINSHEIMER:
17        Q.   A couple more. There is a manual, Brockton
18   Police Department Policies, Procedures and Guidelines,
19   correct?
20        A.   Yes.
21        Q.   You have seen it?
22        A.   I have.
23        Q.   This is a segment of it, correct?
24        A.   Yes, it is.
```