# EXHIBIT 1

ï»¿1
```
 1                                    Volume:   I
 2                                    Pages:    1 - 163
 3                                    Exhibits: 1 - 16
 4
 5                    COMMONWEALTH OF MASSACHUSETTS
 6
 7   PLYMOUTH, SS.                 DISTRICT COURT DEPARTMENT
 8                                 OF THE TRIAL COURT
 9                                 DOCKET NO. 0815CR5844
10
11
12   * * * * * * * * * * * * * * *
13                                *
14   COMMONWEALTH OF MASSACHUSETTS,*
15             Plaintiff          *
16                                *
17   vs.                          *
18                                *
19   DUSTIN ERWIN,                *
20             Defendant          *
21                                *
22   * * * * * * * * * * * * * * *
23
24
25        JURY TRIAL
26        BEFORE THE HONORABLE PAUL C. DAWLEY
27        EXCERPT:  TESTIMONY OF WITNESSES
28
29   APPEARANCES:
30   For the Commonwealth:
31   Patrick T. Cullinan, Assistant District Attorney
32   Plymouth County District Attorney's Office
33   32 Belmont Street
34   Brockton, MA  02301
35
36
37   For the Defendant:
38   Neil V. Madden, Esquire
39   14 Dorchester Street
40   Boston, Ma  02127
41
42                        215 Main Street
43                        Brockton, MA  02301
44                        Tuesday, November 3, 2009
45
46
```

## Commonwealth vs. Dustin Erwin

SHEET 2   PAGE 2

**PAGE 2**

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTOPHER MCDERMOTT | | | | |
| (By Mr. Cullinan) | 3 | | 48 | |
| (By Mr. Madden) | | 21 | | |
| DARVIN ANDERSON | | | | |
| (By Mr. Cullinan) | 54 | | 77 | |
| (By Mr. Madden) | | 65 | | |
| MATTHEW ZAVALA | | | | |
| (By Mr. Madden) | 80 | | 111 | |
| (By Mr. Cullinan) | | 96 | | |
| ROBERT FLINN | | | | |
| (By Mr. Madden) | 113 | | 146 | |
| (By Mr. Cullinan) | | 129 | | 148 |
| MARIA ERWIN | | | | |
| (By Mr. Madden) | 151 | | | |
| (By Mr. Cullinan) | | 161 | | |

E X H I B I T S

| | | |
|---|---|---|
| 1. | Photograph. | 7 |
| 2. | Photograph. | 22 |
| 3. | Photograph. | 24 |
| 4. | Photograph. | 24 |
| 5. | Photograph. | 24 |
| 6. | Photograph. | 159 |
| 7. | Photograph. | 159 |
| 8. | Photograph. | 159 |
| 9. | Photograph. | 159 |
| 10. | Photograph. | 159 |
| 11. | Photograph. | 159 |
| 12. | Photograph. | 159 |
| 13. | Photograph. | 159 |
| 14. | Photograph. | 159 |
| 15. | Photograph. | 159 |
| 16. | Photograph. | 159 |

**PAGE 3**

1  (Court reconvened at 11:17 a.m.)
2  (Defendant present.)
3  (Jury present.)
4      THE COURT: All right. Mr. Cullinan, you may call your
   first witness.
5
6      MR. CULLINAN: Thank you, your Honor. The Commonwealth
7  would call Detective Christopher McDermott.
8      THE CLERK: Good morning, sir.
9      THE WITNESS: Good morning.
10     THE CLERK: Raise your right hand, please.
11         CHRISTOPHER MCDERMOTT, Sworn
12     THE WITNESS: Yes, I do.
13     THE CLERK: Thank you.
14     THE COURT: Good morning, sir. You may be seated if you
   wish or stand.
15
16     THE WITNESS: Thank you, your Honor.
17     THE COURT: Go right ahead, Mr. Cullinan?
18     MR. CULLINAN: Thank you, your Honor.
19              DIRECT EXAMINATION
20  BY MR. CULLINAN:
21  Q   Good morning.
22  A   Good morning.
23  Q   Could you please state your name, spelling your last name
24  for the record?
25  A   My name is Christopher McDermott, M-c-D-e-r-m-o-t-t.

**PAGE 4**

1  Q   And could you describe your employment?
2  A   I'm a Detective for the City of Brockton.
3  Q   And how long have you worked for the police department in
4  Brockton?
5  A   I've been a police officer for approximately 13 years.
6  Q   And how many years have you been a detective?
7  A   Approximately, nine years.
8  Q   And can you describe your general duties and
9  responsibilities with the Brockton Police Department?
10 A   For the last nine years I've been with the detective
11 bureau. Five of those years I was in the drug unit making
12 undercover purchases of narcotics, doing search warrants for
13 narcotics. In 2005, I was moved to a generalist detective
14 position, investigating homicides, robberies, non-life-
15 threatening assaults.
16 Q   In addition over the course of your employment have you
17 ever worked what you would describe as a detail?
18 A   Yes.
19 Q   And what is a detail?
20 A   A detail is a job outside of the police department. You're
21 paid by the individual or the company that you work for to
22 provide security for that business.
23 Q   Now, directing your attention to August of 2008, were you
24 working details at that time?
25 A   Yes.

**PAGE 5**

1  Q   And prior to August 10, 2008 had you ever worked a detail
2  at the Foxy Lady?
3  A   Yes.
4  Q   And could you describe for the jury what the Foxy Lady is?
5  A   The Foxy Lady is an adult nightclub. It provides adult
6  entertainment.
7  Q   And prior to that time how long had you been providing
8  details to the Foxy Lady?
9  A   Approximately, four or five years.
10 Q   And prior to August 10, 2008 during your details had you
11 ever made any arrests?
12 A   At the Foxy Lady?
13 Q   Yes?
14 A   Maybe one or two at the most.
15 Q   Okay. Now, specifically directing your attention to August
16 10, 2008 what was the time period that you were working at the
17 Foxy Lady?
18 A   Ten o'clock at night until 0230 in the morning.
19 Q   And can you describe your appearance when you're there?
20 A   Brockton Police uniform.
21 Q   And can you describe the uniform a little bit further?
22 A   It's dark in color. There's a clearly physical shiny badge
23 on both sides of the sleeve I have an insignia indicating
24 Brockton Police Department. Part of my gear that night, my duty
25 belt, mace, handcuffs, my firearm, my radio, handcuffs.

Commonwealth vs. Dustin Erwin

SHEET 3   PAGE 6

**6**

1   Q   And when you are working security at the establishment,
2   could you describe the area that you stand in?
3   A   I usually will move from the parking lot to the foyer of
4   the establishment.
5   Q   And can you just describe the entrances to get into the
6   Foxy Lady strip club?
7   A   The entrance, there's two doors; one provides handicap
8   accessibility and the other one's a set of stairs that goes into
9   a common hallway surrounded by glass doors.  You walk through a
10  set of glass doors into the reception area where individuals
11  have to show their identification and pay to get in.
12       MR. CULLINAN:  If I could just have a moment?
13       THE COURT:  Sure.
14       MR. CULLINAN:  Permission to approach?
15       THE COURT:  Yes.
16  BY MR. CULLINAN:
17  Q   I'm showing you a photograph; do you recognize that?
18  A   I do.
19  Q   And can you describe what you recognize it to be?
20  A   This is the Foxy Lady Nightclub in the City of Brockton.
21  Q   Okay.  And the area that you were talking about with the
22  multiple entrances is that depicted in that photograph?
23  A   Yes, it is.
24  Q   And is that a fair and accurate depiction of how the
25  entrance way to the club looked on August 10, 2008 when you were

**PAGE 7**

**7**

1   working there?
2   A   Yes.
3       MR. CULLINAN:  I'd ask that that be marked as the
4   Commonwealth's first exhibit.
5       THE COURT:  Any objection that will be marked as Exhibit 1.
6   Mr. Madden?
7       MR. MADDEN:  No objection.
8       THE COURT:  All right.  Exhibit 1.
9       THE CLERK:  Exhibit Number 1.  Can I see that, please?
10  (The clerk marks the photograph as Exhibit Number 1.)
11       THE COURT:  Officer Manning, if you could publish this to
12  the jury, please?
13       THE COURT OFFICER:  Yes, your Honor.
14       MR. CULLINAN:  Thank you, your Honor.
15       THE COURT:  Ladies and gentlemen, from time to time you'll
16  be shown exhibits.  Keep in mind you can look at it briefly.
17  You'll have all the exhibits in this case in the jury room
18  during your deliberations.  Thank you.
19       Go right ahead, Mr. Cullinan?
20       MR. CULLINAN:  Thank you, your Honor.
21  BY MR. CULLINAN:
22  Q   Now, directing your attention to approximately one a.m.,
23  were you still working at that time?
24  A   I was.
25  Q   And what, if anything, caught your attention?

**PAGE 8**

**8**

1   A   It was actually before one a.m.  I was notified by the
2   manager --
3       MR. MADDEN:  Objection, your Honor.
4       THE COURT:  The objection is sustained.
5   BY MR. CULLINAN:
6   Q   Detective, just as to what you yourself observed and saw?
7   A   I observed an individual leave the establishment.  As he
8   was walking through a set of doors, he pushed the doors
9   aggressively causing them to slam open.  I then followed this
10  individual through those set of doors and observed his behavior
11  as he went outside the exit door by the handicap ramp.
12  Q   The individual who slammed through the doors do you see him
13  in the courtroom today?
14  A   I do.
15  Q   Could you please point to him and describe an article of
16  his clothing for the record?
17  A   He's sitting right over here and it looks like he has a
18  maroon collared shirt on.
19       MR. CULLINAN:  I'd ask that the record reflect that the
20  witness identified the defendant as the person who slammed
21  through the doors?
22       THE COURT:  Yes.
23  BY MR. CULLINAN:
24  Q   Now, when you observed the slamming through the doors, what
25  part of the club were you in?

**PAGE 9**

**9**

1   A   At that time I was in the receptionist area.
2   Q   Prior to that foyer area if you're moving from inside to
3   out?
4   A   Yes.
5   Q   And you indicated that at that time you followed the
6   defendant out?
7   A   I followed him out that first set of doors.  I stopped in
8   the front hallway, and he exited through the side door by the
9   handicap ramp.
10  Q   Okay.  At that time were you able to see or observe any
11  more of the defendant?
12  A   Yeah.  I watched him the whole time.
13  Q   Okay.  And can you describe what he was doing?
14  A   He was pacing back and forth on the handicap ramp.  He was
15  talking loud, using profanity, arguing with his friends.
16  Q   And approximately what time is this?
17  A   Approximately, one a.m.
18  Q   Okay.  And you indicated that his friends were present as
19  well?
20  A   Yes.
21  Q   And did you see those individuals exit the club?
22  A   Yes.
23  Q   And when did they exit the club?
24  A   Some immediately upon this individual leaving the club and
25  some shortly thereafter but just like within a few seconds.

Commonwealth vs. Dustin Erwin

SHEET 4   PAGE 10

**10**

```
 1  Q    In addition to the defendant and his friends were other
 2  patrons out in that area?
 3  A    This is a common area for smokers.  There are individuals
 4  out there smoking.  This is also a popular entrance for people
 5  coming in and out and entrance and an exit for people going in
 6  and out of the club.
 7  Q    And were there people participating in smoking and going in
 8  and out at that time?
 9  A    Yes.
10  Q    Now, you indicated you heard the defendant being loud.  Do
11  you recall what he was saying?
12  A    Initially, I don't know what he was saying.  He was just
13  being loud.  I maintained visual contact on him just to watch
14  his behavior, his demeanor.  At some point he walked toward the
15  glass when he observed myself and the manager watching him.  He
16  came up to the glass, grabbed the door, flips me off, used the
17  middle finger, said fuck you.  At that point I opened up the
18  door and I told him to get off the property that he had to leave
19  the property.  His friends ensured me that they would take care
20  of him that it was his bachelor party; they would be responsible
21  for him.  I asked, again, directed it towards him, I said you
22  need to get off the property now, repeated requests for him to
23  get off the property.
24  Q    Now, just taking a step back.  You indicated that the
25  defendant was able to see you through some glass.  Could you
```

**PAGE 11**

**11**

```
 1  describe where that was?
 2  A    I was standing in that front foyer, and he was on the
 3  handicap ramp at the side door.
 4  Q    Was that glass part of the door or part of the wall?
 5  A    It was part of a door.  It's a glass door.
 6  Q    And you indicated that you told the defendant to get off
 7  the property; is that correct?
 8  A    Yes.
 9  Q    And do you know, approximately, how many times you asked
10  him to do so?
11  A    At least three times.
12  Q    And after the defendant had flipped you off as you
13  described and cursed at you when you told him to leave, what did
14  he do?
15  A    His attention was then drawn to his friends who were trying
16  to help him, trying to escort him down the ramp.  They were able
17  to get him into the parking lot.  I continued keeping an eye on
18  this group of individuals.  I followed them down the ramp into
19  the parking lot.  I observed him to be yelling that he can't
20  arrest me.  He looked at me again, said fuck you.  I approached.
21  I attempted to grab his shirt.  He spun violently side to side.
22  I backed up.  His friends again intervened, you know, asked me
23  not to arrest him, said we'd take care of him.  They were trying
24  to remove him from the property.  He began to wrestle with his
25  own friends, throwing one of them off to the side.  At that
```

**PAGE 12**

**12**

```
 1  point his actions I had no other opportunity or no other
 2  actions.  I called for assistance.  I knew I was going to have
 3  to make an arrest.  I walked over to him and I told him --
 4  Q    I'm just going to stop you right there, Detective.  In
 5  terms of what you just indicated, you initially had gone up to
 6  the defendant and grabbed a hold of him.  What was your
 7  intention at that time?
 8  A    My intention was to secure him, to stop the behavior.
 9  Q    Okay.  And after giving him the three warnings about
10  getting off the property, approximately how much time had passed
11  since your first warning for him to leave the property until
12  that point where you tried to grab onto him?
13  A    Just a couple of minutes.
14  Q    And at that point you indicated that you grabbed onto him?
15  A    Yes.
16  Q    And he spun away?
17  A    Yes.
18  Q    And what happened from there?
19  A    At that point his friends, again, they jumped in.  They
20  were trying to grab him.  One of them was speaking to me,
21  explaining bachelor party.  We'll take care of it.  They all
22  appeared to be sober when the individual in question appeared to
23  not be sober.  When I saw them actually physically wrestling
24  with him and he was throwing them away, I called for assistance.
25  I approached again.  I told him he was under arrest, turn
```

**PAGE 13**

**13**

```
 1  around, put your hands behind your back.  I said you can't touch
 2  me.  I tried to reach out and to secure his wrist.  He struck my
 3  arm away.  I backed off.  I used my OC spray.  I gave him a one-
 4  second burst to his chest, his face area.  At that point he
 5  started running.  I chased him.  I was able to catch up to him,
 6  tackle him.  We fell on the ground.  We wrestled briefly.  I
 7  struck him to the side of the face to gain his compliance.  That
 8  still didn't work.  A trooper assisted me and the Brockton
 9  Police K-9 officer assisted me.  We were able to gain control
10  and place him in handcuffs.
11  Q    Now, that night you were able to prior to engaging with the
12  defendant observe his size; is that correct?
13  A    Yes.
14  Q    Did you learn approximately how much he weighed?
15  A    Approximately, 280 pounds.
16  Q    And how tall?
17  A    Approximately, six-four, six-five.
18  Q    And, sir, how tall are you?
19  A    Five-eleven.
20  Q    And how much do you weight?
21  A    Approximately, 175.
22  Q    Now, you indicated the second time you tried to place the
23  defendant under arrest he hit your hand; is that correct?
24  A    Yes.
25  Q    Can you describe that in more detail?
```

Commonwealth vs. Dustin Erwin

SHEET 5   PAGE 14

**14**

1  A    He struck it.  I went to reach out to grab his wrist and he
2  struck my arm so that I couldn't secure him.  And that's when I
3  backed away and used my OC spray.
4  Q    Okay.  And what was he saying at that point when you were
5  trying to secure his arms?
6  A    That I couldn't touch him.
7  Q    And what were you telling him your intentions were?
8  A    To place him under arrest.
9  Q    And you indicated at that point after he had struck you,
10 you had to use your OC spray; is that correct?
11 A    Yes.
12 Q    Can you describe what that is?
13 A    It's a chemical irritant.  It causes an individual's eyes
14 to tear up causing him to choke briefly.  It makes it difficult
15 for the individual to cause any harm to myself or to anybody
16 else.
17 Q    Okay.  And at that time when you took out your OC spray,
18 how many officers were present with you?
19 A    No one.
20 Q    Okay.  And fair to say the defendant was present there and
21 a group of his friends?
22 A    I don't exactly know where the friends were at that time.
23 I was just concentrating on the defendant at the time.
24 Q    And after you sprayed the defendant with the OC spray, did
25 he become compliant at that point?

**PAGE 15**

**15**

1  A    No.
2  Q    Can you describe what he did?
3  A    He took off at a full sprint.  I chased after him and
4  secured him.
5  Q    In what direction did he run in?
6  A    Away from me in an easterly direction.
7  Q    And when he started running, what did you do?
8  A    I was yelling for him to stop running.
9  Q    And did the defendant comply when you were yelling at him
10 to stop running?
11 A    No.
12 Q    Approximately, how far did the defendant run before you
13 were able to catch up with him?
14 A    Maybe 50-60 feet.
15 Q    And at that time were there any other officers present?
16 A    Around that same time, State Police Trooper Sergeant
17 Higginbotham arrived.
18 Q    And could you describe your next struggle with the
19 defendant at that time?
20 A    By the time Sergeant Higginbotham arrived, we had fallen to
21 the ground.  I was on top of the defendant trying to secure him.
22 Q    How did the defendant get down to the ground?
23 A    I brought him down to the ground.
24 Q    And how were you able to do that?
25 A    While I was running, I was running faster than him.  I

**PAGE 16**

**16**

1  wrapped my arms around him and we both went down to the ground.
2  Q    And you indicated the trooper arrived; where did he arrive?
3  A    Right where we were.  He pulled up blocking his path and
4  that's when I was able to grab him.
5  Q    Okay.  And did you strike the cruiser at all?
6  A    No.  I don't believe so.
7  Q    Do you know if the defendant did?
8  A    He may have but I don't know.
9  Q    What was your concern at that time?
10 A    Just putting the defendant in handcuffs to stop the
11 struggle.
12 Q    Okay.  So once you have the defendant down on the ground,
13 can you describe what the defendant's doing?
14 A    The defendant?  He's trying to get up.  I obviously don't
15 want him to get up.  I used a compliance technique.  It's an
16 open-heel palm strike to the available target, which at that
17 time was his head.  I was able to strike him at least once in
18 the side of the face, side of the head area.
19 Q    And is that a technique that you're trained in?
20 A    Yes.
21 Q    And where did you receive that training?
22 A    I trained at the Massachusetts Criminal Justice Training
23 Council.  We also get a class once a year, a four-hour block of
24 use of force defensive tactics.
25 Q    Now, just taking a step back, prior to you using your OC

**PAGE 17**

**17**

1  spray on the defendant, can you describe the stance that you saw
2  him take?
3  A    Initially, he was backing up.  He stopped.  He positioned
4  himself so that he could have his balance and that's when he
5  said I couldn't touch him.
6  Q    And when you say he positioned himself so that he could
7  have his balance, could you describe what you observed him do
8  physically?
9  A    Prepare himself for a fight.
10 Q    And when you say that, what do you mean?
11 A    He steadies himself, puts himself in an advantageous
12 position.  His hands are up.  His feet are, you know, in a
13 position that provides him with balance.
14 Q    When you say his hands were up, were you able to see what
15 his hands were doing?
16 A    Striking my forearm.
17 Q    And prior to that when he's in that fighting position that
18 you described, how are his hands?
19 A    His fists were clenched and they were in front of him.
20 Q    All right.  Now, returning to the point where you have the
21 defendant down on the ground, can you describe the struggle at
22 that point?
23 A    We're down on the ground.  I'm giving commands to put his
24 hands behind his back.  He wouldn't.  That's when I struck him.
25 I was on top of him trying to grab one of his arms and that's

Commonwealth vs. Dustin Erwin

SHEET 6   PAGE 18

**18**

1  when the Sergeant from the State Police and K-9 Officer Darvin
2  Anderson arrived.  He did deploy his K-9 to assist me to
3  restrain and gain compliance.
4  Q    Okay.  Now, when you were asking for the defendant's arms
5  to go behind his back, what was the defendant doing with his
6  arms?
7  A    One arm he was trying to get up and the other arm he was
8  trying to push me off him.
9  Q    And was the trooper assisting you at that point?
10 A    Yes.  At some point, yes.
11 Q    And as yourself and the trooper were trying to get the
12 defendant to comply with your orders, can you describe his
13 compliance?
14 A    There was no compliance.  It was noncompliant, very defiant
15 assaultive towards us.
16 Q    And you indicated that Officer Darvin Anderson arrived as
17 well?
18 A    Yes.
19 Q    You indicated he's a K-9 officer?
20 A    Yes.
21 Q    And during your struggle were you able to see what he
22 actually did with the K-9?
23 A    No.
24 Q    At some point were you able to get the defendant's hands
25 behind his back?

**PAGE 19**

**19**

1  A    Yes.
2  Q    Can you describe that?
3  A    He was placed in handcuffs.  He was put in a cruiser.  He
4  was transported back to the station where he was given the
5  opportunity to rinse his eyes with water.
6  Q    Now, during the time on the scene when the defendant was
7  interacting with his friends, can you describe that interaction?
8  A    Initially, it was argumentative and then it became
9  physical.  They were trying to physically remove him from the
10 property and he was pushing them away.
11 Q    Now, during your interaction with the defendant were you
12 able to form an opinion as to his sobriety?
13 A    Yes.
14 Q    And you could you describe that?
15 A    He was unsteady on his feet, very loud, obnoxious behavior,
16 defiant.  He wasn't making any sense, yelling and swearing.
17 Q    And did that lead you, did those observations lead you to
18 any conclusions about the defendant's sobriety?
19 A    It was my opinion at the time that he was under the
20 influence of alcohol.
21 Q    Now, you indicated that you interacted with at least some
22 of the people you're describing as the defendant's friends;
23 correct?
24 A    Yes.
25 Q    And in your interactions with them were you able to

**PAGE 20**

**20**

1  determine their level of sobriety?
2  A    To some point, yes.
3  Q    And could you describe that?
4  A    They appeared to be sober.
5  Q    Now, after you were able to finally secure the defendant in
6  handcuffs were you able to look around the scene and observe
7  whether there were any individuals in the area?
8  A    Yes.
9  Q    And could you describe that?
10 A    There was a few individuals, who I learned were friends
11 with the defendant.  There were other individuals; passerby's
12 who had stopped just to watch what was going on.
13 Q    And, approximately, what time was it that you were able to
14 place the defendant into custody?
15 A    Approximately, one a.m.
16 ·   MR. CULLINAN:  If I could have a moment, your Honor?
17     THE COURT:  Certainly.
18 BY MR. CULLINAN:
19 Q    Now, the area of the Foxy Lady, could you describe the
20 parking lot that surrounds it?
21 A    It's a large parking lot.  It's well lit.  There's a
22 Walgreenâ€™s that shares a parking lot.  There's also a Bickford's
23 in the parking lot.  There's a row of stores in the far side of
24 the parking lot.
25 Q    Okay.  And the property belonging to the Foxy Lady that

**PAGE 21**

**21**

1  extends beyond the building itself to some of that parking lot?
2  A    Yes.
3  Q    And the area where you were initially interacting with the
4  defendant can you describe whether that was on the Foxy Lady
5  strip club property or not?
6  A    It was; yes.
7     MR. CULLINAN:  Thank you.  I have nothing further at this
8  time.
9     THE COURT:  Thank you.
10    Mr. Madden?
11    MR. MADDEN:  Thank you.
12        CROSS-EXAMINATION
13 BY MR. MADDEN:
14 Q    Sir, you said you work from the parking lot into the foyer
15 area; right?
16 A    Yes.
17 Q    The common walkway area?
18 A    Yes.
19 Q    And that's inside that set of doors that you see in that
20 picture it's inside the two sets of doors; right?
21 A    Yes.
22 Q    And inside that that's sort of like the entrance to the
23 Foxy Lady; correct?
24 A    Correct.
25 Q    And then from there you go into the Foxy Lady through a set

Commonwealth vs. Dustin Erwin

SHEET 7   PAGE 22

**22**

1  of doors that's open. They're open because you go right in and
2  that's where you pay your admission; correct?
3  A  Correct.
4  Q  So and you don't go into the Foxy Lady; right?
5  A  Correct.
6  Q  You're basically, you're charged with the exterior but you
7  would go in if there was a disturbance inside; right?
8  A  Yes.
9  Q  Just to clarify, do you recognize that picture?
10 A  This is the handicap accessible entrance to the Foxy Lady.
11 Q  Is that a fair and accurate depiction of the way it was on
12 the night of August 10th, 2008?
13 A  Yes.
14 Q  And those are the doors that Mr. Erwin left by?
15 A  Yes.
16 Q  Those are the doors that you left by?
17 A  Yes.
18    MR. MADDEN:  May I have that marked, please?
19    THE COURT:  Exhibit 2.
20    THE CLERK:  Exhibit 2.
21    MR. CULLINAN:  No objection, your Honor.
22    THE CLERK:  Thank you, sir.
23 (The clerk marks the photograph as Exhibit Number 2.)
24 BY MR. MADDEN:
25 Q  And as you leave those doors to go down that ramp you said

PAGE 23

**23**

1  that you got out into a parking lot; right?
2  A  Yes.
3  Q  I'm showing you another picture and asking you if you
4  recognize that picture?
5  A  Yes.
6  Q  What do you recognize that to be?
7  A  This is the parking lot that both the Foxy Lady and
8  Walgreen's share.
9  Q  Now, is that the parking lot that you go into from that
10 sort of down ramp?
11 A  Not exactly. There is a -- I think I saw in one of the
12 other pictures, but this is part of the overall parking lot.
13 Q  Is that where the incident finally ended up?
14 A  No.
15 Q  Where did it end up?
16 A  It ended up -- The end result; him being secured?
17 Q  Yeah. Where you cuffed him?
18 A  Around the corner.
19 Q  Okay. Around the corner so it went through that parking
20 lot and went around the front.
21 A  It went through this parking lot and then on the other side
22 of Walgreen's.
23    MR. MADDEN:  May I have that marked please?
24    THE CLERK:  Exhibit Number 3.
25    THE COURT:  Any objection?

PAGE 24

**24**

1    MR. CULLINAN:  None, your Honor.
2    THE COURT:  Exhibit 3.
3  (The clerk marks the photograph as Exhibit Number 3.)
4  BY MR. MADDEN:
5  Q  I'm going to show you two other pictures and ask if you
6  recognize those pictures?
7  A  This appears to be a surveillance camera attached to the
8  overhang at the Foxy Lady.
9  Q  That surveillance camera is above that ramp where Mr. Erwin
10 exited; correct?
11 A  Yes.
12 Q  And that's two pictures of essentially one shows you the
13 awning and the other one shows you a close-up of a surveillance
14 camera?
15 A  Yes.
16 Q  Is that a fair and accurate depiction of the way it was
17 that evening?
18 A  Yes.
19    MR. MADDEN:  Thank you. May I have that marked, please?
20    THE CLERK:  As four and five?
21    MR. MADDEN:  Four and five.
22    THE COURT:  Any objection?
23    MR. CULLINAN:  No.
24    THE COURT:  Exhibits 4 and 5.
25  (The clerk marks the photographs as Exhibit Number 4 and 5.)

PAGE 25

**25**

1  BY MR. MADDEN:
2  Q  Now, you said you have been on detail four or five years
3  prior to this for the four or five years prior to this you've
4  been doing details at the Foxy Lady?
5  A  Yes.
6  Q  And they pay you to do that each time?
7  A  Yes.
8  Q  And the Foxy Lady serves liquor there; right?
9  A  Yes.
10 Q  And they have dancing women?
11 A  Yes.
12 Q  Many bachelor parties?
13 A  Yes.
14 Q  And there are many just general parties of guys just going
15 in and partying throughout the night; right?
16 A  Guys and girls; yes.
17 Q  Guys and girls. And what are the hours of operation?
18 A  I'm not sure what time they open, but they close at two
19 o'clock in the morning.
20 Q  And do they have a detail officer for the whole time
21 they're open or do they just usually put one on later on in the
22 evening?
23 A  For the most part it's from 10 o'clock at night until 2:30
24 in the morning.
25 Q  And that's when you've always done it; right?

Commonwealth vs. Dustin Erwin

SHEET 8   PAGE 26

**26**

```
1  A   Yes.
2  Q   And they do that because that's the time when there's going
3  to be problems; right?
4  A   Not necessarily problems, but they want to deter any
5  problems.
6  Q   And that's the time when people have been drinking for a
7  while; right?
8  A   Yes.
9  Q   And by one o'clock in the morning that's the time when
10 people have been drinking a lot; correct?
11 A   It's possible; yes.
12 Q   And there's been fights inside the Foxy Lady; haven't
13 there?
14 A   There has been.
15 Q   And you've had to break up fights inside the Foxy Lady;
16 right?
17 A   Yes.
18 Q   There's been fights in the parking lot outside the Foxy
19 Lady; right?
20 A   Yes.
21 Q   And people have been thrown out of the Foxy Lady; right?
22 A   Yes.
23 Q   And people have resisted being thrown out of the Foxy Lady;
24 right?
25 A   I'm not sure what your question is.
```

**PAGE 27**

**27**

```
1  Q   Well, when the management asks you to leave and you say no,
2  I haven't done anything wrong, you know, and the management had
3  to ask you to escort them out?
4  A   Yes.
5  Q   And in four to five years of doing a detail from ten to
6  two-thirty, you're telling us you only made one arrest at the
7  Foxy Lady prior to this incident?
8  A   I didn't say one arrest.
9  Q   What did you say on direct?
10 A   I believe I said two to maybe three.
11 Q   Two to three in four to five years. Now, you stated that
12 you first were drawn to Mr. Erwin's -- your attention was first
13 drawn to Mr. Erwin when he slammed the door?
14 A   Yes.
15 Q   Now, that was the outside door; correct?
16 A   No. That was the internal door going into that front
17 foyer.
18 Q   The one that's open at all times?
19 A   I don't know what you're talking about.
20 Q   Well, you said -- I asked you. I said are the internal
21 doors left open because people go in there and pay their
22 admission fee?
23 A   No, both doors are shut.
24 Q   Okay. So how did he slam it?
25 A   It's a double-set of door similar to those, all glass. I
```

**PAGE 28**

**28**

```
1  guess he just pushed them extremely hard and they slammed open.
2  Q   Now, he didn't break anything; right?
3  A   No.
4  Q   Okay. And he had friends with him at that time; correct?
5  A   Immediately after he went through, yes.
6  Q   Okay. And there were people also entering the building at
7  that time; correct?
8  A   Yes.
9  Q   So there's a lot of interaction in that hallway at that
10 time of night; right?
11 A   Yes.
12 Q   As there always is?
13 A   Yes.
14 Q   And that's right outside where you pay to get into the Foxy
15 Lady?
16 A   Correct.
17 Q   And once your attention was drawn to him, he was leaving;
18 right?
19 A   Yes.
20 Q   And he continued to leave and he left; didn't he?
21 A   No.
22 Q   Where did he go?
23 A   He went to the handicap ramp that I had mentioned earlier.
24 Q   Well, he left. He went outside the building?
25 A   He went outside the building; yes.
```

**PAGE 29**

**29**

```
1  Q   And you stated on direct that you waited inside the
2  building; right?
3  A   Yes.
4  Q   Now, you wrote a report in this case; didn't you?
5  A   Yes.
6  Q   And you wrote it shortly thereafter after the incident;
7  right?
8  A   Yes.
9  Q   As a matter of fact you wrote it at 2:47 in the morning,
10 that's about an hour and a half or two hours later; correct?
11 A   Yes.
12 Q   And you're taught to write in those reports, you're taught
13 to write in those when you go to Massachusetts State Academy,
14 right, State Police Academy?
15 A   It's similar to the State Academy but it's run by the
16 Criminal Justice Training Council at the time.
17 Q   And they teach you to write a report when you first attend
18 and you're learning how to become a police officer; right?
19 A   Yes.
20 Q   And they teach you to include all the details that are
21 relevant to making your arrest in that report; right?
22 A   Yes.
23 Q   And they teach you to make it true and accurate; correct?
24 A   Yes.
25 Q   And these reports are often reviewed or are always reviewed
```

Commonwealth vs. Dustin Erwin

SHEET 9   PAGE 30

**30**

1  by superior officers; correct?
2  A  Yes.
3  Q  And they're put on file in case there's other officers that
4  need to follow-up an investigation; correct?
5  A  Yes.
6  Q  And they don't have you to contact so they need to read the
7  report to get the information; correct?
8  A  Correct.
9  Q  Now, in writing that report two hours afterwards -- Do you
10  have a copy?
11  A  I do.
12  MR. CULLINAN:  Objection, your Honor.  Ask to approach.
13  THE COURT:  Sure.
14  (Inaudible discussion at the sidebar.)
15  BY MR. MADDEN:
16  Q  Do you remember writing that report that in that report you
17  wrote —that as Mr. Erwin was leaving the club, he slammed the
18  front glass door causing a loud bang.  I followed the defendant
19  outside to observe his condition.—  Do you remember writing
20  that?
21  A  Yes.
22  Q  You went outside.  You didn't wait inside.  You followed
23  him outside the building?
24  A  I followed him outside the doors from the reception area to
25  the hallway.

**PAGE 31**

**31**

1  Q  And you watched him go?
2  A  Yes.
3  Q  Okay.  And he did go.  He left; right?  He left the
4  building?
5  A  He left the building; yes.
6  Q  He left the building with his friends; correct?
7  A  Yes.
8  Q  And they were walking down the ramp?
9  A  No.
10  Q  Well, they didn't stand right outside the door?
11  A  They did.
12  Q  They did.  And they stood there for a period of time?
13  A  Just a couple of minutes.
14  Q  Okay.  And at some point in time you allege that he noticed
15  you and then he swore at you and gave you the finger; right?
16  A  Yes.
17  Q  And you understood that when he said that; right?
18  A  Yes.
19  Q  He wasn't, as you testified, he wasn't saying things that
20  wasn't making -- the same things that weren't making sense,
21  right, you understand that; right?
22  A  I did understand that; yes.
23  Q  Then when he said later on you can't arrest me, you
24  understood that as well; right?
25  A  I did.

**PAGE 32**

**32**

1  Q  And so the things that he was saying you could understand
2  them and they made sense; didn't they?
3  A  Some of what he was saying; yes.
4  Q  Okay.  And as his friends eventually got him down the
5  bottom of the ramp and into the parking lot; correct?
6  A  Yes.
7  Q  And you followed him down the ramp and into the parking
8  lot?
9  A  Yes.
10  Q  And you continued to follow him; right?
11  A  Into the parking lot; yes.
12  Q  As they left the building and the establishment?
13  A  Yes.
14  Q  As they were walking away, you continued to follow them?
15  A  Yes.
16  Q  And you said as he's walking away he's turned around and
17  he's backwards, he's walking backwards, right, facing you?
18  A  Yes.
19  Q  He's asking you what are you following us for; right?
20  A  I don't remember that; no.
21  Q  You don't remember that but you remember him walking
22  backwards; right?
23  A  Yes.
24  Q  So he wasn't so unsteady on his feet that he couldn't walk
25  backwards through a parking lot as he's talking to you; right?

**PAGE 33**

**33**

1  A  That's a matter of opinion.
2  Q  Okay.  The defendant didn't fall down at that time; did he?
3  A  No.
4  Q  Now, at some point in time you decided to go up and grab
5  him; right?
6  A  Yes.
7  Q  So after he left the building; he left the ramp.  He left
8  and he was walking out in the parking lot; right?
9  A  He was standing in the parking lot with his friends; yes.
10  Q  Okay.  And you grabbed him by the shirt; right?
11  A  I attempted to grab him by the shirt.
12  Q  I thought you said -- Okay.  And you did grab him; didn't
13  you?
14  A  I grabbed his shirt; yes.
15  Q  Okay.  And he turned and twisted and got away from you;
16  right?
17  A  Yes.
18  Q  And moved away from you?
19  A  Yes.
20  Q  Okay.  And he continued to move away from you?
21  A  Not on his own will.
22  Q  You're saying that he was being pushed or pulled away by
23  his friends?
24  A  Yes.
25  Q  Okay.  And you stayed there and continued to watch him;

Commonwealth vs. Dustin Erwin

34

1  right?

2  A  Yes.

3  Q  And you stayed there and continued to follow them as they
4  were leaving and exiting the area; right?

5  A  Yes.

6  Q  And it didn't have a no trespassing, he wasn't asked to
7  exit or leave Walgreen's; right?

8  A  No.

9  Q  So once he got to Walgreen's he was good.  He left; right?

10 A  No.

11 Q  No?  He was not trespassing on Walgreen's territory; was
12 he?

13 A  No, but he was still creating a dangerous situation,
14 disorderly.

15 Q  Because he was swearing at you?

16 A  Because he was physically fighting with his own friends.

17 Q  That's what you say?

18 A  That's what happened.

19 Q  Now, all this happened started to happen outside that
20 awning; right?

21 A  Yes.

22 Q  That awning where they have the surveillance camera; right?

23 A  Yes.

24 Q  And you don't have a tape of this incident; do you?

25 A  No.

35

1  Q  And you didn't bring -- And you didn't ask for the Foxy
2  Lady to get you a tape of this incident; did you?

3  A  No.

4  MR. CULLINAN:  Objection.

5  THE COURT:  Sustained.

6  MR. CULLINAN:  Move to strike, your Honor.

7  THE COURT:  Sustained.  The objection is sustained.

8  BY MR. MADDEN:

9  Q  You didn't bring it with you today any sort of surveillance
10 tape of this incident; right?

11 A  No.

12 MR. CULLINAN:  Objection, your Honor.

13 THE COURT:  The answer stands.

14 BY MR. MADDEN:

15 Q  Now, you said on direct that you did training at least once
16 a year on self-defense and combat; is that right?  What was the
17 training?

18 A  Use of force and defensive tactics; yes.

19 Q  Where they teach you how to bring down people that are
20 bigger than you; right?

21 A  Yes.

22 Q  And they teach you what types of forceful actions you can
23 take to bring down a guy that's larger than you; right?

24 A  They don't necessarily teach us.  They explain what tools
25 that we have that we're supposed to use.

36

1  Q  And you actually do physical combat training too; right?

2  A  No.

3  Q  No, but you know -- you know what you should do in order to
4  bring somebody under control that's larger than you; right?

5  A  Yes.

6  Q  So the fact that he's larger than you even though he's
7  bigger than you doesn't make a difference.  That's something
8  you're trained to handle; correct?

9  A  Yes.

10 Q  And when you walked up to him the second time, you
11 attempted to grab his wrist; right?

12 A  I attempted to grab his wrist; yes.

13 Q  And that's when he knocked your arm away?

14 A  Yes.

15 Q  After you reached out to grab him; correct?

16 A  Yes.

17 Q  Okay.  At that point he's in the Walgreen's parking lot?

18 A  Yes.

19 Q  At that point he had left the territory of the Foxy Lady?

20 A  Yes.

21 Q  Okay.  And at that point in time when he knocked your arm
22 away, you took your mace and you maced him in the face; right?

23 A  Yes.

24 Q  As a result of that mace, mace essentially forms a cloud,
25 right, when you spray it it's not like a direct, it does form a

37

1  cloud; right?

2  A  Yes.

3  Q  So to move away from it that would be something that would
4  be a natural reaction, just move back away from it; correct?

5  A  Yes.

6  Q  Okay.  And that's what he did; correct?

7  A  He did take off in a full sprint; yes.

8  Q  Now, at that time his friends were on either side of him;
9  weren't they?

10 A  I don't specifically remember where his friends were when
11 that happened.

12 Q  When you maced him, there were friends standing right next
13 to him on either side of him; weren't there?

14 A  Again, I don't remember exactly where they were standing.

15 Q  Would you be surprised that the mace hit two of his other
16 friends as well?

17 A  No.  I wouldn't be surprised; no.

18 Q  So they were close enough that when you maced him the mace
19 got the people around him?

20 A  No.  That's not what I said.  I said I wouldn't be
21 surprised.  The effects of the mace it lingers around for a
22 couple of seconds after it's dispersed.

23 Q  Now, he never physically went at you with a punch; right?

24 A  Correct.

25 Q  His actions were defensive in nature.  If you went to reach

Commonwealth vs. Dustin Erwin

SHEET 11   PAGE 38

**38**

1  him, he just pushed you away with his arm?
2     MR. CULLINAN: Objection, your Honor.
3     THE COURT: Overruled. You can answer.
4  BY MR. MADDEN:
5  A   That, again, it's a matter of opinion. I give him a
6  command that he's under arrest. I turn around. I attempt to
7  secure his wrist and my hand is struck. It's not my opinion
8  that that's defensive. I take that as assaultive towards me.
9  Q   And how many friends at that point in time were around the
10 defendant?
11 A   Again, I wasn't paying attention to his friends. I was
12 just concentrating on the individual.
13 Q   Okay. And as he moved away other police officers were
14 arriving; right?
15 A   The other police officers didn't arrive until the pursuit.
16 Q   And you said that he ran 50 to 60 feet?
17 A   Yes.
18 Q   Now, and when he ran 50 to 60 feet according to you, there
19 was another car there, right, the State Police?
20 A   A trooper did arrive; yes.
21 Q   And you didn't see that trooper hit Mr. Erwin in the front
22 shin?
23 A   No.
24 Q   You didn't see him run him over?
25 A   No.

**39**

1  Q   You didn't see him get hit and knocked to the ground by
2  that car?
3  A   No.
4  Q   And that's when you got on top of him; right?
5  A   No.
6  Q   That's when you were able to get on top of him when he was
7  knocked over by that car; correct?
8  A   No, it's not correct.
9  Q   And you say that car that happened -- Going to Exhibit 3 I
10 believe, you say that happened sometime around the corner of
11 that Walgreenâ€™s?
12 A   Yes.
13 Q   So all the way down to the front; there's a street there?
14 A   Yes.
15 Q   What street is that?
16 A   That's Oak Street.
17 Q   Okay. But it was in the parking lot of Walgreenâ€™s?
18 A   Yes.
19 Q   Do you know where the police car came from?
20 A   I don't.
21 Q   You didn't see it come into the parking lot?
22 A   I saw it in front of me as I was pursuing him, but I don't
23 know where he came from. I don't know if he came from
24 Walgreenâ€™s, the Foxy Lady or from Oak Street.
25 Q   Was it moving towards you?

PAGE 40

**40**

1  A   It was ahead of me on my left side.
2  Q   Which way was it moving?
3  A   Easterly.
4  Q   Okay. Was it moving in a direction towards you and Mr.
5  Erwin or was it moving sort of (inaudible).
6  A   Parallel, paralleling us.
7  Q   And where was Officer Anderson at that point in time?
8  A   I don't know.
9  Q   Was he in a separate cruiser?
10 A   Yes.
11 Q   Were there other officers with him?
12 A   No.
13 Q   And you didn't see his car?
14 A   No.
15 Q   Was the State Police cruiser a marked cruiser?
16 A   I believe so; yes.
17 Q   Was Officer Anderson in a marked Brockton Police cruiser?
18 A   Yes.
19 Q   And at some point in time he arrived as well; right?
20 A   Yes.
21 Q   And this is after your (inaudible) with Mr. Erwin; correct?
22 A   Yes.
23 Q   And then there's a State Police Trooper there?
24 A   Yes.
25 Q   And Officer Anderson arrives and at what point in time did

PAGE 41

**41**

1  you give him the open-faced palm to the back of his head?
2  A   To the side, side face, head area; yes.
3  Q   Yeah. At what point in time did you do that?
4  A   While we were wrestling on the ground.
5  Q   And you said it was with an open palm?
6  A   Palm, heel; yes.
7  Q   Okay. And did it force his face into the ground?
8  A   No.
9  Q   So it should not have left a mark; right?
10 A   It may have left a mark; yes.
11 Q   Because you hit him with your palm; right?
12 A   Right.
13 Q   You didn't hit him with your knuckles?
14 A   Correct.
15 Q   So there should not have been -- There wouldn't have been a
16 swollen bruising mark there; is that the training you received?
17    MR. CULLINAN: Objection.
18    THE COURT: Sustained.
19 BY MR. MADDEN:
20 Q   How is it -- What is the effect of that open-palm hit?
21    MR. CULLINAN: Objection.
22    THE COURT: Sustained in that form.
23 BY MR. MADDEN:
24 Q   In your training and experience as you're trained what is
25 --

Commonwealth vs. Dustin Erwin

SHEET 12   PAGE 42

**42**

1  A   The effect is to shock the --
2      MR. CULLINAN: Objection, your Honor.
3      THE COURT: The objection's overruled. You may answer.
4  BY MR. MADDEN:
5  A   The effect is to shock the individual to comply. And in
6  this case it didn't immediately work.
7  Q   It's not to harm him?
8  A   No.
9  Q   So if Mr. Erwin was left with bruising and swelling in his
10 face as a result of that open-faced palm then it was
11 administered incorrectly?
12     MR. CULLINAN: Objection.
13     THE COURT: Overruled.
14 BY MR. MADDEN:
15 A   I can't answer that.
16 Q   And at what time did -- And Sergeant Higginbotham from the
17 State Police was there before Officer Anderson was there;
18 correct?
19 A   Yes.
20 Q   And where are all his friends at that point in time?
21 A   I wasn't paying attention to them at that time.
22 Q   Were they yelling? Did you hear any noise in the
23 background?
24 A   No.
25 Q   You didn't hear anybody say what the heck, why are you

**43**

1  running Mr. Erwin over; why you running Dustin over?
2  A   No.
3  Q   No. You didn't hear anything like that?
4  A   No.
5  Q   But there are at least two officers now on Mr. Erwin at
6  that time, you and Sergeant Higginbotham; right?
7  A   At some point Sergeant Higginbotham did get out of his car
8  and help me secure him.
9  Q   And it was after that that Officer Anderson unleashed his
10 dog to attack Mr. Erwin; correct?
11     MR. CULLINAN: Objection.
12     THE COURT: Sustained.
13 BY MR. MADDEN:
14 A   I don't know when he deployed the dog.
15     THE COURT: The question's sustained.
16 BY MR. MADDEN:
17 Q   At some point in time Officer Anderson's dog came over to
18 assist; correct?
19 A   Yes.
20 Q   And in assisting it bit and chewed on Mr. Erwin's leg;
21 correct?
22     MR. CULLINAN: Objection.
23     THE COURT: You may testify to what you observed.
24 BY MR. MADDEN:
25 A   I don't know. I'm not sure what the dog did.

PAGE 44

**44**

1  Q   Well, Mr. Erwin was already on the ground when he came over
2  to assist; right?
3  A   Yes.
4  Q   Mr. Erwin was already under control when he came over to
5  assist; right?
6  A   No.
7  Q   You didn't need any assistance taking Mr. Erwin down at
8  that point in time; correct?
9  A   I needed assistance securing him.
10 Q   And how exactly would a dog assist you in putting on
11 handcuffs?
12 A   Again, it's similar to the palm-heel strike where it gains,
13 it shocks him to gain his compliance.
14 Q   So having a dog chewing on his leg and biting into his leg
15 is going to help you put on handcuffs?
16     MR. CULLINAN: Objection.
17     THE COURT: Sustained.
18 BY MR. MADDEN:
19 Q   Now, you didn't need any medical treatment as a result of
20 Mr. Erwin striking your arm; correct?
21 A   No.
22 Q   You said Mr. Erwin resisted. I think you charged him with
23 resisting arrest; correct?
24 A   Yes.
25 Q   And that would be the striking and the battering of your

PAGE 45

**45**

1  arm as you attempted to put the cuffs on; right?
2  A   That would be one of the times; yes.
3  Q   And do you remember you writing that police report again on
4  page two, you were putting in sort of in shorthand that the five
5  charges that you charged him with; one would be trespass of real
6  property, another disorderly conduct, another disturbing the
7  peace and then the four would be resisting arrest. Do you
8  remember that section?
9  A   Yes.
10 Q   And in that section it says there's a designation of
11 weapon/forced used; right?
12 A   Yes.
13 Q   And by that you put "none"; correct?
14 A   No weapons used; yes.
15 Q   Weapon or force. It doesn't just say weapons. It says
16 weapon/force used. You put none in there; right?
17 A   I don't recall.
18 Q   I'll show you.
19     MR. CULLINAN: Your Honor, could we approach for a moment?
20     THE COURT: Sure.
21 (Inaudible discussion at the sidebar.)
22 BY MR. MADDEN:
23 Q   I'll show you your report page one and two and ask you if
24 you recognize that?
25 A   Yes, I do.

Commonwealth vs. Dustin Erwin

SHEET 13   PAGE 46

**46**

1   Q   Is that your signature on it?

2   A   Yes.

3   Q   Is that the report that you -- part of the report that you

4   filled out that day?

5   A   Yes.

6   Q   Now, do you see on page two where there's resisting arrest?

7   A   Yes.

8   Q   And it says weapon/force used?

9   A   Yes.

10   Q   You put in "none"; right -- right?

11   A   I guess I did; yes.

12   Q   Okay.  And then further down it says A&B on a Police

13   Officer; right?

14   A   Yes.

15   Q   And, again, it says weapon or force used.  And how did you

16   fill that one out?

17   A   None.

18   Q   Thank you.  Okay.  Now, just after, finally how many

19   officers where there when you finally had Mr. Erwin restrained

20   and in the cruiser?

21   A   There were two troopers, myself and Officer Anderson.

22   Q   Trooper meaning the State Police Officer?

23   A   Yes.

24   Q   And then there was Officer Ronald Schubert?

25   A   He arrived afterwards and transported.

PAGE 47

**47**

1   Q   Mr. Erwin?

2   A   Yes.

3   Q   So he was one of the troopers or by troopers you mean State

4   Troopers?

5   A   Yeah.  There were two State Troopers, Sergeant Higginbotham

6   and then another trooper and then myself, Anderson.  And at some

7   point Officer Schubert arrived to transport the defendant back

8   to the station.

9   Q   Now, did you have any interaction with any of the other

10   people, Mr. Erwin's friends, during the placing of Mr. Erwin in

11   the police cruiser or thereafter?

12   A   Yes.

13   Q   And do you remember telling Mr. Erwin's friends if you guys

14   see -- if any of you had seen anything here, I'm going to arrest

15   you too?

16       MR. CULLINAN:  Objection.

17       THE COURT:  Overruled.  You may answer.

18   BY MR. MADDEN:

19   A   No.

20   Q   Do you remember macing one of his friends?

21   A   No.

22   Q   Afterwards saying if you saw anything I'm going to arrest

23   you as well?

24   A   No.

25   Q   Do you remember putting another one of his friends in

PAGE 48

**48**

1   handcuffs and putting him in one of the cruisers?

2   A   No.

3   Q   Do you remember one of his friends being placed in

4   handcuffs and placed in the cruiser or a trooper's car or one of

5   the cars?

6   A   There was an individual that was in a trooper's car.  I

7   told the trooper that he was cooperative and I removed him from

8   the car.  The trooper took the handcuffs off and let him go.

9   Q   So you're not the one who maced him; right?

10   A   No.  I didn't mace him.

11   Q   And you didn't say to any of those individuals present

12   other than Mr. Erwin if anyone saw anything here, I'm going to

13   arrest you?

14       MR. CULLINAN:  Objection, your Honor.

15       THE COURT:  Overruled.

16       MR. CULLINAN:  Asked and answered.

17       THE COURT:  Overruled.

18   BY MR. MADDEN:

19   A   No.

20       MR. MADDEN:  Nothing further.

21       THE COURT:  Thank you.  Any redirect?

22       MR. CULLINAN:  Yes, your Honor

23                  REDIRECT EXAMINATION

24   BY MR. CULLINAN:

25   Q   Detective, during cross-examination you made statements

PAGE 49

**49**

1   about gaining the compliance of the defendant; do you recall

2   that?

3   A   Yes.

4   Q   And can you describe whether after you just made verbal

5   commands towards the defendant to get off the property or to

6   stop whether he comply with the verbal commands alone?

7   A   No, he did not.

8   Q   Could you describe whether after you placed your hands on

9   the defendant to place him under arrest whether the defendant

10   complied at that time?

11   A   On two occasions, he did not.

12   Q   Once the defendant began to run away from you, could you

13   describe the speed at which he was moving away?

14   A   He took off.  He was running at what appeared to be a full

15   sprint.  I was not quite at a full sprint at that time.  It

16   wasn't until that I saw him start to slow down that I started to

17   gain on him that I picked up speed in an attempt to secure him

18   and take him down on the ground.

19   Q   Fair to say it was more than a couple of steps needed to

20   move away from the OC spray left?

21   A   Absolutely, yes.

22   Q   Now, once you were able to catch up with the defendant,

23   were you still yelling at him?

24   A   To get on the ground; yes.

25   Q   Okay.  And did the defendant comply when you're yelling at

Commonwealth vs. Dustin Erwin

SHEET 14  PAGE 50

50
1  him?
2  A    No.
3  Q    And at some point you were able to grab the defendant
4  again?
5  A    Yes.
6  Q    And can you describe what the defendant did at that point?
7  A    While on the ground?
8  Q    Before getting down on the ground?
9  A    Before I maced him?
10 Q    No, just taking a step back.  When you were running after
11 him and caught up with him, you put your hands on him; correct?
12 A    Yes.
13 Q    Okay.  Where did the defendant go from there?
14 A    To the ground.
15 Q    Okay.  So at that point when you got him down to the ground
16 can you describe the defendant's compliance?
17 A    He was still not complying.  He was trying to get up and he
18 was trying to push me off him.
19 Q    And at some point another officer became involved; correct?
20 A    Yes.
21 Q    And who was the first person to assist you?
22 A    Sergeant Higginbotham.
23 Q    Okay.  So while you're having the assistance of Sergeant
24 Higginbotham, are you still saying anything to the defendant?
25 A    Just trying to get his hands behind his back to place him

PAGE 51

51
1  in handcuffs.
2  Q    Okay.  So now that there are two law enforcement personnel
3  on scene trying to get his hands behind his back, could you
4  describe the defendant's level of compliance at that time?
5  A    He was still uncooperative, actively resisting.
6  Q    Now, at some point based on your training and experience
7  you determine that you needed to shock the defendant into
8  compliance; is that correct?
9  A    I did that before Sergeant Higginbotham got involved.
10 Q    Okay.  And can you just describe that process?
11 A    Just with an open heel, just with the palm of my hand, I
12 just wanted to hit an available target to shock and to gain
13 compliance.  And at the time the only available target based on
14 our positioning, I'm on top of him and he's trying to push me
15 away, he's trying to get up, was the side of his head and his
16 face area.
17 Q    Okay.  And when you struck the side of the defendant's head
18 did he become compliant at that point?
19 A    No.
20 Q    And then Sergeant Higginbotham became involved; correct?
21 A    Yes.
22 Q    And he still remained noncompliant?
23 A    Yes.
24 Q    And at some point you indicated Officer Anderson came onto
25 the scene; correct?

PAGE 52

52
1  A    Yes.
2  Q    And could you hear the dog?
3  A    No.
4  Q    And at some point did you realize that the dog was present
5  or Officer Anderson was present?
6  A    Yes.
7  Q    And how did you realize that?
8  A    At some point Officer Anderson came into my line of vision
9  off to my right side.  I was still on top of the defendant.
10 Q    Fair to say you were focused on the defendant?  You're in a
11 struggle at that time?
12 A    Yes.
13 Q    And you indicated that a dog may be used as another shock
14 to gain compliance technique; is that correct?
15 A    Yes.
16 Q    And Officer Anderson deployed his dog in such a manner?
17 A    Yes.
18 Q    Okay.  And at that point did the defendant finally become
19 compliant?
20 A    It was a combination of the dog and two other police
21 officers; yes.
22 Q    So did that take a period of time even once the dog was
23 engaged?
24 A    No.  I don't believe so.
25 Q    And it's only at that point after all those steps you took

PAGE 53

53
1  that you were able to secure the defendant?
2  A    Yes.
3  Q    And when you say secure the defendant, what were you trying
4  to do that whole time?
5  A    Place him in handcuffs.
6  Q    And once you placed him in handcuffs where did you bring
7  him?
8  A    We stood him up.  Officer Schubert arrived.  We put him in
9  the backseat of the cruiser and he was brought to the police
10 station.
11 Q    And you said at that point you recognized that someone else
12 on scene had put one of the defendant's friends into custody?
13 A    Yes.
14 Q    And what did you do as a result?
15 A    I told the trooper that his friends were being cooperative.
16 They were trying to assist me.  I removed him from the car.  I
17 asked the trooper not to arrest him.  He didn't.  He took him
18 out of the handcuffs and let him go.
19 Q    So not only did you not just arrest everyone on scene, you
20 actually had someone taken out of custody; is that correct?
21 A    Yes.
22 Q    And once back at the station, did you interact with the
23 defendant any further at that time?
24 A    No.
25    MR. CULLINAN:  Thank you.  I have nothing further.

Commonwealth vs. Dustin Erwin

54

1    THE COURT:  Any recross?
2    MR. MADDEN:  No.
3    THE COURT:  Thank you, sir.  You may step down.
4    THE CLERK:  Thank you, sir.
5  (Witness excused.)
6    MR. CULLINAN:  The Commonwealth would call Officer Darvin
7  Anderson?
8    THE COURT:  Okay.
9    THE CLERK:  Good afternoon, sir.
10   THE WITNESS:  Good afternoon.
11   THE CLERK:  Raise your right hand, please.
12           DARVIN ANDERSON, Sworn
13   THE WITNESS:  Yes, I do.
14   THE CLERK:  Thank you.
15   THE COURT:  Good afternoon.
16   THE WITNESS:  Good afternoon, your Honor.
17   THE COURT:  You can stand or be seated whatever you wish.
18   THE WITNESS:  I'd like to stand.
19   THE COURT:  Go right ahead, Mr. Cullinan.
20   MR. CULLINAN:  Thank you.
21           DIRECT EXAMINATION
22  BY MR. CULLINAN
23  Q   Could you please state your name spelling your last name
24  for the record?
25  A   Yes, sir.  My name is Officer Darvin Anderson, A-n-d-e-r-s-

55

1  o-n.
2  Q   And could you describe how you're employed?
3  A   I'm employed with the Brockton Police Department, sir.
4  Q   In what capacity?
5  A   I'm a K-9 officer from the seven at night to three a.m.
6  shift.
7  Q   How long have you been employed by the City of Brockton as
8  an officer?
9  A   Twenty-two years, sir.
10  Q   And can you describe, approximately, how many of those
11  years has been as a K-9 officer?
12  A   The last nine years.
13  Q   And do you currently have one K-9 who's assigned to you?
14  A   Yes, sir.  I work a 10-year-old Czechoslovakia Shepherd
15  Gomo, G-o-m-o.
16  Q   And have you and your dog, Gomo, undergone any training?
17  A   Yes.
18  Q   And can you describe that for the Court?
19  A   We went through 16 weeks of basic obedience and tracking
20  through the Academy in Barnstable County and in addition to that
21  another 16 weeks in gun detection.
22  Q   And in addition to that training, do you do any ongoing
23  training?
24  A   Yes.  We officially train twice a month with the Barnstable
25  County Sheriff's Department and about 40 other police

56

1  departments.  In addition to that I do something at least three
2  or four times a week on my own with my dog.
3  Q   And when you say you do something three or four times a
4  week on your own, what do you mean?
5  A   It can be anything from a track, I'll run a track for him
6  or a simple gun detection or even playing with his retrieval
7  toys just to keep his interest in doing police work.
8  Q   And can you describe the skills which Gomo was trained in
9  for the jury?
10  A   Oh, he was trained in -- His ballistic skills, sir?
11  Q   Ballistics and anything else.
12  A   Okay.  General patrol, he's a generally trained patrol dog.
13  When we say general patrol most the time when you're watching
14  television and you see a dog tracking on a long line tracking
15  for lost children, tracking for suspects, tracking in buildings
16  when buildings are broken into, that's what we call a general
17  patrol dog.  My dog is also a dual-purpose dog.  He has another
18  trained specialty where he specializes in finding ballistic
19  evidence, guns, bullets, spent shell casings; that's his
20  secondary training.
21  Q   And in terms of the primary training is a K-9 ever used to
22  gain compliance of a suspect?
23  A   That's correct, sir.
24   THE COURT:  Any objection?
25   MR. MADDEN:  Objection.

57

1    THE COURT:  All right.  Overruled.  I'll allow it.
2  BY MR. CULLINAN:
3  Q   You can answer the question?
4  A   Yes, sir.  Yes.
5  Q   And can you describe his training in that area?
6  A   The training for a dog, a K-9 in apprehension.  We do a lot
7  of bite work and we do an awful lot of bite work especially when
8  the dog is young.  You people will sometimes look at our
9  training and think wow, they do a lot of biting, biting, biting
10  and they do.  That's to perfect it, perfect it.  When a dog
11  apprehends a suspect, our dogs don't rip and tear that cause
12  avulsion.  That's what a house dog does.  We call them fear
13  dogs.  A K-9 basically takes his four canines, apprehends the
14  suspect, and if the suspect complies, 99 percent of the time,
15  the suspect will have a little pinhole if that where the K-9
16  marks were.
17  Q   When the person doesn't comply, can you describe what it
18  would look like?
19  A   Well, you know what, it could look anywhere from still not
20  too bad or if you have a suspect that has a lot of fight in
21  them, what I like to say about these dogs, they're not robots.
22  You're not going to have my dog in this room and he wags his
23  tail.  You kick my dog in the face, it's going to be like you
24  kicking any man in the face.  He's going to react.  He's going
25  to fight for his life.  So if you want to put the fight into one

Commonwealth vs. Dustin Erwin

SHEET 16   PAGE 58

**58**

1  of these dogs, if you want to grab him by the throat, he's going
2  to stop. He's going to bite you here. You want to hit him
3  here; he's going to bite you here. I'd like to equate it as
4  they're like boxers. If you see a boxing match and the guy puts
5  his right hand down, the other boxer hits him in the left jaw.
6  If he puts it down again, he hits him in the left jaw. So
7  they'll take what you give them. You want to put your hand out
8  and say don't bite me, that's where you're going to get bit.
9  Q   Now, directing your attention to August 10, 2008, were you
10 on duty?
11 A   That's correct, sir.
12 Q   And what shift were you working?
13 A   Seven at night till three a.m.
14 Q   And what area of Brockton were you in?
15 A   I cover the whole area of Brockton. Having my specialty in
16 being a K-9 unit I'm not assigned to their specific broken
17 window calls. All my calls are pretty much violent in nature.
18 Obviously, the shootings, the homicides, the buildings broken
19 into. We handle pretty much all those calls.
20 Q   And is Gomo still actively working?
21 A   Yes. He is, sir.
22 Q   To this day?
23 A   Yes.
24 Q   Now, prior to August 10, 2008, did you know Detective
25 Christopher McDermott?

PAGE 59

**59**

1  A   Yes, sir.
2  Q   And had you had the opportunity to work with him prior to
3  that?
4  A   Yes. Detective McDermott is one of the younger officers
5  compared to me. I remember when he came on the job. I think I
6  had the pleasure of working with him on a few shifts, you know,
7  guiding him as older officers will tend to do.
8  Q   Now, directing your attention to shortly before and the
9  minutes after one a.m., did you hear a dispatch?
10 A   Yes.
11 Q   And whose voice did you hear?
12 A   It was Detective McDermott's.
13 Q   And what did he indicate?
14 A   I don't remember his exact words. I remember there was get
15 me some cruisers and I remember hearing him in some serious
16 distress.
17    MR. MADDEN: Objection.
18    THE COURT: Overruled. The objection's overruled. The
19 answer stands.
20 BY MR. CULLINAN:
21 Q   Now, you indicated that prior to that time you had worked
22 extensively with Detective McDermott; is that correct?
23 A   Yes.
24 Q   And can you describe your reaction when you heard his voice
25 calling for help with serious distress?

PAGE 60

**60**

1  A   I knew it was something serious because of the fact that I
2  know him to be an extremely --
3    MR. MADDEN: Objection, your Honor.
4    THE COURT: Sustained. This is sustained.
5  BY MR. CULLINAN:
6  Q   What was your reaction when you heard Detective McDermott
7  in distress?
8  A   I needed to get there as soon as I could to help him.
9  Q   And at that point did you go towards the Foxy Lady?
10 A   Correct.
11 Q   And as you know what the Foxy Lady is?
12 A   Absolutely.
13 Q   Can you briefly describe that?
14 A   The Foxy Lady is known as, it has a few names. It's known
15 as a gentlemen's club, but it's a club that's a strip club.
16 It's a club that young ladies, beautiful young ladies dance
17 perform dances. It's frequented by professional athletes,
18 professional dancers, but it is truly a gentlemen's club where
19 they expect you to go there and respect Brockton and act like
20 true Brocktonians.
21 Q   And, approximately, how long did it take you to get to the
22 Foxy Lady?
23 A   I don't remember where I was, but it didn't take me long at
24 all.
25 Q   And could you describe your appearance that night?

PAGE 61

**61**

1  A   I wear what's called the BDU, that's a battle dress
2  uniform. It's more of a military-style uniform with the
3  parachute pants and the black and the high boots because of the
4  nature of my job and I also wear a baseball cap.
5  Q   And when you got into the area, where did you pull into?
6  A   I pulled right directly into the Foxy Lady, I believe right
7  off Oak Street. And I saw Detective McDermott in pursuit of a
8  suspect.
9  Q   Okay. And when you say you saw him in pursuit of a
10 suspect, what did you see him doing?
11 A   He was chasing a large male.
12 Q   Okay. And do you see that male in the courtroom today?
13 A   Yes.
14 Q   Could you please point to him and describe an article of
15 his clothing for the record?
16 A   The gentleman in the dark clothing and the red tie to my
17 right next to Attorney Madden.
18    MR. CULLINAN: I'd ask that the record reflect that the
19 witness identified the defendant?
20    THE COURT: Yes.
21 BY MR. CULLINAN:
22 Q   And at that time what did you do?
23 A   At that point I accelerated my vehicle. At some point I
24 saw Detective McDermott wrestling with the suspect. I
25 immediately exited my cruiser and activated my K-9 to assist me.

Commonwealth vs. Dustin Erwin

SHEET 17  PAGE 62

**62**

1   Q   Okay.  And how do you activate your K-9?
2   A   I open the door up, and like I said they're not robots, all
3   the training we do when they hear those sirens and they hear the
4   screeching of the car, they know it's time to work.
5   Q   And what did you direct your dog to do at that point?
6   A   I gave him the command to apprehend the suspect.
7   Q   Okay.  And what did your dog do?
8   A   He quickly grabbed the rear end of the suspect, who at that
9   time decided to comply, so at that point I released him
10  immediately off him.
11  Q   Okay.  And where was the defendant and Detective McDermott
12  as Gomo was moving towards him?
13  A   Rolling on the ground and my concern was obviously the
14  officer's gun side.  You know I think you forget we carry
15  firearms, and you don't roll on the ground with a police
16  officer.  A police officer has a firearm.  You don't roll on the
17  ground with him.  You have to protect his firearm and you have
18  to protect your backside and my backside is what's behind me.  I
19  can see what's behind me.  I need another police officer, my K-9
20  or a good citizen to tell me if I'm in danger from behind me.
21  Q   Okay.  So as Gomo approached you indicated that he grabbed
22  onto the defendant?
23  A   Yes.
24  Q   And how did he do that and in what area?
25  A   With his teeth.  The defendant's a large guy.  He grabbed

PAGE 63

**63**

1   his rear end toward the belt side.
2   Q   And, approximately, how long did that go on for?
3   A   A second or two.
4   Q   And then what did you do?
5   A   Released him off, took his leash and you know gave him the
6   commands to watch, the dog's on a watch to protect my backside,
7   anybody coming on my backside, he's going to alert.  And if
8   you're coming to my backside he's coming to bite you.
9   Q   And were there people in the area at that time?
10  A   Yes.
11  Q   And when you said you gave him a command to release, what
12  do you actually do?
13  A   I actually pull him right off.  Gomo's a very, very -- He's
14  an aggressive dog when it's time to be aggressive but he's very
15  good with commands and we've been working together for so long.
16  When I pull him and he knows I want him to release, he releases.
17  Q   Okay.  And at that time when you were having him release,
18  what's going on with the defendant on the ground?
19  A   The defendant's still fighting.  He's under control.
20  Detective McDermott is wrestling him.  There's another trooper
21  on hand and they pretty much have him under control.  But you
22  know I consider under control when you're under control and
23  you're compliant.  If you have a size 12 - 13 shoe kicking --
24      MR. MADDEN:  Objection.
25      THE COURT:  All right.  Sustained at this point.  Next

PAGE 64

**64**

1   question, please.
2       THE WITNESS:  I'm sorry.
3   BY MR. CULLINAN:
4   Q   At some point did they gain the compliance of the
5   defendant?
6   A   Yes, sir.
7   Q   And what did you do at that point?
8   A   I put my K-9 back in my cruiser at some point and tried to
9   get the rest of the crowd away, obviously, away from the
10  officers and maintain peace.
11  Q   And while this struggle was going on were you able to
12  observe what Detective McDermott looked like?
13  A   Yes.
14  Q   Can you describe his appearance?
15  A   Well, he was, you know, on the ground so his uniform was a
16  mess and he had been struggling with a very large individual.
17  Q   But he was in uniform at that time?
18  A   Yes, sir.
19  Q   And how about the trooper that you saw?
20  A   The trooper was in uniform also.
21  Q   Do you recall if they both had badges on?
22  A   Yes, they did.
23  Q   And did you see any cruisers in that area aside from your
24  own?
25  A   Myself and State Police and at some point other cruisers

PAGE 65

**65**

1   arrived.
2   Q   And were the lighting in use on those cruisers?
3   A   Yes.
4   Q   And did you have any further involvement once the defendant
5   was placed under arrest?
6   A   No.  As I said maintained, made sure all the other
7   civilians were away and the police officers were safe.
8       MR. CULLINAN:  Thank you.  I have nothing further.
9       THE COURT:  Cross-examination?
10                    CROSS-EXAMINATION
11  BY MR. MADDEN:
12  Q   You said your dog is a tracking dog, sort of a patrol dog?
13  A   Yes, sir.
14  Q   And in that respect it is deployed to find individuals that
15  are lost; right?
16  A   At times, yes.
17  Q   And also to chase individuals that are running from the
18  police; right?
19  A   To apprehend, yes.
20  Q   Somebody that's taken off in the woods after a car crash or
21  a car accident or a car chase or something, it will be deployed
22  to track them down; right?
23  A   We do deploy him in that manner; yes.
24  Q   And when they're deployed to do that, they're by themselves
25  to take down the individual; right?

Commonwealth vs. Dustin Erwin

SHEET 18   PAGE 66

**66**

1  A   At times, yes.
2  Q   And you know then followed by the police officers as they
3  come up; right?
4  A   Yes.
5  Q   And it's also trained to find ballistics; right?
6  A   That's correct.
7  Q   And is it trained to find drugs?
8  A   No.
9  Q   So it has those two specific talents?
10 A   Correct.
11 Q   And how often do you use it as a tracking dog?
12 A   You know I don't count, but you know often.  I mean my dog
13 has apprehended 60 suspects in his career, and I mean a week
14 doesn't go by when I'm not looking for someone.
15 Q   Okay.  And when it does, when you're tracking someone do
16 you give it a piece of the cloth or something to make it --
17 A   No.  Dogs generally track by foot disturbance, sir.  If you
18 were lost or if you were lost I would ask someone naturally
19 where did you see Attorney Madden, and someone would tell me I
20 last saw his footsteps by that microphone.  I would then put my
21 dog's leash under his shoulder because it helps keep their nose
22 down, and I would give him the command to track, and he would
23 follow your odor until he found you.
24 Q   Okay.  So it does by odor?
25 A   Yes.

**67**

1  Q   Okay.  And you work with him regularly to do this?
2  A   Yes.
3  Q   Okay.  And you also work with him and you go to training
4  regularly for ballistics?
5  A   Yes.
6  Q   Essentially the same thing.  It can smell gun power, gun
7  shells?
8  A   Gun power oils.  Yes, sir.
9  Q   Okay.  And on this day -- First of all, let's go back.  You
10 described the Foxy Lady as a gentleman's club; right?
11 A   Yes.
12 Q   This gentleman's club charges $15 to get into; right?
13 A   I never frequented it myself but I believe yes, sir.
14 Q   Okay.  And you don't have to wear a coat and tie to go
15 there, sir?
16 A   I do not believe there's a dress code.
17 Q   Jeans, T-shirt, anything you want to wear?
18 A   I wouldn't say anything.  I don't think that they allow
19 tank tops there.
20 Q   Okay.  All right.  And they allow anybody in as long as
21 you're of age and you know there's no membership qualification;
22 right?
23 A   As long as you're of age and you act like a gentleman, they
24 don't mind you being in.
25 Q   Or a woman?

**68**

PAGE 68

1  A   Yes.
2  Q   They allow women in there just as often?
3  A   Yes.
4  Q   And they host many bachelor's parties?
5  A   Yes, sir.
6  Q   And that's the kind of thing that they do.  They have
7  people come in there for big parties and drinking and watching
8  girls dance; right?
9  A   Correct.
10 Q   Okay.  And so when you got a call from Officer McDermott,
11 you knew that he was on detail?
12 A   Yes, sir.
13 Q   All right.  So he's getting paid by the Foxy Lady to work
14 that night; right?
15 A   The Foxy Lady is paying the city and the city is paying
16 Detective McDermott.
17 Q   Is he paid as if he's on regular duty or does he get paid
18 separately?
19 A   There's a separate rate but his check comes from the City
20 of Brockton not the Foxy Lady.
21 Q   And he gets paid more than he normally gets as an officer?
22 A   Not overtime, less than overtime, sir.
23 Q   Okay.  Have you ever done that?
24 A   I have not worked that detail.
25 Q   So when he calls you and he says that he is apprehending a

**69**

1  suspect; is that what he said in his call?
2  A   No.  I don't remember the exact words, but it was obvious
3  for this young man with his credentials he was in distress.
4  Q   This young man that's been on the force for 19 years I
5  believe it was, 13 years?
6  A   No, 13 years.  Yes.
7  Q   Been a detective for five years?
8  A   Correct.
9  Q   And gets regular training on how to apprehend and bring
10 people under control?
11 A   Yes.
12 Q   Okay.  And when you arrived, you saw him and one other guy;
13 right?
14 A   Correct.
15 Q   And he was on top of the guy?
16 A   They were wrestling.
17 Q   Well, he was on top of the guy?
18 A   I'll give that to you.  They were wrestling.
19 Q   Okay.  And there was a State Police Trooper there; right?
20 A   Yes.
21 Q   And that State Police Trooper was next to the two of them?
22 A   We all arrived at the same time pretty much; yes.
23 Q   Did you see him give him an open-palm smash to the far side
24 of his face?
25 A   No, I did not.

Commonwealth vs. Dustin Erwin

70

1  Q  No.  You didn't see that?

2  A  No.

3  Q  Okay.  You didn't arrive there in time to see that State

4  Trooper car hit Mr. Dustin Erwin and knock him to the ground;

5  did you?

6  A  The State Trooper car did not hit him.

7  Q  You didn't see that; did you?

8  A  It did not hit him.

9  Q  All right.  The State Trooper was there ahead of time?

10 A  Yeah.  Well, not enough -- We arrived at the same time.

11 Q  You arrived at the same time.

12 A  Yes.

13 Q  Okay.  So where did you come from?

14 A  I don't know where I was in the city.  I believe I pulled

15 in from Oak Street.

16 Q  Oak Street.  And where did the State Trooper come from?

17 A  I have no idea, sir.

18 Q  You said you arrived at the same time.  You must have seen

19 where he came from if you arrived at the same time.

20 A  But when I see one of my brother officers or anybody

21 wrestling with a six-foot something suspect, I really don't

22 concentrate on which street I came from.  My first

23 responsibility is to help him and restore order.

24 Q  Okay.  Well, the only street that he can come from to get

25 into that Walgreen's parking lot is Oak Street; right?

71

1  A  Or Pearl.

2  Q  Pearl would be the side street that goes in front of the

3  Foxy Lady; correct?

4  A  Right.

5  Q  Okay.  Now, I'm going to show you Exhibit Number 3, do you

6  recognize that?

7  A  Yes.

8  Q  Okay.  Where were you when you pulled in there?

9  A  Sir, I entered from one of the entrances.  I can't -- I

10 believe, I would think that I entered from Wall Street, because

11 I remember seeing him from a distance running.

12 Q  From Wall Street?

13 A  From Oak Street.

14 Q  That would be this street out here that you see?

15 A  Yes.

16 Q  Behind the stop sign?

17 A  Yes.

18 Q  Do you know which direction you were coming from?

19 A  No.

20 Q  So you don't know whether you entered on the other side of

21 Walgreen's or this side of Walgreen's?

22 A  I don't know.

23 Q  Do you know where they were when you saw them?

24 A  They were somewhere in the parking lot toward Bickford's

25 restaurant.

72

1  Q  And where's Bickford's, here?

2  A  No.  Bickford's would be on the opposite side of this.

3  Q  Okay.  So they were around the corner of this building?

4  A  Yes.

5  Q  And the State Police Trooper was there already or

6  was arriving at the same time?

7  A  He pulled up maybe two seconds before me.

8  Q  Before you.  So you didn't see what happened when he pulled

9  up; right?

10 A  If he had what the witnesses said he had done, I would have

11 seen that, sir.  I believe I would have seen that.

12 Q  Well, he was out of his car by the time you got into the

13 parking lot?

14 A  No, not by the time I got in the parking lot; no.

15 Q  Now, at that point in time were there other people around?

16 A  There were people I believe on their way, a group of his

17 colleagues were on their way running down, trying to help us.

18 Q  Trying to help you?

19 A  Yes.

20 Q  So they didn't interfere with Officer McDermott; right?

21 A  I think inadvertently, you know, what happens at these

22 clubs, someone acts up and --

23 Q  Officer, the question is did they interfere with Officer

24 McDermott, Detective McDermott?  I'm sorry.

25 A  Well, yes.

73

1  Q  While he was wrestling with Mr. Erwin, they weren't on top

2  of him; right?

3  A  No, sir.

4  Q  Okay.  Did you hear any of them say why did you hit Dustin

5  with the car?

6  MR. CULLINAN:  Objection.

7  THE COURT:  Overruled.  You can answer that, sir.

8  BY MR. MADDEN:

9  A  No.

10 Q  They didn't interfere with Trooper Higginbotham either;

11 right?

12 A  No, not to my knowledge.

13 Q  And they didn't interfere with you as you approached the

14 two people either; right?

15 A  They did not.

16 Q  So the people that were there were out of the way; right?

17 A  By the time that they ran over to that location; yes.

18 Q  So you come up, there's two officers and one man on the

19 ground and your first impulse is to let the dog go and attack?

20 MR. CULLINAN:  Objection, your Honor.

21 BY MR. MADDEN:

22 Q  Right?

23 THE COURT:  Overruled.  You can answer that, sir.

24 BY MR. MADDEN:

25 A  I want to tell you this about canines is first of all is

Commonwealth vs. Dustin Erwin

SHEET 20   PAGE 74

**74**

1  they don't attack.  An attack is an unprovoked incident; that's
2  what you see a pit bull doing.  Okay.
3  Q    Thank you for that -- thank you for that definition.  Your
4  first impulse is open the door and say get him or whatever
5  command you give him to subdue the person?
6  A    No.
7       MR. CULLINAN:  Objection, your Honor.
8       THE COURT:  The objection is sustained.  The comment is
9  stricken.  You can re-ask the question, Counsel.
10 BY MR. MADDEN:
11 Q    As you arrived on scene and you see two officers subduing
12 Mr. Erwin, the first thing you do is open your car door and give
13 the command to your dog; right?
14 A    Yes.
15 Q    You didn't go over to the scene first and say how's
16 everything going with you guys; huh?
17 A    No.
18 Q    And there was two on one; right?
19 A    No.
20 Q    You didn't say hey, should I get the dog out; do you think
21 we've got things under control here; right?
22 A    Repeat that again, sir?
23 Q    You did not go and assess the situation to see whether the
24 dog was necessary first?
25 A    I did not take a survey when I thought one of my brother

**PAGE 75**

**75**

1  officer's life could be in danger.  No, I did not.
2  Q    Now, you think his life was in danger.  First it was just
3  struggling --
4       MR. CULLINAN:  Objection, your Honor.
5       THE COURT:  Sustained.  Let's just ask the question and you
6  can answer the question.  Go ahead.
7  BY MR. MADDEN:
8  Q    You stated on direct that he was wrestling on the ground;
9  right?
10 A    Correct.
11 Q    Now, you think his life's in danger?
12 A    Yes.
13      THE COURT:  Hold on a minute.  Is that a question, Counsel?
14      MR. MADDEN:  Is that one?  No.  Strike that.
15      THE COURT:  If it's a question, otherwise it's stricken.
16 BY MR. MADDEN:
17 Q    And upon seeing him rolling on the ground, you open your
18 door and command your dog to subdue him or whatever command you
19 use.  What command do you use?
20 A    It's a command in another language that I really would ask
21 not to repeat in the courtroom because --
22 Q    (Inaudible).
23 A    Okay.  Thank you, sir.
24 Q    You said that the dog attacked his rear-end; right?
25 A    No.

**PAGE 76**

**76**

1  Q    What did he attack?
2  A    I said the dog apprehended him toward the rear; yes.
3  Q    Okay.  I'm sorry.  Towards the rear.  I'm showing you two
4  pictures and I ask you if that's consistent with the type of dog
5  bites that your dog inflicts on people when it bites?
6  A    No.
7  Q    No?
8  A    No, sir.
9  Q    So you wouldn't expect that your dog would leave those kind
10 of bruises?
11 A    They certainly aren't from my dog.  It looks more like
12 scrape marks and I believe that's his leg.
13 Q    All right.  Okay.  So those do not appear to be the types
14 of wounds your dog would leave?
15 A    No.
16 Q    All right.  Now, afterwards Mr. Erwin was placed in a car,
17 you said you went out to address the rest of the crowd; correct?
18 A    Correct.
19 Q    Do you remember arresting anybody in that crowd?
20 A    No.
21 Q    Do you remember putting anybody in cuffs in that crowd?
22 A    I did not; no.
23 Q    Do you remember anyone being placed in cuffs?
24 A    Yes.
25 Q    And who did that?

**PAGE 77**

**77**

1  A    I don't recall who did that.
2  Q    Do you remember him being maced before he was placed in
3  cuffs?
4  A    No.
5  Q    Did you hear anybody say if anybody saw anything, we're
6  going to arrest you?
7       MR. CULLINAN:  Objection.
8       THE COURT:  Overruled.  You can answer that.
9  BY MR. MADDEN:
10 A    No, sir.
11 Q    But they did put at least one other person in custody;
12 right?
13 A    Your client was the only one that was arrested, sir.
14 Q    One other person was placed in cuffs and placed in the
15 cruiser; correct?
16 A    Correct.
17      MR. MADDEN:  Nothing further.
18      THE COURT:  Thank you.  Anything further?
19      MR. CULLINAN:  Yes.
20           REDIRECT EXAMINATION
21 BY MR. CULLINAN:
22 Q    Officer, were you able to look at the defendant after you
23 had removed your dog?
24 A    Yes.
25 Q    And can you describe whether you ever saw the defendant

Commonwealth vs. Dustin Erwin

SHEET 21   PAGE 78

**78**

1  stand up?

2  A  Yes.

3  Q  Now, in addition, when you first got on the scene, you

4  indicated that you saw Detective McDermott; correct?

5  A  Correct.

6  Q  Where did you see him first?

7  A  I saw him running from the Foxy Lady towards the Bickford's

8  restaurant.

9  Q  And what did you see in front of him?

10  A  I saw the defendant running from him.

11  Q  Okay.  And at any point did you loose site of him at that

12  time?

13  A  No.

14  Q  Did you see the defendant go down to the ground?

15  A  Yes.

16  Q  And at that point did you see the defendant get struck by a

17  car?

18  A  No.  He didn't get stuck.  No.

19  Q  So you saw him that whole period of time?

20  A  Yes, sir.

21  Q  And at that point you responded with your canine?

22  A  Correct.

23  MR. CULLINAN:  Thank you.  I have nothing further.

24  THE COURT:  Anything further?

25  MR. MADDEN:  No, your Honor.

PAGE 79

**79**

1  THE COURT:  Sir, thank you.  You may step down.

2  THE WITNESS:  Yes, sir.

3  THE CLERK:  Thank you, sir.

4  (Witness excused.)

5  MR. CULLINAN:  Your Honor, the Commonwealth would rest.

6  THE COURT:  All right.  The Commonwealth rests.

7  Ladies and gentlemen this is a good point to recess for

8  lunch.  We're going to take the luncheon recess at this point.

9  We're going to reconvene at two o'clock sharp.  I ask you all to

10  be on time, because obviously we can't start until everybody's

11  back here ready to proceed.

12  Now, I want you to keep in mind, again, my prior

13  instruction to you.  You're not to discuss this case with each

14  other or with anybody else.  Don't look up or seek out any

15  information.  Don't speak to anybody at all about the case and

16  very importantly don't speak to each other about the case.

17  Having said that we're now going to be in recess until two

18  o'clock.  The court officer will show you exactly where to go.

19  (Jury excused at 12:47 p.m.)

20  (Court reconvened at 2:07 p.m.)

21  (Defendant present.)

22  (Jury present.)

23  THE COURT:  Good afternoon ladies and gentlemen.  The

24  Commonwealth has rested its case.

25  Counsel, do you wish to present evidence?

PAGE 80

**80**

1  MR. MADDEN:  Yes, your Honor.  Thank you.

2  THE COURT:  Matthew Zavala?

3  THE COURT:  Step right up here, sir?

4  THE COURT OFFICER:  Good afternoon.  Just watch your step,

5  just step right in and remain standing for a minute, please.

6  THE CLERK:  Squeeze right in there, sir.  Good afternoon.

7  THE WITNESS:  Good afternoon.

8  THE CLERK:  Raise your right hand, please.

9  MATTHEW ZAVALA, Sworn

10  THE WITNESS:  I do.

11  THE CLERK:  Thank you.

12  THE COURT:  Good afternoon.

13  THE WITNESS:  Good afternoon.

14  THE COURT:  You can be seated or stand whatever's more

15  comfortable.

16  THE WITNESS:  Okay.  I'll sit.

17  THE COURT:  Go right ahead.

18  DIRECT EXAMINATION

19  BY MR. MADDEN:

20  Q  Please introduce yourself to the jury and his Honor and

21  spell your last name for the record?

22  A  Okay.  Hi, everyone.  My name is Matthew Zavala.  The

23  spelling of my last name is Z-a-v-a-l-a.

24  Q  Okay.  And where do you live?

25  A  I live in Portsmouth, New Hampshire.

PAGE 81

**81**

1  Q  How long have you lived there?

2  A  Probably a few months, three to four months.

3  Q  Where did you live prior to that?

4  A  I lived in Newmarket, New Hampshire.

5  Q  And how long did you live there?

6  A  About a year.

7  Q  And what do you do?

8  A  Currently, I am pursuing my Masters in education.  So I'm

9  an intern basically for the year requirement.

10  Q  What school do you go to?

11  A  It's at Noble High School it's in North Berwick, Maine.

12  Q  Okay.  And you're single?

13  A  Yes.

14  Q  Okay.  And do you know Mr. Erwin.

15  A  Yup.

16  Q  And how do you know him?

17  A  I used to work at a pizza place in Durham and one of the

18  owners got engaged with him and so I've known him for about a

19  year.  He became an owner there.

20  Q  Okay.  And who was the person that you worked for before

21  you knew Mr. Erwin?

22  A  Maria, his wife.

23  Q  And you were going to school in Durham at that time?

24  A  Yup.  I was still an undergrad at UNH.  So I was on campus.

25  I lived in Durham at that time.  It was a couple years ago.

Commonwealth vs. Dustin Erwin

82

```
1   Q   And what was the name of the pizza store?
2   A   Wildcat Pizza.
3   Q   Okay. And you say you worked there for two years?
4   A   Yup.
5   Q   And Mr. Erwin worked there the last year of that?
6   A   Yup. He came in right about halfway through my time there.
7   Q   So as of August 2008 -- I'm sorry, did you know Mr. Erwin?
8   A   Yes, I did.
9   Q   And how long had you known him?
10  A   In August of 2008, prior to that I didn't know him, so
11  probably about a year.
12  Q   Okay. So you have known him for about a year?
13  A   Yeah.
14  Q   And there was a bachelor party scheduled for him on August
15  10th; right?
16  A   Yes, I believe so.
17  Q   And who scheduled that?
18  A   I forget the gentleman's name. I think the best man of the
19  wedding.
20  Q   Okay. And what were the arrangements; do you know?
21  A   For the bachelor party, I had to work that day so I wasn't
22  able to go up until later in the evening, but you know we just
23  got a hotel basically. And then we were planning on going to a
24  strip club that night.
25  Q   To where?
```

83

```
1   A   To a strip club.
2   Q   Okay. And where was the hotel?
3   A   It was in Brockton.
4   Q   Okay. Do you know the name of it?
5   A   I don't.
6   Q   Okay. And so what time did you arrive at the hotel?
7   A   Later in the night, probably around seven - eight o'clock.
8   Q   Okay. And who was there?
9   A   Everybody that was going to be at the bachelor party was
10  already there.
11  Q   Okay. And what were they doing?
12  A   Just hanging out, watching TV, you know, having a beer.
13  Q   Okay. And who did you arrive with?
14  A   Rob Flinn.
15  Q   Okay. And the two of you came down late because you were
16  working. Was he working as well?
17  A   Yup. We both had to work that day at the store, so we just
18  planned to carpool later in the evening to get up there.
19  Q   And by the store you mean the pizza --
20  A   Yup. Wildcat Pizza.
21  Q   And so you got there around, did you say eight o'clock?
22  A   Yeah, probably eight o'clock.
23  Q   Okay. And everyone was there. How long did you stay at
24  the hotel?
25  A   Probably no more than an hour, hour and a half. We weren't
```

84

```
1   there for too, too long.
2   Q   Okay. And then what did you do?
3   A   And then we took a cab to the strip club, the Foxy Lady.
4   Q   So no one drove?
5   A   Nope.
6   Q   Okay. And so you took a cab there. How many cabs did you
7   need?
8   A   There was a couple. There was a good handful of us so
9   maybe two, maybe three.
10  Q   Do you know about what time you got to the Foxy Lady?
11  A   Later in the night, probably nine or ten o'clock I would
12  say right around there.
13  Q   Okay. And did you have to pay to get in?
14  A   I don't remember. There might have been a cover.
15  Q   Okay. And as you walked into the place, do you remember
16  what the foyer was like as you walked in?
17  A   Yup. On the left side -- Do you want me to describe that?
18  Q   Sure.
19  A   The left side basically had the huge stage where the
20  dancers would go and do like dances for all the gentlemen and
21  they had some seating on the right. We sat kind of in the back
22  behind the stage.
23  Q   Okay. And what did you do while you were there?
24  A   Got a couple of massages, had a couple of drinks, tried to
25  relax, have a good time.
```

85

```
1   Q   Okay. And were you with Mr. Erwin the whole time?
2   A   Yes.
3   Q   So you were sitting at the same table as him?
4   A   We had a couple different tables. We were in the general
5   area.
6   Q   And did you have a chance to interact with him at all?
7   A   Yeah.
8   Q   Okay. And through the course of the evening how many times
9   would you say that you actually went up to him?
10  A   A couple times. You know we eventually tried to pay for a
11  lap dance for him to celebrate.
12  Q   You tried to do that?
13  A   Yup. Well, me and a couple of other guys, me and Robert I
14  think maybe one or two other guys.
15  Q   And how did that work out?
16  A   That didn't go well. That's kind of where the night went
17  south. We paid the dancers to do the lap dance. They did it
18  and then afterwards they tried to say that we didn't pay for it.
19  They got the manager involved.
20       MR. CULLINAN: Objection, your Honor.
21       THE COURT: Overruled.
22  BY MR. MADDEN:
23  A   So at the end of the dance, the dancers said that we didn't
24  pay for it and we said we did.
25       MR. CULLINAN: Objection, your Honor.
```

Commonwealth vs. Dustin Erwin

PAGE 88

**86**

1    THE COURT:  Overruled.  The answer stands.
2    BY MR. MADDEN:
3    A    We said we did.  The manager then became involved and
4    eventually we just tried to come to an agreement to make peace.
5    He paid them half of what the dancers wanted, just to let
6    everything settle a little bit to stay.  And so after we --
7    Q    Who was involved in that discussion with the manager?
8    A    It was me and Rob and I want to say another gentleman, but
9    basically just me and Rob.
10   Q    So Mr. Erwin wasn't involved?
11   A    No.
12   Q    Okay.  And after that discussion what happened next?
13   A    And then basically after we paid, within a few minutes the
14   manager said you know if you're with him you've got to leave.
15   He's too drunk.
16   Q    With who, meaning who?
17   A    Dustin. .
18   Q    Okay.  And in your opinion what was his state of sobriety
19   at that time?
20   A    It came as a shock to me.  Honestly, I didn't think we were
21   being that rowdy.  I thought that paying the, making the halfway
22   payment you know would settle everything.  We weren't obnoxious
23   or loud or anything.
24       MR. CULLINAN:  Objection, your Honor, unresponsive to the
25   question.

**PAGE 88**

1    Q    Okay.  And as you left, where were you in relation to Mr.
2    Erwin?
3    A    As we proceed out into the parking lot, I was basically
4    right behind him, probably within a half a foot or foot, you
5    · know, right next to him.
6    Q    Okay.  And who else was near him?
7    A    Rob was I think next to me and then basically everybody was
8    -- we left as a group, so we were all in pretty close proximity.
9    Q    Did you hear any unusual noises as you left the building?
10   A    Nope, nothing unusual.
11   Q    Did you see a police officer as you left the building?
12   A    Yup.  The police officer I guess that the Foxy Lady hires
13   or has continued to follow us after we left.
14   Q    Well, what do you mean continued to follow you?  Was he
15   following you --
16   A    He followed us out into the parking lot and then just
17   continued to follow us into the parking lot basically as we were
18   leaving.
19   Q    I'm going to show you what was previously marked Exhibit 2,
20   and do you recognize that, please?
21   A    Yup.
22   . Q    And what do you recognize that to be?
23   A    That's the ramp that we came out.
24   Q    Now, show that to the jury and point out how you came down
25   that ramp?

---

PAGE 87

**87**

1    THE COURT:  Overruled.  The answer stands.
2    BY MR. MADDEN:
3    Q    And what was his state of sobriety in your opinion at that
4    time?
5    A    Probably, he wasn't drunk or heavily intoxicated.  I would
6    say you know maybe a good buzz.
7    Q    Okay.  And had he been bothering anybody or was he --
8    A    No.  Like I said, we weren't obnoxious or unruly or loud or
9    anything.
10   Q    Just having a good time?
11   A    Yeah, trying to.
12   Q    Okay.  When the manager said you had to leave, what did you
13   do?
14   A    So we left, basically.
15   Q    You left.  And how did Dustin react to that?
16   A    Immediately, I mean no reaction really.  He was kind of
17   like this is ridiculous but you know we just left.  We went out
18   the door and we proceeded to the parking lot.
19   Q    And what type of words were had with the manager?
20   A    I mean I was a little shocked, so I was like you know I'm
21   surprised we couldn't stay because we went halfway but he wasn't
22   having it.  He wanted us out so we left.
23   Q    Now, how many people were with you at that time?
24   A    There was a good handful of people, probably between five
25   and eight maybe.

**PAGE 89**

**89**

1    A    I want to say we came out and then took a right into this
2    parking lot.
3    Q    Okay.  Now, where was Dustin when you came out?
4    A    Dustin was in front of me.  So I was behind him.  I don't
5    know if that's what --
6    Q    Okay.  And then who was next to you?
7    A    Again, I want to say Rob then everybody was kind of you
8    know shuffling in behind.
9        MR. MADDEN:  Can we publish this?
10       THE COURT:  Is it two?
11       MR. MADDEN:  Two, yes.
12       THE COURT:  Sure.  Mr. Officer?
13   BY MR. MADDEN:
14   Q    As you're walking down the ramp there at any point in time
15   did you stop or did you congregate?
16   A    Nope.  We continued to walk down into the parking lot with
17   the officer following us.  Dustin kind of turned around and said
18   you know why are you following us.
19   Q    Okay.  Where were you going at that time?
20   A    We called a cab.  We were trying to go meet him in the
21   parking lot.
22   Q    And where in the parking lot were you planning to --
23   A    We walked quite a -- I want to say the pharmacy right
24   there.  We went and got cash there before we went into the club,
25   so we kind of met him there I think.  We were going to anyway.

Commonwealth vs. Dustin Erwin

SHEET 24   PAGE 90

**PAGE 90**

1   Q   Okay.  Is that where the cab dropped you off?
2   A   Yeah.  Well, I think he pulled in that parking lot and
3   dropped us off, you know, in front.
4   Q   Okay.  Now, as you got off that ramp and you started
5   walking down to the parking lot, right, what happened then?
6   A   So, yeah, I mean the officer from the Foxy Lady continued
7   to follow us, and Dustin turned around and kind of said why are
8   you following us.
9        MR. CULLINAN:  Objection, your Honor.
10       THE COURT:  What's the objection?
11       MR. CULLINAN:  Permission to approach?  Hearsay rule.
12       THE COURT:  The objection's overruled.
13  BY MR. MADDEN:
14  Q   He followed you and Dustin turned around; right?
15  A   Yup.
16  Q   How far away was he from you?
17  A   From Dustin?
18  Q   From the group of you, Dustin?
19  A   The police officer?
20  Q   Yes, the police officer?
21  A   Probably maybe five or ten feet just kind of shadowing us
22  following us as we left.
23  Q   And what were you guys doing as you were leaving?
24  A   Well, we were leaving because we got kicked out, but Dustin
25  kind of noticed him first I think and kind of swung around and

**PAGE 91**

1   just kind of questioned why he was following us.  I don't think
2   anybody else was really wondering, but Dustin was kind of like
3   you know why are you following us; we're leaving?  And that's
4   when Dustin turned around, so his face was to me.  But I was
5   trying to just, you know, say Dustin, you know, we don't need to
6   deal with this.  We can just continue on our way.  The cab's
7   coming.  It's not a big deal.
8   Q   So Dustin was in front of you and the officer was behind
9   you?
10  A   Yeah.
11  Q   So you were sort of listening to everything Dustin was
12  saying over to the officer?
13  A   Uh-huh.
14  Q   And what was he saying to him?
15       MR. CULLINAN:  Objection, your Honor.
16       THE COURT:  Who's talking now?
17  BY MR. MADDEN:
18  Q   What was Dustin saying to the officer?
19       THE COURT:  The objection's overruled.  You may answer.
20  BY MR. MADDEN:
21  A   Okay.  Again, like I said, Dustin was saying why are you
22  following us; we're leaving, something probably along the lines
23  of you know you wanted to be cop or something like that your
24  whole life.  So you know you're kind of doing a power trip type
25  thing.

**PAGE 92**

1   Q   Was he swearing too?
2   A   Yeah.  He was probably saying, like you know, what the F
3   are you doing following us.  We're leaving.  Something along
4   those lines.
5   Q   Was he making any threatening gestures or anything?
6   A   Nothing threatening, no.  I mean just kind of questioning
7   why and then like I said he wanted to be a cop his whole life or
8   something like that kind of power trippy (sic).
9   Q   And at any point in time did he stop?
10  A   No.  He continued to walk backwards the whole time.
11  Q   And where was Rob at this time?
12  A   I want to say either to the left or to the right to me,
13  because we were all kind of like I said in a group going out, so
14  he was on either on my left or my right.
15  Q   Okay.  And so how far did you get?
16  A   Quite a ways actually, because we were walking the whole
17  time as this conversation was going on between Dustin and the
18  police officer.
19  Q   Okay.  And what happened then?
20  A   And that's where things got really fast, really quick.
21  Basically, the officer took out his pepper spray or mace or
22  whatever they carry on them and sprayed and sprayed Dustin and I
23  got hit with that as well.
24  Q   And where were you at the point in time when he sprayed
25  Dustin?

**PAGE 93**

1   A   I was still directly in front of Dustin.  And then as he
2   sprayed, me and Dustin got separated because I got sprayed too,
3   so I was trying to collect myself.
4   Q   So did he have to go around you to spray Dustin?
5   A   No.  He just kind of sprayed in our general direction.
6   Q   How far away was he?
7   A   I mean by that time he got really close to us.
8   Q   How far away was he?
9   A   At the time he sprayed, probably a couple feet.  He was
10  right behind us.
11  Q   Okay.  I'm showing you what's previously been marked
12  Exhibit 3, do you recognize that?
13  A   Yup.
14  Q   What do you recognize it as?
15  A   Well, that's the parking lot and that's the Walgreen's like
16  I said earlier that we went in previously.
17  Q   Can you turn that and point and show the jury, just point
18  about where you were in that parking lot when the officer
19  approached you and sprayed Dustin?
20  A   We were probably around, almost around the corner right
21  around that area where these cars are kind of blocking the view.
22  Q   Right at the corner.  Okay.  So you had walked that whole
23  distance?
24  A   Yeah.  I mean the conversation's going on the whole time as
25  it was happening as we were walking.

Commonwealth vs. Dustin Erwin

SHEET 25  PAGE 94

**94**

1  Q  And you're clearly off Foxy Lady territory; right?

2  A  Yeah. We were far away. I was trying, like I said, to

3  just get everybody out of there. I didn't see the need to stay.

4  We called a cab.

5  Q  So as a result of getting sprayed or having the spray shot,

6  what did Dustin do, what did you see Dustin do?

7  A  That's when Dustin and me kind of separated, because I

8  again was trying to collect myself. Dustin kind of went off

9  trying to collect himself I guess I would call it too, because

10  he got sprayed.

11  Q  What did you see happen next?

12  A  Again and this is the really fast point of the story.

13  Basically, to my left side I saw a cruiser come, hit Dustin. He

14  basically got face planted. So his face went straight to the

15  ground. And that's when a police officer came from the right

16  side and got in my face, and I was like this is ridiculous. I

17  can't believe you guys are doing this, and he basically said to

18  me if you say one more word, I'm going to arrest you. And I

19  said the same thing I said this is ridiculous and then I got

20  arrested or detained or whatever and thrown in the back of a

21  cruiser.

22  MR. CULLINAN: I'm going to objection on those hearsay

23  statements, your Honor.

24  THE COURT: I'll see you at the sidebar.

25  (Inaudible discussion at the sidebar.)

PAGE 95

**95**

1  BY MR. MADDEN:

2  Q  So you were cuffed at that point in time?

3  A  Yup. I was cuffed. I was put in the back of the cruiser

4  and then I mean I just sort of sat there.

5  Q  So the last thing you saw was Dustin being hit by a car?

6  A  Yeah. It was the last thing and then the cop kind of got

7  in my face.

8  Q  How far away from you was Dustin when he got hit by the

9  car?

10  A  He was a good amount of feet, probably like 15, maybe even

11  20 feet. It was a good distance.

12  Q  How clear a view did you have?

13  A  Pretty clear.

14  Q  Was there anyone between you and him at the time?

15  A  Nope.

16  Q  No question in your mind that the car impacted him?

17  A  Yup. I definitely saw a car --

18  THE COURT: The question's excluded. It's leading. It's

19  excluded.

20  BY MR. MADDEN:

21  Q  And did you see anything else that happened after that?

22  A  Nope. I mean I just kind of sat in the cruiser and was you

23  know a little maced, so I was wondering what exactly was going

24  on and you know why I was arrested.

25  MR. MADDEN: Nothing further. Thank you.

PAGE 96

**96**

1  THE COURT: Thank you. Cross-examination.

2  MR. CULLINAN: Yes.

3  CROSS-EXAMINATION

BY MR. CULLINAN:

5  Q  Good afternoon, sir.

6  A  How you doing? Good afternoon.

7  Q  How did the defendant get about 15 to 20 feet away from

8  you?

9  A  When we both got sprayed with mace that's when he was

10  trying to, again, collect himself. I was trying to collect

11  myself and he kind of separated himself.

12  Q  He ran; correct?

13  A  No. He was kind of walking and I guess waving his hands at

14  his face because of the mace.

15  Q  He walked 20 feet away from you?

16  A  Yeah.

17  Q  Did you watch him the whole time?

18  A  Not walk because I was sprayed too.

19  Q  You were sprayed in the face?

20  A  Yeah.

21  Q  You were having trouble seeing at that time?

22  A  Yeah.

23  Q  It was stinging your eyes?

24  A  Yeah.

25  Q  You were concerned about yourself and what was going on;

PAGE 97

**97**

1  correct?

2  A  Yup.

3  Q  So fair to say you weren't watching what was happening to

4  the defendant the whole time; correct?

5  A  Not immediately after I got sprayed; no.

6  Q  Now, you're the defendant's friend; correct?

7  A  Yeah. I'd say we're friends.

8  Q  Could you say you're friends?

9  A  Yeah.

10  Q  Friendly enough that you went to his bachelor party?

11  A  Yeah.

12  Q  Friendly enough that you traveled from another state to get

13  to the bachelor party?

14  A  Yup.

15  Q  Friendly enough that after a long day of work, you went to

16  that bachelor party?

17  A  Yeah.

18  Q  So now, would you consider yourselves friends?

19  A  Yeah. Yeah, we're friends.

20  Q  In addition, you indicated that you're getting your

21  Master's Degree; is that right?

22  A  Yup.

23  Q  And where in Maine is that?

24  A  It's in North Berwick.

25  Q  How long does it take to get from Maine to Brockton?

Commonwealth vs. Dustin Erwin

SHEET 26   PAGE 98

**98**

1    A    Maine to Brockton?  I have no idea.

2    Q    Two hours?

3    A    It takes from Portsmouth it's an hour and a half, so maybe

4    more, probably two hours.

5    Q    So at the very least from Portsmouth to here is a couple of

6    hours?

7    A    It's an hour and a half; yeah.

8    Q    And you came down to testify here today for the defendant?

9    A    Yup.

10   Q    And as he is your friend, you want to help him if you

11   could?

12   A    I mean, yeah.  He's a friend.

13   Q    In addition to the relationship you have --

14   (Alarm going off.)

15        MR. CULLINAN:  May I proceed, your Honor?

16        THE COURT:  Sure.  Thank you.

17   BY MR. CULLINAN:

18   Q    In addition to the relationship you have with the defendant

19   as a friend, you indicated that you worked for the defendant's

20   wife's family; is that correct?

21   A    Yup.

22   Q    And you did that for a period of a few years?

23   A    Yeah, about two years.

24   Q    At the pizza shop?

25   A    Uh-huh.

**99**

1    Q    And you're still friendly with that family and the

2    ownership of that establishment?

3    A    Not so much anymore since I stopped working there.  We

4    don't really keep in touch but I would say we're still friends.

5    Q    Now, you indicated that you went down and the first thing

6    you did was check into the hotel?

7    A    Yup.

8    Q    And was the defendant drinking at that time?

9    A    Yeah.  I mean everybody had at least probably a beer in

10   their hands drinking, watching TV.

11   Q    And that went on for how long?

12   A    Probably about an hour or so maybe a little more give or

13   take.

14   Q    Okay.  And how many people did you say were with you?

15   A    A handful, like I think I said five to eight, so probably

16   around there.

17   Q    Could you name them?

18   A    Could I name them?

19   Q    Yes?

20   A    Me, Rob, Dustin and then I don't really know his friends.

21   I forget the best man's name, but I don't really know them by

22   name.

23   Q    And you said you took two maybe three cabs?

24   A    Yeah.

25   Q    And you indicated that you don't really know where you got

PAGE 100

**100**

1    dropped off?

2    A    From the cab?

3    Q    Specifically, you know the establishment you got dropped

4    off at, but you don't recall where in the parking lot you got

5    dropped off?

6    A    It was probably in the front parking lot, that general

7    area.

8    Q    Sir, do remember where you got dropped off?

9    A    Yeah.  In the general area of the front of the parking lot

10   of the Foxy Lady.

11        MR. CULLINAN:  Permission to approach --

12        THE COURT:  Sure.

13        MR. CULLINAN:  -- showing Exhibit 2?

14   BY MR. CULLINAN:

15   Q    Do you recognize that, sir?

16   A    Yes, I do.

17   Q    What does that depict?

18   A    The entrance to the Foxy Lady.

19   Q    Does that show where you got dropped off at all?

20   A    I would say it was probably right in front here.

21   Q    If you can hold up that photo?

22   A    Yup.

23   Q    And show the jury?

24   A    Probably right in front.  I would guess right there

25   somewhere.

PAGE 101

**101**

1    Q    And, sir, could you tell the jury do you distinctly

2    remember being dropped off there or you're guessing that's where

3    you got dropped off?

4    A    No.  We got dropped off in the front; yeah.

5    Q    And had you ever been to the Foxy Lady before?

6    A    Nope.

7    Q    But you were going to have a good time with the defendant

8    at his bachelor party; correct?

9    A    Yup.

10   Q    Now, once you got in, you indicated you engaged in some

11   massages?

12   A    Yup.

13   Q    Is that correct?

14   A    Yes, it is.

15   Q    And how many of you were engaging in that contact?

16   A    How many massages did I get?

17   Q    No.  How many of you were engaging in getting massages?

18   A    Probably like three of us I want to say.  Me, one other and

19   then I think it was like me, Jimmy and then maybe Rob.  I don't

20   know; a couple of us.

21   Q    Okay.  And then at some point you bought a lap dance for

22   the defendant; is that correct?

23   A    Yup.

24   Q    And could you describe the drinking you saw the defendant

25   doing?

## Commonwealth vs. Dustin Erwin

SHEET 27    PAGE 102

**102**

1  A    The drinking as in what he was drinking or?
2  Q    Yes?
3  A    I want to say beer. We were all drinking beer.
4  Q    And at some point you stated in your opinion the defendant
5  was at least buzzed; is that correct?
6  A    Yup.
7  Q    And fair to say the defendant's a large individual?
8  A    Yup.
9  Q    Approximately, 280 pounds?
10 A    I guess so; yes.
11 Q    Now, at some point it came to a point where management
12 asked you and your group to leave; correct?
13 A    Yes.
14 Q    And people were upset about that?
15 A    Yeah. We weren't happy.
16 Q    And you indicated that the defendant led the way and you
17 guys left?
18 A    Right.
19 Q    And you remember the defendant going through the front two
20 doors?
21 A    Of the Foxy Lady?
22 Q    Yes?
23 A    Yeah.
24 Q    To go outside?
25 A    Yeah.

**PAGE 103**

**103**

1  Q    You recall him pushing both those doors open?
2  A    Do I -- Are you asking me if I saw the defendant push the
3  doors open?
4  Q    Yes?
5  A    No. I mean he just kind of opened the door. I don't think
6  it was a push or anything like that.
7  Q    And you indicated you saw the officer at that time?
8  A    Yup.
9  Q    The officer didn't say anything to you?
10 A    No. Not that I know of.
11 Q    The officer didn't say anything to the defendant at that
12 time?
13 A    Not that I'm remembering; no.
14 Q    Okay. And when you went out, you agree that you turned
15 down the ramp?
16 A    Yeah. I want to say we walked out the ramp and then I
17 think we turned to the right towards where we got dropped off.
18 Q    And at that point, you stopped and you guys were talking?
19 A    Nope. We kind of just continued to walk.
20 Q    Okay. Well, at some point someone called a cab; correct?
21 A    Yup. I think somebody called it in this strip club before
22 we left because we knew we were getting kicked out, so.
23 Q    And who made that call?
24 A    I don't know.
25 Q    Fair to say it's loud inside the strip club; right?

**PAGE 104**

**104**

1  A    Yeah.
2  Q    Now, when you got outside is that when you realized that
3  the defendant was buzzed?
4  A    I mean I think we were in the strip club is when we were
5  all probably feeling buzzed I guess.
6  Q    So you had the opinion the defendant was buzzed before you
7  went outside?
8  A    Yeah. Sure.
9  Q    And you indicated once you got outside, you recall the
10 defendant was swearing; correct?
11 A    Yeah.
12 Q    And he was doing that loudly?
13 A    Yeah.
14 Q    And fair to say it's approximately one a.m.?
15 A    I don't know the time. Probably, yeah, sure. I would say
16 it was maybe before depending upon, because the place wasn't
17 closed yet, so I don't know if the places close in Boston around
18 one, but they do in New Hampshire, so.
19 Q    Do you think it was 11:30?
20 A    Not that early, no; probably around 12. I don't know.
21 Q    So at midnight that was the time that you left?
22 A    Yeah, right around there.
23 Q    And the defendant went outside. You indicated you saw the
24 officer again; correct?
25 A    Yeah. He basically followed us out.

**PAGE 105**

**105**

1  Q    Okay. And at some point you heard the officer indicate
2  that the defendant needed to leave the property; correct?
3  A    Well, the manager said it earlier, so I think he was just
4  making sure we were leaving.
5  Q    You heard the officer say that though; correct?
6  A    I don't think I heard him say it.
7  Q    Sir, was it clear to you that the officer wanted you to
8  leave the property?
9  A    Well, he was just following us. So we were leaving to go
10 to the cab.
11 Q    So you thought that the officer wanted you to come back and
12 that's why he was following you?
13 A    No, no, no. I don't think the officer wanted us to come
14 back.
15 Q    And you indicated you had never been to this strip club
16 before?
17 A    Yup.
18 Q    You don't really know where their property lines end or
19 anything like that; correct?
20 A    No.
21 Q    Now, you indicate at some point you get some mace in your
22 eyes; is that correct?
23 A    Yup.
24 Q    Okay. And, obviously, you react to that?
25 A    Uh-huh.

Commonwealth vs. Dustin Erwin

**106**

1   Q   You start rubbing your eyes?
2   A   Yeah.  I probably rubbed them.
3      MR. CULLINAN:  If I could have a moment, your Honor?
4      THE COURT:  Sure.
5   BY MR. CULLINAN:
6   Q   Now, you saw the officer reach out and grab the defendant;
7   correct?
8   A   I don't think he ever grabbed him; no.
9   Q   Excuse me.  You have to speak up, sir.
10   A   Oh, I'm sorry.  I don't think he ever grabbed him; no.
11   Q   So you never saw the officer touch the defendant?
12   A   No.
13   Q   So the only interaction you saw between the officer and the
14   defendant was the spraying of mace?
15   A   Yes.  Well, other than the conversation; yes.
16   Q   And you indicated you didn't hear the officer saying
17   anything to the defendant?
18   A   No.  I'm sure he did.
19   Q   So when you said conversation you're referring --
20   A   I'm sure he did, but I don't remember exactly what was
21   said, if that helps.
22   Q   So when you say conversation, you're referring to what the
23   defendant was saying?
24   A   Well, yeah.  I mean he was saying, you know, swearing at
25   the officer, I'm assuming.  I don't remember exactly what was

**107**

1   said, but I'm assuming the officer responded in some way.
2   Q   But the defendant was loud at that time?
3   A   Loud?
4   Q   Yes?
5   A   Yeah.
6   Q   And he was starting to get belligerent?
7   A   No.  I mean we were still kind of walking away so.
8   Q   The defendant was upset?
9   A   Yeah, with the officer following us.  Yeah.  I mean he
10   wasn't happy about it.
11   Q   Well, he's upset about getting kicked out, too; right?
12   A   I'm assuming so, yeah.
13   Q   You were upset about having to leave; right?
14   A   I mean after we left, I didn't really care.  I was like all
15   right, I guess we'll just go back to the hotel and do whatever.
16   Q   And what was the name of the hotel you went back to?
17   A   I don't remember the exact name.  I know it was across the
18   street from like a strip mall or something.
19   Q   And at some point you were placed into custody?
20   A   Yup.
21   Q   There were handcuffs put on you?
22   A   Uh-huh.
23   Q   At some point you were released from custody; correct?
24   A   Yup.
25   Q   Do you recall who released you?

**108**

1   A   Not specifically the officer's name, but there was two or
2   three officers that opened the door to the back of the cruiser.
3   Q   One of those officers was Detective McDermott; wasn't it?
4   A   I'm not sure on the name exactly to be honest with you,
5   but.
6   Q   Do you recall him saying that you were actually trying to
7   help with the situation and that's why you should be released?
8   A   Are you asking me when he opened the door?
9   Q   Yes?
10   A   Yeah.  I mean basically when he opened the door he said
11   what's your story.  I said I was trying to you, you know, leave the
12   Foxy Lady, you know, get everybody out of there.
13   Q   Who were you talking to at this point?
14   A   One of the police officers.  There was, like I said, two or
15   three like around the door when they opened it.
16   Q   Do you recall what their uniforms looked like?
17   A   Blue.  I don't know.  Sorry.
18   Q   Do you know what a State Trooper is versus --
19   A   Yeah, I mean --
20   Q   -- a police officer?
21   A   I think a State Trooper is like green and gray or green and
22   tan.
23   Q   You indicated you're from New Hampshire; right?
24   A   I am.
25   Q   So you're not sure who was actually talking to you at that

**109**

1   point?
2   A   I would say officers were wearing blue, blue uniforms.
3   Q   Now, fair to say from the point where you got sprayed with
4   the mace inadvertently, you'd agree that the mace wasn't sprayed
5   directly at you; correct?
6   A   Well, the way he sprayed it it was kind of in our
7   direction, so I mean I don't know if he was aiming for me or
8   whatnot, but he definitely sprayed it like not just one person.
9   He kind of sprayed like in the general direction of us, so.
10   Q   Now, let's just take a step back.  You indicated that the
11   defendant was facing the officer; correct?
12   A   Yes, he was.
13   Q   And you were facing the defendant?
14   A   Yes, I was.
15   Q   So fair to say it wasn't sprayed directly into your face if
16   it came from behind you; correct?
17   A   Yeah.  I don't think he was specifically targeting me.
18   Q   And that stung?
19   A   Yup.
20   Q   It was not a good feeling and certainly you reacted more
21   focused on that?
22   A   Yeah.  I mean I probably rubbed my eyes and wafted my face
23   a little.
24   Q   And that's about the point that everything really sped up
25   for you?

Commonwealth vs. Dustin Erwin

110

1  A   Yeah.  I mean that's, like I said, I saw the cruiser hit
2  Dustin immediately to my left, probably; I think 15 - 20 feet
3  away.
4  Q   And what did that cruiser look like?
5  A   I want to say, it was dark, so I think it was black.  I
6  would guess the color.
7  Q   It was black?
8  A   I would say.
9  Q   Okay.
10 A   It might have been a dark navy blue.
11 Q   And what part of the cruiser?
12 A   The very front, the bumper.
13 Q   What part of the bumper?
14 A   I want to say there was like one of those black bars on the
15 front of the bumper.  I'm not sure though.
16 Q   So what part --
17 A   The front.
18 Q   -- allegedly hit Dustin?  What part, the bumper or the
19 black thing that you described?
20 A   I want to say the black thing, the black bar thing.
21 Q   And you described that as the black car?
22 A   Yeah.  I mean it could have been dark navy blue because,
23 like I said, it was at night so it was pretty dark.
24 Q   And where do you claim that it struck the defendant?
25 A   Probably right at the kneecaps or higher thigh area.

111

1  Q   Well, we need to be careful, not probably.  Where did you
2  see it strike him?  You indicated you saw this; right?
3  A   Yeah.
4  Q   Where did it strike him?
5  A   Knees or above, right in that and the bumper is probably a
6  good size, so it hit more than just the knee I would say.
7  Q   And where were you at that point?
8  A   I was looking to the left, so still in the parking lot.  Is
9  that what you're asking?
10 Q   At that point were you being placed in custody?
11 A   Nope.  That's when officers after I saw Dustin hit they
12 came up to me and said say one more word and we're going to put
13 you under arrest.
14 Q   And who said that to you?
15 A   One of the officers.
16 Q   What did he look like?
17 A   White gentleman, blue suit, blue uniform.
18 Q   What's his name?
19 A   I don't know.  I don't know any of the officers' names.
20     MR. CULLINAN:  I have nothing further at this time.
21     THE COURT:  Thank you.  Anything further, Counsel?
22            RECROSS-EXAMINATION
23 BY MR. MADDEN:
24 Q   When the officer came up to you after you saw Mr. Erwin
25 being knocked down by that car, what did they say to you?

112

1  A   He said if you say --
2  .   MR. CULLINAN:  Objection, your Honor.
3      THE COURT:  Overruled.  You may answer this.
4  BY MR. MADDEN:
5  A   They said if you say one more word, we'll arrest you.
6  Q   And then what did you do?
7  A   And then I said like this is ridiculous.  I can't believe
8  you're doing this and then I was cuffed immediately.
9      MR. MADDEN:  Nothing further.  Thank you.
10     MR. CULLINAN:  Nothing further.
11     THE COURT:  Thank you, sir.  You may step down.
12     THE WITNESS:  Thank you.
13 (Witness excused.)
14     MR. MADDEN:  Robert Flinn.
15     THE COURT:  Good afternoon.
16     THE COURT OFFICER:  Step right in, yup, just all the way in
17 and remain standing for a minute, please.
18     THE CLERK:  Good afternoon, sir.
19 .   THE WITNESS:  Good afternoon.
20     THE CLERK:  Would you be kind enough to raise your right
21 hand.
22            ROBERT FLINN, Sworn
23     THE WITNESS:  I do.
24     THE CLERK:  Thank you.  You can have a seat.
25     THE COURT:  You can be seated or stand, whatever's more

113

1  comfortable.
2      THE WITNESS:  I prefer to stand.  I'm short, sir.
3             DIRECT EXAMINATION
4  BY MR. MADDEN:
5  Q   Please introduce yourself to the jury and his Honor and
6  spell your last name for the record?
7  A   My name is Robert Flinn, F-l-i-n-n.
8  Q   And where do you live?
9  A   I live at Four Spring Street, Newmarket, New Hampshire.
10 Q   And how long have you lived there?
11 A   I've been at that apartment for about two years.
12 Q   Okay.  And what do you do?
13 A   I am a graduate student at UNH.  I'm getting my Masters of
14 Education in counseling.
15 Q   Okay.  And do you know Mr. Erwin?
16 A   Do I?  Yes; yup.
17 Q   How do you know him?
18 A   I used to work at Wildcat Pizza and he was my boss.
19 Q   Okay.  And how long have you known him?
20 A   I'd say from about midway through junior year, so about a
21 year and a half at least.
22 Q   And how long did you work at Wildcat Pizza?
23 A   I started working there in my sophomore year of college, so
24 about four years ago.
25 Q   Okay.  And Mr. Erwin came on at some point in time?

Commonwealth vs. Dustin Erwin

**114**

1  A   Yeah.  He was later -- It used to be owned by his wife's
2  brother and then he joined later on.
3  Q   Okay.  In August of 2008 you were working there?
4  A   Yes.
5  Q   Okay.  And Mr. Erwin was your boss at that time?
6  A   One of my bosses; yes.
7  Q   And who was your other boss?
8  A   Maria Erwin.
9  Q   And what was their relationship, if you know?
10 A   At the time they were engaged.
11 Q   Okay.  And at some point in time there was a bachelor party
12 planned; correct?
13 A   Yes, there was.
14 Q   And that was August 10, 2008?
15 A   Yup.
16 Q   And did you have anything to do with the planning of that
17 party?
18 A   No, not at all.
19 Q   Were you asked to attend?
20 A   Sort of last minute, later on probably the week before I
21 was asked to attend.
22 Q   Okay.  And did you do so?
23 A   Yes, yes.  I did attend.
24 Q   And do you know what the plans for the party were?
25 A   I knew we were going down somewhere in Mass.  Once again, I

**PAGE 115**

**115**

1  wasn't involved in the planning, so I ended up catching a ride
2  down with Matt Zavala and we went down to Brockton, Mass. here.
3  He went to the Country Inn I think it was, and then we went to
4  the Foxy Lady is where we went.
5  Q   All right.  And was most of the bachelor party there for
6  the day ahead of you?
7  A   Yeah.  Yeah.  Matt and I were the last two to arrive.
8  Q   And why did you arrive so late?
9  A   Well, Matt was working through the dinner rush I think.  I
10 had only worked the morning shift.  And I'm pretty sure Matt had
11 to work through the dinner, which usually ends around like 6:30
12 - 7:00-ish.  And then he came and picked me up and it's a pretty
13 long drive down, so.
14 Q   All right.  So do you know what time you arrived?
15 A   Probably closer to nine.  It was already dark out, so.
16 Q   Okay.  And what did you do when you got there?
17 A   We hung out in the hotel room for maybe at most an hour and
18 then we tried to get a hold of cabs.  And we had to get a few
19 cabs because there was several of us and then we drove down to
20 the Foxy Lady.
21 Q   And how many people were there?
22 A   Maybe 12.
23 Q   Okay.  And did everybody have a room there or did you like
24 get three rooms and everybody's going to bunk?
25 A   Yeah.  There was a couple of rooms and everyone was going

**PAGE 116**

**116**

1  to share beds I believe.
2  Q   Okay.  So the plan was to stay in Brockton that night?
3  A   Yes, it was.
4      MR. CULLINAN:  Objection, your Honor.
5      THE COURT:  Well, it's leading.  Sustained.
6  BY MR. MADDEN:
7  Q   So what did you do for the hour before you went to the Foxy
8  Lady?
9  A   Played poker in the hotel room, hung out there, you know,
10 joking around with each other.
11 Q   What did you have to drink?
12 A   Getting to meet everyone.
13 Q   I'm sorry.
14 A   There was a couple of light beers there.  I think it was
15 Bud Light maybe, Coors Light, something.
16 Q   All right.  So you went to the Foxy Lady at about what
17 time?
18 A   We got there probably after 10, somewhere between 10 -
19 10:30.
20 Q   Okay.  And what did you do when you got there?
21 A   Well, the place was already full, so we went to a back
22 table and we were pretty far back, more of a corner area and we
23 sat down in the corner.
24 Q   Do you recall if you had to pay to get in?
25 A   Yeah.  Yeah.  It was like $10 or $15.

**PAGE 117**

**117**

1  Q   Okay.  And you paid and you went in and how many tables did
2  you get?
3  A   At least two.  We kind of crammed chairs around all the
4  tables, so we could all fit back there.
5  Q   Okay.  And so what happened then over the course of the
6  evening there?
7  A   You know we just relaxed, had a good time.  And then not
8  too long into the evening an incident occurred where Matt and I,
9  Matt Zavala and I, we had asked two girls to give Dustin a lap
10 dance.  And we paid them and they went and gave him the lap
11 dance.  And then they came back and asked us for the money and
12 we said we already paid you.  And they said oh, no you didn't.
13 Yeah, we did.  So then they went and they got the manager, the
14 guy that was working out front.  They had him come back and he
15 tried to kick Dustin -- tried to kick Matt and I out, and so we
16 were in the front lobby there talking to the doorman.  And I
17 said look I know what's going on, you know what's going on.  I
18 know you tell me you can trust these girls, but this is a scam.
19 So how about we just call it even and we'll split the
20 difference.  We'll pay an additional $10 rather than another 20.
21 And so Norman said fine, you know, I'll take that.  So you know
22 of course it was a scam.
23      So he let us back in and just a couple minutes after that
24 I'm looking over and I see the two girls complaining to him,
25 again, because clearly they wanted the full amount extra.  And

Commonwealth vs. Dustin Erwin

SHEET 31    PAGE 118

**118**

1  shortly after that the manager came over and just said oh, he's
2  got to go.  What?  Then he's like that guy --
3  Q    Who was he pointing to?
4  A    Pointing to Dustin.  And we're all confused because Dustin
5  wasn't doing anything.  He's just sitting.  And he came in and
6  he said oh, he's got to go.  So clearly it seemed to be some
7  sort of retaliation for --
8  Q    Okay.
9  A    Sorry.
10 Q    So what happened after that?
11 A    They had the bouncers come over and Dustin got up, you
12 know, obviously, he was a bit upset but he walked out.  We got
13 out to the front lobby, you know, he tried talking to the
14 manager.  The manager wasn't having none of it and we left.
15 Q    Okay.  Okay.  So at the front lobby you stopped?
16 A    Yup -- yup.
17 Q    And was this inside the establishment or was it sort of
18 outside the doors?
19 A    There's sort of a foyer in the front and we were in there.
20 Q    How long were you there for?
21 A    Just a minute or two.
22 Q    Okay.  And then how many people were there?
23 A    There was myself, Matt, maybe a couple of the other guys
24 from the bachelor party but there was people going in and out
25 the whole time.  There was actually another bachelor party

**119**

1  arriving as we were being taken out so.
2  Q    And as you left, how did you leave the building, like who
3  left in what formation?
4  A    It was Matt, Dustin and I walked right out the front door.
5  Jimmy Asprogiannis, trouble with the last name, he followed
6  right behind us.
7  Q    Who's Jimmy?
8  A    Pardon?
9  Q    Who's Jimmy Asprogiannis?
10 A    Demetrius is his full first name.  He's Maria's younger
11 brother.
12 Q    Okay.
13 A    Yeah.  He's also now partial owner of Wildcat Pizza.
14 Q    Okay.  He followed you?
15 A    Yup.  He was right behind us.
16 Q    And as you went out the door, what did you do?
17 A    Walked away.
18 Q    Now, what was in front of you as you walked out the door?
19 A    We went down the ramp.  There was a limo there from this
20 other bachelor party arriving in the parking lot, just walked
21 down the ramp.  Yeah.  Yup.
22 Q    Do you recognize that?
23 A    Yeah.  The limo was right in here.
24 Q    Hold that in front of you, sir --
25      THE COURT:  For the record what exhibit is that?

PAGE 120

**120**

1  .    MR. MADDEN:  I'm sorry.  Exhibit, I think it's 3 -- 2,
2  Exhibit 2.
3  BY MR. MADDEN:
4  Q    I'm showing you what's been marked Exhibit 2, is that the
5  ramp that you walked down?
6  A    Yes, it is.
7  Q    And as you walked down it, did anything happen as you
8  walked down it?
9  A    No.
10 Q    Where were you?
11 A    Where was I?
12 Q    Yes?
13 A    Right next to Dustin.
14 Q    And where was Matt?
15 A    On the other side of Dustin, kind of slightly behind him at
16 that point in time.
17 Q    Behind him?
18 .A    Yeah.
19 .    And then you walked straight down?
20 A    Yeah.
21 .    You said people were arriving at the same time?
22 A    Yeah.  People were arriving.  People were coming in and
23 out.  There were people smoking cigarettes outside, you know.
24 Q    Very busy there?
25 A    Yeah.  Oh, yeah.

PAGE 121

**121**

1  Q    Okay.  When you got down to the parking lot?
2  A    Uh-huh.
3  Q    What happened when you got to the parking lot?
4  A    Well, the police officer who was watching the door followed
5  us out.  And we were walking away and Dustin was verbally upset.
6  So he was yelling this is crap.  I got kicked out of my own
7  bachelor party.
8  Q    How was he facing as he was saying that?
9  A    Dustin?
10 Q    Yeah?
11 A    He was facing back towards the bar.
12 Q    Okay.  Now, how far behind you is this police officer?
13 A    At that point in time, 15 feet maybe but he came up a lot
14 closer and started following right on us.
15 Q    Well, when you were first in the parking lot just getting
16 off that ramp you say he was 15 feet behind you?
17 A    At least.  He kind of stayed on the ramp for just a little
18 bit.
19 Q    Okay.  And where were you walking towards?
20 A    We were heading towards there was a Walgreen's there.
21 Q    Why were you going in that direction?
22 A    Because we were told to leave the property.  They said we
23 had to get off the property.  This was a lit parking lot.  I
24 don't know Brockton and I don't think I'd want to be walking
25 around in the middle of the night not knowing where I am.  So we

Commonwealth vs. Dustin Erwin

**122**

1  went to a lit parking lot right there and we were going to call
2  a cab.
3  Q    Okay.  And so as you're walking you say Dustin turned
4  around?
5  A    Yup -- yup.
6  Q    And why did he turn around?
7        MR. CULLINAN:  Objection.
8        THE COURT:  Sustained.
9  BY MR. MADDEN:
10  Q    So he turned around?
11  A    Yup.
12  Q    Where were you at the point in time when he turned around?
13        MR. CULLINAN:  Objection.
14        THE COURT:  Sustained.
15  BY MR. MADDEN:
16  Q    You said he turned around at some point in time; correct?
17  A    Yes.  I did say he turned around.
18        THE COURT:  You may answer that.  The answer stands.
19  BY MR. MADDEN:
20  Q    Now, at the point in time that he turned around, where were
21  you?
22  A    Where were we?
23  Q    In relation to the parking lot?
24  A    In relation to the parking lot?  We were a good 15 meters
25  maybe from the ramp.  So we had already been walking away, and

**123**

1  he was turning around looking over his shoulder beforehand, but
2  he was turning around as he was walking away.
3  Q    I'm showing you Exhibit 3, do you recognize that?
4  A    Yup -- yup.
5  Q    What do you recognize that as?
6  A    That's the Walgreenâ€™s right there.
7  Q    Were you prior to that exhibit or were you in that exhibit
8  at the point where he started turning around?
9  A    Probably, well this is that parking lot.  When he first
10  started turning around, we were closer to the Foxy Lady; yup.
11  Q    All right.  So you were heading to that parking lot?
12  A    Right.
13  Q    Okay.  So what happened then?
14  A    The police officer kept following us.  He kept coming
15  closer and Dustin was yelling why are you following me, what are
16  you doing, why are you kicking me out of my bachelor party.  And
17  you know we were walking away the whole time and Dustin's
18  saying, you know, we've left the property, why are you following
19  us.
20  Q    Now, was he yelling it or was he saying it?
21  A    He wasn't yelling but he was firmly stating it.
22  Q    Did he sound pissed off?
23  A    Yeah.  Well, he had just been kicked out of his own
24  bachelor party.
25        MR. CULLINAN:  Objection, your Honor.

**124**

1        THE COURT:  Overruled.
2  BY MR. MADDEN:
3  Q    And what was the police officer doing?
4  A    He was just following.  He was just getting closer and
5  closer and coming.  He's saying I'm going to follow you.  He
6  just kept coming.
7  Q    Does Dustin make any gestures towards him that were
8  physical or threatening in nature?
9  A    No.
10        MR. CULLINAN:  Objection, your Honor.
11        THE COURT:  Sustained -- sustained.
12        MR. CULLINAN:  Permission to approach?
13        THE COURT:  Sure.
14  (Inaudible discussion at the sidebar.)
15  BY MR. MADDEN:
16  Q    So for how a long distance then did you walk in that
17  central formation?
18  A    Until we turned the corner around the Walgreenâ€™s.
19  Q    Okay.  So you made it all the way to the end of the
20  building?
21  A    Yeah.  He made it all the way past the end because we had
22  gotten probably at least even with the front doors of the
23  Walgreenâ€™s.
24  Q    Any time during that time did the police officer get to the
25  point where he was actually did you see -- what did you see in

**125**

1  terms of the police officer's proximity to Dustin?
2  A    At the closest, he probably got maybe feet from us.  I mean
3  he was right there.
4  Q    In terms of Mr. Erwin what did you see in terms of any
5  gestures he made or anything that he did?
6  A    No -- no.  He was walking away the whole time.
7  Q    And where were you next to him in proximity to him the
8  whole time?
9  A    I was right next to him, flanking right there between him
10  and the Walgreenâ€™s.  I was on that side of him, his left side;
11  because he had his back facing the direction we were going.
12  Q    And turning to Exhibit 3, Mr. Erwin is on this side.  You
13  were on the inside --
14  A    Yup.
15  Q    -- towards the, near the Walgreenâ€™s?
16 · A    Yes.
17  Q    Okay.
18  A    Inside.
19  Q    And Mr. Zavala was where?
20  A    Mr. Zavala was on the other side.
21  Q    Okay.  And did he stay back or was he --
22  A    Well, he was kind of back a little bit more, a little bit
23  more in front of Dustin as opposed to on the side.  But he was
24  if I was Dustin, he was probably right about here.
25  Q    Okay.  So then what happened when you got to the corner

Commonwealth vs. Dustin Erwin

126

1  there?
2  A    You know we turned the corner and just out of the blue
3  Dustin got maced and Matt got maced some too.  And I have no
4  idea why the cop maced him.  It was just all of a sudden there
5  was mace everywhere.  And you know Matt started coughing.
6  Dustin covered his eyes and took a couple of quick steps and was
7  coming to a stop.  And from the left-hand side a squad car came
8  in as Dustin's slowing down and he's coming to a stop, putting
9  his hands up and a squad car comes in and takes him right in the
10 leg and knocks him right on the ground.
11 Q    Okay.  Now, did any mace get on you?
12 A    No, no.  I'm substantially shorter than Dustin.  I'm
13 guessing the mace was pointed up, because I didn't get clipped
14 by any of it but Matt did.
15 Q    What did you do when the mace was sort of sprayed there?
16 A    I took a few steps to the side just to stay out of the
17 cloud but you know it didn't hit me at all.
18 Q    Did you watch Mr. Erwin at that time?
19 A    Did I watch him?  Yeah.  Oh, yeah.  You know I was there
20 with him the whole time.  I just all of a sudden saw him take a
21 couple of quick steps, and he's coming to a stop and he got hit
22 by a squad car.  It was kind of hard to miss.
23 Q    Okay.  How far away were you at that point in time?
24 A    From where I was standing, because I took a couple of steps
25 aside, maybe 20 or so feet.

127

1  Q    Okay.  Has anything between you and Mr. Erwin?
2  A    No.
3  Q    Okay.  And what happened after that?
4  A    After that he looked fairly dumbfounded.  He started to try
5  to get back up.  He was coming back to his feet and the cops ran
6  in and tackled him and brought him right down onto the ground
7  real hard and they jumped on top of him.  It looks like they
8  were being fairly rough, but their back was to me.
9  MR. CULLINAN:  Objection, your Honor.
10 THE COURT:  Sustained.
11 MR. CULLINAN:  Move to strike.
12 THE COURT:  It's stricken.  Nonresponsive.
13 BY MR. MADDEN:
14 Q    How many cops?
15 A    At least two because there was the squad car that hit him
16 and that cop got out and the cop that was next to us came
17 sprinting in and joined in the tackle.
18 Q    Okay.  Who was first?
19 A    Who was first?  I believe it was the cop that was in the
20 car.
21 Q    Okay.  And they were -- You said the two of them were
22 running?
23 A    Yup -- yup.
24 Q    But you could only see their backs?
25 A    Yup.  And then there was at least one more squad car that

128

1  came in from the right that was parked there.  And they had
2  already had Dustin down on the ground, already had him
3  restrained and somebody opened up the back of the squad car and
4  let out a canine.  And the canine I saw it go running over at
5  Dustin's legs.  I heard barking, growling and Dustin screaming.
6  And at that point in time a cop came up and started screaming at
7  all of us if we were watching, we will be arrested.  If you are
8  watching, you will be arrested.  And then you need to leave or
9  you'll be arrested.  And they kept telling us to turn around and
10 get out of the area or they will cuff us.  And actually Matt,
11 who was staying outside coughing because he was maced, ended up
12 getting arrested for standing there coughing.  So it was quite
13 the event.
14 Q    When the car came with the canine, they came after Mr.
15 Erwin was down; right?
16 A    I thought it was the car that hit him.  I believe it was
17 that car.
18 Q    Okay.  And who let the canine out of the car?
19 A    One of the officers, you know, it's hard to say which
20 officer it all happened really quick I just saw the back door
21 open up and the dog come jumping out.
22 Q    How fast did it happen really from the point where the mace
23 is sprayed to the point where Mr. Erwin is placed in the back of
24 the cruiser?
25 A    In the back of the cruiser?  Well, from the point the mace

129

1  is sprayed to being detained and having the dog on him, 30
2  seconds at most.  But you know they held him on the ground for a
3  while and they were all on top of him for a little while until
4  they put him in.
5  Q    And you went back home after that or you went back --
6  A    Yeah.  We ended up catching cabs after walking into a
7  farther parking lot because we were forced to leave that one.
8  MR. MADDEN:  One second, your Honor.  Nothing further.
9  THE COURT:  Thank you.  Cross-examination.
10 MR. CULLINAN:  Thank you, your Honor.
11                        CROSS-EXAMINATION
12 BY MR. CULLINAN:
13 Q    Good afternoon.
14 A    Good afternoon.
15 Q    Did you say you're friends with the defendant?
16 A    I'd say I'm friends with him; yes.
17 Q    And are you friends with the defendant's now wife?
18 A    Yes.
19 Q    And in addition are they still your boss or just in the
20 past they were your boss?
21 A    In the past they were my boss.  I don't work there anymore.
22 Q    And you worked there for four years?
23 A    It was on and off.  It was kind of sporadic because I go
24 back to my family's house over the summer.
25 Q    At the time of your trip to the strip club you were still

Commonwealth vs. Dustin Erwin

SHEET 34    PAGE 130

130

1   working for them?
2   A    Well, then I was.  There was one summer where I delivered
3   pizzas all summer long, but then after that summer I started
4   working at the summer rec in my hometown.
5   Q    The summer that you went to the strip club were you working
6   for them?
7   A    Yes -- yes.
8   Q    Now, you indicated that you traveled down from the New
9   Hampshire area with Matt; is that correct?
10  A    Yup.
11  Q    And you arrived at the hotel, you believe that was around
12  nine p.m.
13  A    Uh-huh.
14  Q    And you indicated that 12 people were there for the
15  bachelor party thereabouts, 12?
16  A    Yeah.
17  Q    At least that many; correct?
18  A    I would say around that many.
19  Q    And you were playing poker and drinking pretty much right
20  when you got there?
21  A    Yeah.
22  Q    And at some point you leave and go to the Foxy Lady?
23  A    Yeah.  It was shortly after we left, you know.
24  Q    And how did you get from the hotel to the Foxy Lady?
25  A    Cabs.

PAGE 131

131

1   Q    How many cabs?
2   A    At least two.  We kind of piled into the cabs.
3   Q    So you fit 12 people in the two cabs?
4   A    I said at least two.  I can't remember.  I wasn't in the
5   first cab.  I wasn't in the last cab.  It could have been three.
6   Q    So if you weren't in the first and you weren't in the last
7   --
8   A    Yeah.
9   Q    -- there were at least three?
10  A    I'm assuming there were three.  I don't remember the exact
11  number of cabs.
12  Q    You didn't walk there?
13  A    No.  We did not walk there.
14  Q    And you went into the Foxy Lady.  You indicated that you
15  sat in a corner?
16  A    If you walk in, there's the back wall and it was straight
17  back and kind of to the left and there was sort of an alcove, a
18  little bit of the wall came forward and then over and that's
19  where we were sitting.
20  Q    So you sat down, all 12 of you sat together?
21  A    Yeah.
22  Q    You pulled some tables together?
23  A    Yup.
24  Q    You crowded some chairs in?
25  A    Uh-huh.

PAGE 132

132

1   Q    The defendant was probably somewhere towards the middle of
2   the crowd; right?
3   A    Yup.
4   Q    Facing the stage?
5  ·A    Yup.
6   Q    And you all began drinking at that time; correct?
7   A    Yeah.  I wasn't really drinking much.  I didn't have much
8   money.
9   Q    Other people were drinking though; right?
10  A    Yeah -- yeah.
11  Q    You had at least money for the cab?
12  A    Yup.
13  Q    And money to pay the cover charge to get in you said;
14  right?
15  A    Yeah.
16  Q    No one paid for you for those things; correct?
17  A    No -- no.
18  Q    And in addition while you're there and you didn't have much
19  money, you engaged in some of the activities of the strip club;
20  correct.
21  A    I just sat at the table.
22 ·Q    You sat at the table.
23  A    I had maybe a drink and sat at the table.  Strip clubs
24  aren't my thing.
25  Q    But you went there anyway?

PAGE 133

133

1   A    Well, I was going for my friend's wedding.
2   Q    Now, as you were sitting there, you were able to see the
3   defendant; correct?
4   A    Yeah.
5   Q    And fair to say even though you weren't drinking much, the
6   defendant was?
7   A    No.  He wasn't.
8   Q    He wasn't?
9   A    He wasn't drinking much.
10  Q    But he was drinking?
11  A    He was drinking but he was certainly sober.
12  Q    How many shots did you guys buy him?
13  A    I didn't see him do any shots.  I didn't buy him any shots.
14  Q    How many beers?
15  A    I didn't buy him any drinks.
16  Q    Did you see him drink any drinks?
17  A    I did see him drinking drinks.
18  Q    Was anyone else buying him drinks?
19  A    Maybe one or two people bought him a drink.
20  Q    So you guys weren't really there for the drinking.  You
21  were there for the girls; correct?
22  A    Yeah.
23  Q    Now, at some point people begin to get lap dances from
24  these girls?
25  A    Yeah.  Some of the guys got them.

Commonwealth vs. Dustin Erwin

**134**

1  Q   And you were present.  You were watching that?
2  A   No.  There was like a separate area where they did those.
3  Q   So you weren't present for that?
4  A   No.
5  Q   Do you know if the defendant went and got a lap dance?
6  A   I bought him a lap dance.
7  Q   So you didn't have much money.
8  A   I intentionally set my money in a manner so I wouldn't
9  spend too much that weekend.  I had to save up for rent.  I have
10  student loans.  I don't have much money to spend.
11  Q   But you spend money on a good investment and bought the
12  defendant a lap dance?
13       THE COURT:  It's excluded.  Next question.
14  BY MR. CULLINAN:
15  Q   Now, after that was done you indicated that there was a
16  disagreement about payment?
17  A   Uh-huh.
18  Q   Is that a yes?  You have to answer yes or no.
19  A   Yes -- Yes, it is.
20  Q   And at some point the defendant's asked to leave the
21  establishment?
22  A   After, yes -- yes.
23  Q   And you also leave with the defendant?
24  A   Yup.
25  Q   And as you're leaving you indicated that you stopped in a

**135**

1  foyer area and you had further conversation with the management?
2  A   Yeah.  Well, we were just asking him why --
3  Q   Just yes or no, sir?
4  A   Yes.  Sorry.
5  Q   Okay.  And in that area, that's the general area that the
6  police officer was standing in for the night as well.
7  A   Yes.
8  Q   And he was present during that?
9  A   Yes.
10  Q   Okay.  And fair to say you were asked to leave the property
11  at that time?
12  A   Yes.
13  Q   And you indicate that the defendant led the way out the
14  doors; correct?
15  A   Yes.
16  Q   And you went down the ramp?
17  A   Uh-huh.  Yes.
18  Q   And were you looking behind you at that time?
19  A   No.
20  Q   You said that the police officer was at least 15 feet
21  behind you?
22  A   Well, this is as we got farther down, we looked back to see
23  if the rest of the bachelor party was following us.
24  Q   Correct.  And he was at least 15 feet behind you?
25  A   Yes.

**PAGE 136**

**136**

1  Q   I think you used meters when you talked about it?
2  A   That was about how far.  Yeah.  I used to run track.
3  Sorry.
4  Q   Now, as you're leaving, you indicated that in your opinion
5  the defendant was upset?
6  A   Yeah.  He was a little bit upset.  He got kicked out of his
7  bachelor party.
8  Q   Okay.  And you could tell he was upset because he was
9  swearing at that time; correct?
10  A   He was swearing; yes.
11  Q   And he was loud?
12  A   He was fairly loud but he wasn't screaming.
13  Q   Okay.  At approximately what time is this that you're
14  getting kicked out?
15  A   Oh, God, well after 12, probably 12:45-ish towards one.
16  Q   Now, as you're leaving you indicated there was a lot of
17  traffic coming in and out?
18  A   Yeah.
19  Q   There was actually another bachelor party coming in?
20  A   Yeah.  There was a limo of people that had just were
21  coming.
22  Q   There were people outside smoking?
23  A   Yeah.
24  Q   There were people leaving when you were leaving?
25  A   Yup.

**PAGE 137**

**137**

1  Q   People coming in?  Now, approximately how long would you
2  say you were in the Foxy Lady?
3  A   Well, we left the hotel after 10, so maybe two hours or so,
4  a little bit longer.  If we left at 10, got there, got in by
5  10:30 so a good two, two and a half hours.
6  Q   Okay.  And once there became a problem, you were asked
7  several times to leave; correct?
8  A   Several times to leave?
9  Q   More than once?
10  A   No.  He just came out to the foyer and asked what was going
11  on and then we left.
12  Q   So prior to going out to the foyer, you were told to leave;
13  correct?
14  A   Yeah.  We were told to leave and then we stopped outside
15  there because you can't really talk inside the place.  It's loud
16  in there.  So we just asked once we got out into the foyer where
17  it was quieter, we asked what was going on.
18  Q   And they told you to leave again at that point?
19  A   Yeah and then we left.
20  Q   So you indicated that it's loud inside that club is it
21  consistently loud?
22  A   Yeah.
23  Q   Not the type of place you can make phone calls, things like
24  that?
25  A   I don't know.  I suppose if you got a good phone you could.

Commonwealth vs. Dustin Erwin

SHEET 36   PAGE 138

138

1  Q   Would you be able to hear anything?
2  A   I don't know.  It depends on the person.
3  Q   Now, as you're leaving at some point you notice that the
4      officer is nearby?
5  A   That the officer's nearby; yeah.
6  Q   Yes.  And the defendant notices that; correct?
7  A   Yeah.
8  Q   And would you describe the defendant as a large individual?
9  A   Yeah.
10 Q   Six foot four?
11 A   Yeah.
12 Q   280 pounds?
13 A   Maybe about that; yeah.
14 Q   Fair to say as he's walking he's towering over you?
15 A   Yeah.
16 Q   Towering over Matt?
17 A   Yeah.
18 Q   And he turns around he's facing where the police officer
19     is; correct?
20 A   Correct.
21 Q   And that's to your backside?
22 A   Yes.
23 Q   So you don't see the police officer at this time?
24 A   Well --
25 Q   When you first turned around?

PAGE 139

139

1  A   -- I'm looking at I keep looking at what Dustin's looking
2      at obviously.  Because I'm saying let's just go -- let's just
3      go, so I'm walking.
4  Q   And you turn around and you start walking backwards?
5  A   I'm not walking backwards.  I'm looking, glancing over my
6      shoulder.
7  Q   So you're looking back at the officer.  Fair to say when
8      you're looking back at the officer; you're not looking at the
9      defendant?
10 A   Well, he was right in my view too.  He, Dustin, was right
11     next to me.  The officer was right about here.  I can see both
12     of them.
13 Q   And the defendant's getting more upset at that point;
14     correct?
15 A   No.  I wouldn't say he's getting anymore upset.  We're
16     walking away the whole time.
17 Q   Well, you indicated that he was upset at the officer;
18     correct.
19 A   Well, yeah.  He was upset.
20 Q   So was he more upset at the point the officer began to
21     follow him than he was when he left the club?
22 A   No.  He wasn't escalating at all.
23 Q   But you indicated he was yelling why are you kicking me out
24     of the bachelor party; is that correct?
25 A   Yeah.

PAGE 140

140

1  Q   This is crap?
2  A   Yeah.
3  Q   Was that his language or was he using --
4  A   Every now and again he may have flourished a little, but.
5  Q   When you say flourished, what do you mean by that?
6  A   He may have used more colorful language.  He may have swore
7      a couple of times.
8  Q   And at that point fair to say you just want to get on with
9      the rest of the night and get back to the hotel?
10 A   Yeah.  I think everyone did.
11 Q   Okay.  And you were trying to encourage the defendant to do
12     that, just move on; right?
13 A   And he was.
14 Q   And that's what the rest of your friends were doing,
15     encouraging the defendant to move on?
16 A   Well, myself, Matt and Demetrius.  We were right there and
17     the others were all coming up too.  We were all moving on; yeah.
18 Q   Trying to move him along?
19 A   No.  He was moving himself along.
20 Q   Now, you indicated at some point you realize that someone,
21     people around you got maced; is that correct?
22 A   Yes, Dustin and Matt.
23 Q   And did you actually see that?
24 A   Did I actually see them get maced?  Not really.  I just
25     tasted the mace --

PAGE 141

141

1  Q   But you were aware of it?
2  A   Oh, yeah.  I was standing right there.
3  Q   And at that point you said the defendant took a couple
4      quick steps; correct?
5  A   Yup.
6  Q   And when you say a couple, do you mean two?
7  A   Maybe five or six.  Like I said, he was only like 20 - 25
8      feet away from me at most when he got hit by the squad car.
9  Q   So he took a couple quick steps and made it 25 feet away?
10 A   You said yourself he's a big guy, big strides.
11 Q   And you said that whole thing happened pretty quick?
12 A   Very quickly.
13 Q   And you saw the officer just prior to that place his hands
14     on the defendant?
15 A   No.
16 Q   You didn't see that?
17 A   No.  We were walking away the whole time.  I don't think
18     that happened.
19 Q   Now, you indicated that you saw the defendant hit by a car;
20     is that correct?
21 A   That is correct.
22 Q   Can you describe that cruiser?
23 A   It was it looks like a normal cruiser.  It came in from the
24     left and --
25 Q   Just describe the car, sir?

Commonwealth vs. Dustin Erwin

SHEET 37   PAGE 142

**142**

1  A   Oh, describe the car?  I guess I would say it was one of
2  the Crown Vic models from the standard police cruisers, Brockton
3  Police.
4  Q   How did you know it was Brockton Police?
5  A   They say it on the side of the car.
6  Q   And what color was it?
7  A   Mostly white.
8  Q   And you indicate you saw that car hit the defendant?
9  A   Yes.
10 Q   What part of the car?
11 A   It was the front passenger's side.
12 Q   Front passenger's side?
13 A   Yeah.
14 Q   And what part of the actual vehicle?
15 A   It looked like near the front lights but maybe a little
16 more towards the center.
17 Q   And where on the defendant did you allegedly see that hit
18 him?
19 A   It took him in the legs.
20 Q   Which leg?
21 A   Left leg first.
22 Q   Where in the leg?
23 A   Kind of behind the knee or yeah, around behind the knee.
24 Q   But fair to say the defendant was running at that point?
25 A   No.  He wasn't.  He was stopping.

**143**

1  Q   He was standing still?
2  A   He was about to stand still.  He was slowing down coming to
3  a stop and then they hit him.
4  Q   The defendant was moving?
5  A   Coming to a stop.  He was moving; yes.
6  Q   And you were able to see a struggle that happened after
7  that; correct?
8  A   Yes.
9  Q   So the defendant's down on the ground; correct?
10 A   Yup.
11 Q   He doesn't have his hands over his head at that point;
12 correct?
13 A   No.  He just got hit by a car.  He seemed pretty confused.
14 Q   I just ask that you answer the questions.
15 A   No.
16 Q   Did he have his hands over his head?
17 A   He had his hands up but not over his head.
18 Q   His hands were up?
19 A   He was getting up after he got hit and he was bringing his
20 hands out to his sides.
21 Q   Fair to say the police were ordering for him to stay down;
22 correct?
23 A   I would say yeah.
24 Q   And the police were yelling at him?
25 A   Well, they weren't really yelling at that point.  They

PAGE 144

**144**

1  started yelling stay down after they tackled him.
2  Q   Okay.  And that's at the point that the defendant's trying
3  to get up?
4  A   No.  Well, he had gotten back up after being hit.
5  Q   Just yes or no?
6  A   Can you restate the question?
7  Q   The police were yelling at the defendant to stay down and
8  that's the point you described him trying to get up with his
9  hands?
10 A   No.
11 Q   And you indicate there were two officers at that point?
12 A   Yes.
13 Q   Describe what their uniforms looked like?
14 A   Dark blue uniform.
15 Q   Same uniform for both?
16 A   The other officer it was harder to tell the one who drove
17 the cruiser, because I had the flashing lights from the cruiser
18 coming in after he turned his lights on.
19 Q   So it was really tough to see?
20 A   No — no.  It was easy to see when he was coming up and hit
21 him and then he turned the lights on.  It was a well-lit parking
22 lot.  The issue was --
23 Q   Okay.  So what color was the officer who drove the cruiser
24 in uniform and it was clearly lit and easy to see?
25 A   Dark blue.

PAGE 145

**145**

1  Q   Is that a guess?
2  A   No.
3  Q   So same as the others?
4  A   Same as the others.
5  Q   And you're positive?
6  A   Ninety percent.
7  Q   And at that point you turned your attention to your other
8  friend, correct, Matt, who you had driven down with?
9  A   Yes.
10 Q   And you saw he was having some trouble with his eyes;
11 correct?
12 A   Oh, yes.  His eyes were all red.  He was coughing.
13     MR. CULLINAN:  If I could have a moment, your Honor?
14     THE COURT:  Sure.
15 BY MR. CULLINAN:
16 Q   Now, you indicated that you saw the canine come out of that
17 cruiser, which had bit the defendant; correct?
18 A   Yeah.
19 Q   And which door did that come out of?
20 A   Rear passenger-side.
21 Q   So fair to say at some point that second officer was
22 involved, stopped being involved to let his dog out?
23 A   Yeah.  They had already detained Dustin and were *holding*
24 him down.
25     MR. CULLINAN:  I have nothing further.

Commonwealth vs. Dustin Erwin

SHEET 38   PAGE 146

**146**

1   THE COURT: Anything further, Counsel?

2   MR. MADDEN: Just a few questions.

3                 REDIRECT EXAMINATION

4   BY MR. MADDEN:

5   Q   The DA asked you some questions about Mr. Erwin talking to

6   the police officer, and in fact most of what he was saying was

7   why are you following us; isn't that true?

8   A   Yes.

9   Q   And that's what he was concerned with. What are you doing

10  following us? We're leaving.

11  A   Yup. And we had already left the property.

12  Q   Okay. Now, you're from New Hampshire?

13  A   Pardon?

14  Q   You're from New Hampshire?

15  A   Yes.

16  Q   You were born there?

17  A   No. I was born in Warwick, Rhode Island.

18  Q   Where?

19  A   Warwick, W-a-r-w-i-c-k.

20  Q   Have you even been to Brockton before?

21  A   No. That was my first time.

22  Q   Have you ever lived in Massachusetts?

23  A   No.

24      MR. CULLINAN: Objection, your Honor.

25      THE COURT: Overruled. I'm going to allow this. I think I

PAGE 147

**147**

1   know where it's going to take us. If it doesn't, I'll sustain

2   your objection, but go ahead.

3   BY MR. MADDEN:

4   Q   So you had never seen a Brockton cruiser before; right?

5   A   No.

6   Q   That was the first time you saw one that night; right?

7   A   Yeah. That was the first experience.

8   Q   And have you ever seen a Massachusetts State Police

9   cruiser?

10  A   No.

11  Q   That you know of?

12  A   No.

13  Q   Okay. And have you ever seen an undercover police cruiser

14  working in Brockton or for the Massachusetts State Police?

15  A   No.

16  Q   Have you ever seen a Massachusetts State Trooper?

17  A   No.

18  Q   Do you know what kind of uniforms they wear?

19  A   No. I mean if they're anything like New Hampshire, do they

20  wear brimmed hats.

21  Q   Massachusetts?

22  A   No, I don't.

23  Q   Prior to that night did you ever see -- Well, other than

24  Officer McDermott was that the first time you ever seen a

25  Brockton police uniform?

PAGE 148

**148**

1   A   No -- no.

2   Q   Other than when you saw Officer McDermott was that the

3   first time you had ever seen --

4   A   Oh, sorry. Yeah. That was the first time. I meant I had

5   never seen -- I've never been to Brockton before.

6   Q   Okay. How fast would you say this all happened from the

7   moment that he got maced until he was hit by the car and tackled

8   on the ground and bit by the dog?

9       MR. CULLINAN: Objection, your Honor.

10      THE COURT: Overruled. You may answer.

11  BY MR. MADDEN:

12  A   Just a few seconds. The car must have been coming up the

13  street already.

14  Q   So this all happened just immediately?

15  A   Very fast.

16  Q   Confusing situation?

17  A   Not too confusing. I mean I saw it all happen.

18  Q   Well, lots of cars came in?

19  A   Yeah.

20  Q   Lot of police officers arrived at the same time?

21  A   Oh, yeah.

22      MR. MADDEN: Nothing further.

23      THE COURT: Mr. Cullinan?

24                 RECROSS-EXAMINATION

25  BY MR. CULLINAN:

PAGE 149

**149**

1   Q   You had a clear view of what was going on; correct?

2   A   Yeah.

3   Q   And as you described, you described the cruiser which you

4   saw hit the defendant; correct?

5   A   Yes.

6   Q   And, again, you were able to read the side of that?

7   A   Yeah. I thought I had read Brockton on the side.

8   Q   And prior to testifying today, did you discuss your

9   testimony with anyone?

10  A   No.

11  Q   Did you talk about the night at all after it happened?

12  A   At all after it happened?

13  Q   Yes?

14  A   Yeah. I told my family what I saw.

15  Q   Did you discuss it with anybody else?

16  A   No.

17  Q   You didn't discuss it on the way home with Matt?

18  A   I didn't go home with Matt. My girlfriend picked me up.

19  Q   And did you discuss it with any of the attorneys?

20  A   No.

21      MR. CULLINAN: Thank you. I have nothing further.

22      THE COURT: Thank you, sir. You may step down.

23      THE CLERK: Thank you, sir.

24  (Witness excused.)

25      THE CLERK: Wait right outside, sir.

Commonwealth vs. Dustin Erwin

SHEET 39   PAGE 150

**150**

1    MR. MADDEN:  May we approach sidebar?
2    THE COURT:  Sure.
3    (Inaudible discussion at the sidebar.)
4    THE COURT:  Good afternoon, ma'am.
5    THE WITNESS:  Hello.
6    THE COURT OFFICER:  Watch your step, just step right in,
7    just remain standing for one minute.
8    THE WITNESS:  Sure.  Thank you.
9    THE CLERK:  How are you?
10    THE WITNESS:  Good.  How you doing?
11    THE CLERK:  Raise your right hand, please.
12           MARIA ERWIN, Sworn
13    THE WITNESS:  Yes.
14    THE CLERK:  Thank you very much.
15    THE COURT:  You can be seated, ma'am, or you may stand,
16    whatever's more comfortable.
17    Counsel, you may proceed.
18    THE WITNESS:  I'll see if I can stand.
19    MR. MADDEN:  There's a number of photos.  I thought we
20    could mark them for identification if not just in a group
21    (inaudible).
22    THE COURT:  Sure.  Has the assistant DA seen them?
23    MR. CULLINAN:  I have, your Honor.
24    MR. MADDEN:  Yes.
25    THE COURT:  All right.

---

PAGE 151

**151**

1    MR. MADDEN:  Label them one group, A, B, C.
2    THE COURT:  Well, we'll mark them individually; Mr. Clerk
3    and we'll go from there.
4    THE CLERK:  Yes, sir.
5    THE COURT:  Go right ahead, Counsel.
6           DIRECT EXAMINATION
7    BY MR. MADDEN:
8    Q    Good afternoon.
9    A    Hello.
10    Q    Please introduce yourself to the judge and the jury and
11    spell your last name for the record.
12    A    Hello.  My name is Maria Erwin, and my last name is spelled
13    E-r-w-i-n.
14    Q    And how are you related to Mr. Dustin Erwin?
15    A    He is my husband.
16    Q    And how long have you been married?
17    A    A year and two months.  We got married on August 23rd,
18    2008.
19    Q    Do you have any children?
20    A    Yes.  We have a three-week-old little boy.
21    Q    Where do you live?
22    A    In Barrington, New Hampshire.
23    Q    And what do you do?
24    A    We own a restaurant, pizza.
25    Q    Where is that?

---

PAGE 152

**152**

1    A    In Durham, New Hampshire.
2    Q    Okay.  And how long have you owned that?
3    A    About five years.
4    Q    Okay.  And how did you meet Mr. Erwin?
5    A    We actually met through my cousin, who was going out with
6    his friend and you know they had been friends for a long time
7    and then we met.  So we kept crossing paths but we never met
8    each other.
9    Q    And you work together now at the restaurant?
10    A    Yes.  I'm actually on maternity leave right now, but we've
11    been working together.
12    Q    Okay.  As of August -- When did you first meet him?  I'm
13    sorry.
14    A    We met in January of 2006.
15    Q    Okay.  So you were planning to get married on August 23rd,
16    2008?
17    A    Yes.
18    Q    And what did you know about the bachelor party that was
19    planned for August 10th?
20    A    I knew that the guys were going to go play paintball during
21    the day and then they were going to go to, they had rented a
22    hotel, a couple of hotel rooms or whatever, and they were going
23    to go there for a little bit to relax and then they were going
24    to go out to the Foxy Lady afterwards.
25    Q    So you knew all the things that were going to happen that

---

PAGE 153

**153**

1    night?
2    A    Oh, yes.  It was a bachelor party so I knew, you know.
3    Q    Okay.  And at some point in the evening did you get a phone
4    call?
5    A    Yes.  Dustin called me collect and he was very upset.  He
6    was crying.
7    MR. CULLINAN:  Objection, your Honor.
8    THE COURT:  Sustained.  It's hearsay.
9    BY MR. MADDEN:
10    Q    What time did you get the phone call?
11    A    I don't remember exactly but it must've been right around
12    -- I don't know, maybe two o'clock in the morning.  I can't
13    remember exact.
14    Q    Okay.  And the phone call was from someone in
15    Massachusetts?
16    A    Yes.
17    MR. CULLINAN:  Objection, your Honor.
18    THE COURT:  Well, the answer stands.  If you know.
19    BY MR. MADDEN:
20    Q    And as a result of that phone call what did you do?
21    A    I went -- I came to Brockton to pick up my husband because
22    he had been arrested.
23    Q    Okay.  And where did you find him?
24    A    I actually ended up finding him at the hotel.  He had
25    bailed himself out and his friend picked him up.  And we

SHEET 40   PAGE 154

154

1  actually met, we called each other, and we met at the hotel
2  because I happened to be at the exit when he called me and said
3  that he had got a ride.  So we met in the parking lot of the
4  hotel.  We had just pulled up, both pulled up at the same time.
5  Q   Okay.  In your opinion what was his state of sobriety at
6  that point in time?
7  A   Oh, he was sober.
8  Q   What did you see when you saw him?
9  A   My husband was his eye was all like swollen shut.  He was
10 black and blue.  His face, his nose was like, he looked like he
11 had just been through, I don't know if I can say the word or
12 not, but hell.
13         MR. CULLINAN:  Objection, your Honor, characterization?
14         THE COURT:  The last sentence is stricken but her
15 observations stand as to her testimony regarding his eyes, face
16 and nose.  That part of it stands.
17 BY MR. MADDEN:
18 Q   What was his emotions like?
19 A   And also if I could say --
20         THE COURT:  Just hold on one moment.  Next question.
21 BY MR. MADDEN:
22 Q   Did you notice anything else?
23 A   Yes.  I noticed that he had -- he had wounds on his calf.
24 Q   How did you notice that?
25 A   Well, he showed me, and you know, I looked and then he told

PAGE 155

155

1  me -- well, I can't tell you what he told me.
2  Q   Okay.  What kind of wounds were they?
3  A   They were bite marks, dog bite marks.
4         MR. CULLINAN:  Objection, your Honor.
5         THE COURT:  The objection is sustained.
6  BY MR. MADDEN:
7  Q   They were puncture wounds?
8  A   Yes.
9         MR. CULLINAN:  Objection, your Honor.
10        THE COURT:  Sustained.  It's leading.  It's stricken.
11 BY MR. MADDEN:
12 Q   Okay.  And what was his emotional state?
13 A   He was upset.  He had been crying.  He was just very upset
14 and wanted --
15 Q   And what did you do as a result of his condition?  What
16 happened after you saw him?
17 A   He got into my car and we got out of Brockton as fast as
18 possible and I took him to the hospital.
19 Q   Now, why didn't you take him to Brockton Hospital?
20 A   I did not want to stay in Brockton.  My husband had just
21 been beat up by the police officers in Brockton.
22        MR. CULLINAN:  Objection, your Honor.  Move to strike.
23        THE COURT:  The objection is sustained.  It's
24 nonresponsive.  The response is stricken.  You're to disregard
25 that.

PAGE 156

156

1  .
2         Ma'am, I would just ask you if you could to --
2         THE WITNESS:  I'm sorry.
3         THE COURT:  -- listen to the question and answer the
4  question that's asked of you.
5         THE WITNESS:  Okay.
6  BY MR. MADDEN:
7  Q   You wanted to leave Brockton?
8  A   Yes.  I wanted to --
9         THE COURT:  That's stricken.  Again, if you could ask a
10 question that's not leading.
11        MR. MADDEN:  Okay.
12 BY MR. MADDEN:
13 Q   Where did you go?
14 A   We went back to Haverhill, Massachusetts.
15 Q   Why did you go there?
16 A   That's our hometown where we're originally from, and we
17 went to the hospital there.
18 Q   Okay.  And what happened when you got to the hospital?
19 A   Dustin was admitted and we were there for a few hours.
20 They had to irrigate --
21        MR. CULLINAN:  Objection, your Honor.
22        THE COURT:  Sustained.
23 BY MR. MADDEN:
24 Q   Your testimony is he was placed in a room?
25 A   Yes.

PAGE 157

157

1  Q   Okay.  And did you see doctors attending to him?
2  A   Yes.
3  Q   Okay.  Did you stay with him the whole time?
4  A   Yes.
5  Q   What else did you do when you were there?
6  A   I took some pictures of Dustin of his face and legs and
7  everything of his injuries.
8  Q   Okay.  I'm going to show you a series of photos now?
9         THE CLERK:  I'm getting there.  Okay.  No.  Here you go.
10        MR. MADDEN:  We'll start with these.
11        THE CLERK:  Take more.
12        THE COURT:  How many do you have just so we --
13        THE CLERK:  We got up to 16, your Honor.
14        THE COURT:  All right.  Go ahead, Counsel.  Sure why don't
15 you show them all at once.
16        Ma'am, will you look at those?
17        THE WITNESS:  Yup.
18 BY MR. MADDEN:
19 Q   Are those copies of the pictures?
20 A   Yes.  These are the pictures that I took.
21 Q   Okay.  Now, some of these are self-explanatory, however,
22 I'm going to show you what was marked Exhibit 14 and ask you if
23 you can describe or explain where, what part of the body you took
24 that picture?
25 A   Okay.  This is his knee, right?  No.  I'm sorry.  This is

Commonwealth vs. Dustin Erwin

SHEET 41   PAGE 158

## 158

1  his elbow.  I'm sorry.
2  Q   Okay.  I'll show you --
3      THE COURT:  As you do this if you'd show the jurors so that
4  they can see what she's referring to?
5      MR. MADDEN:  Okay.
6      THE WITNESS:  Do you want me to show?
7      THE COURT:  Sure.
8      THE WITNESS:  This is his elbow.
9      THE COURT:  Thank you.
10  BY MR. MADDEN:
11  Q   And I'm showing you now Exhibit 8 and ask you if you can
12  explain what that is?
13  A   Yeah.  This is his calf and there are the puncture wounds.
14      MR. CULLINAN:  Objection, your Honor.
15      THE COURT:  No, the answer stands.  Just hold it up, ma'am,
16  if you'd show the jurors.  All right.
17  BY MR. MADDEN:
18  Q   And Exhibit 10?
19  A   And this is again the calf area where the puncture wounds
20  were.
21  Q   And the other pictures are pictures of his face?
22  A   Yes.
23  Q   And are self-explanatory.
24  A   Yes.
25  Q   But those were pictures that were taken that night by you;

## 159

1  right?
2  A   Oh, yes.
3      THE COURT:  Why don't we at this point admit them?
4      MR. MADDEN:  Oh, yes.
5      THE COURT:  What numbers do we have, Mr. Clerk?
6      THE CLERK:  We have 6 through 16, your Honor.
7      THE COURT:  Any objections?
8      MR. CULLINAN:  No, your Honor.
9      THE COURT:  Six through 16 are marked and now admitted.
10      THE CLERK:  Okay.
11      MR. MADDEN:  Thank you, your Honor.
12  (The clerk marks the photographs as Exhibits Numbered 6 through
13  16.)
14  BY MR. MADDEN:
15  Q   As to the injuries that he had on his leg have they healed?
16  A   No.  There are still scars there.
17  Q   Have the other injuries healed?
18  A   Yes.
19  Q   How long did it take for the swollen eye to heal?
20  A   A while, which was an issue at our wedding, because the
21  wedding was about 13 days after this whole thing happened.
22      THE COURT:  All right.  Hold on, ma'am.  Next question.
23      THE WITNESS:  Sorry.
24  BY MR. MADDEN:
25  Q   How about his injuries to his hand?

PAGE 160

## 160

1  A   I think --
2  Q   Do you remember, Exhibit Number 12?
3  A   Yes.  His hand was pretty scraped up.
4  Q   And how long did that take to heal up?
5  A   That took a while also.  I don't know exactly how long but
6  it did take a little while.  He might still have a scar
7  actually.
8  Q   Okay.  And how long did he stay at the hospital?
9  A   It was a few hours.  I don't remember exactly what time we
10  left but it was maybe eight in the morning if I had to take a
11  guess, but I know we were there for a few hours.
12  Q   And were you next to him the whole time?
13  A   Yes.
14  Q   What were the doctors doing to the wound in his leg?
15  A   They had to irrigate it.
16      MR. CULLINAN:  Objection.
17      THE COURT:  Sustained.
18  BY MR. MADDEN:
19  Q   Okay.  What did you see?
20  A   I saw --
21  Q   What types of --
22  A   -- there was tubes.
23      MR. CULLINAN:  Objection.
24      MR. MADDEN:  Okay.  I'll withdraw the question.
25      THE COURT:  All right.

PAGE 161

## 161

1      MR. MADDEN:  That's all I have.
2      THE COURT:  Thank you.  Any questions, Mr. Cullinan?
3      MR. CULLINAN:  Just briefly, your Honor.
4          CROSS-EXAMINATION
5  BY MR. CULLINAN:
6  Q   Good afternoon ma'am.
7  A   Good afternoon.
8  Q   You're currently married to the defendant; correct?
9  A   Yes.
10  Q   You love him?
11  A   Yes.
12  Q   You'd do what you can to support him; correct?
13  A   Of course.
14  Q   Including coming here today?
15  A   Well, I came here today, yeah, to tell the truth.
16  Q   And fair to say you weren't present for anything that
17  happened on August 10th, 2008 until the time you picked up the
18  defendant at the hotel?
19  A   No, I was not.  Yeah.  No.
20  Q   You didn't see what happened?
21  A   Nope.
22  Q   And you didn't see how his injuries occurred?
23  A   Nope.
24      MR. CULLINAN:  Thank you.  I have nothing further.
25      THE COURT:  Thank you.  Anything further?

Commonwealth vs. Dustin Erwin

SHEET 42   PAGE 162

162
1    MR. MADDEN:  No.
2    THE COURT:  Thank you.  You may step down.
3    THE WITNESS:  Thank you
4    (Witness excused at 3:35 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PAGE 163

163
1
2
3                    C E R T I F I C A T E
4
5        I, Kim M. Crandell, Certified Verbatim Court Reporter, do
6    hereby certify that the foregoing is a true and accurate
7    transcript of an excerpt of a CD recording of the court
8    proceedings in the above-entitled matter.
9        I, Kim M. Crandell, further certify that the foregoing is
10   in compliance with the Administrative Office of the Trial Court
11   Directive on Transcript Format.
12       I, Kim M. Crandell, further certify that I neither am
13   counsel for, related to, nor employed by any of the parties to
14   the action in which this hearing was taken, and further that I
15   am not financially nor otherwise interested in the outcome of
16   the action.
17
18
19
20   _____
21   Kim M. Crandell, CVR
22   Date:  March 1, 2011
23   KC Court Reporting
24   140 Warren Street West
25   Raynham, MA  02767
26   508-944-7158
27   kimcrandell@comcast.net

SHEET 1  PAGE 1

ï»¿1

```
1                                    Volume:  II
2                                    Pages:   1 - 27
3                                    Exhibits: 17
4
5                 COMMONWEALTH OF MASSACHUSETTS
6
7    PLYMOUTH, SS.              DISTRICT COURT DEPARTMENT
8                              OF THE TRIAL COURT
9                              DOCKET NO. 0815CR5844
10
11
12   * * * * * * * * * * * * * *
13                                *
14   COMMONWEALTH OF MASSACHUSETTS,*
15             Plaintiff          *
16                                *
17   vs.                          *
18                                *
19   DUSTIN ERWIN,                *
20             Defendant          *
21                                *
22   * * * * * * * * * * * * * *
23
24
25        JURY TRIAL
26        BEFORE THE HONORABLE PAUL C. DAWLEY
27        EXCERPT:  CLOSING ARGUMENTS
28
29
30   APPEARANCES:
31   For the Commonwealth:
32   Patrick T. Cullinan, Assistant District Attorney
33   Plymouth County District Attorney's Office
34   32 Belmont Street
35   Post Office Box 1665
36   Brockton, MA  02303
37
38   For the Defendant:
39   Neil V. Madden, Esquire
40   14 Dorchester Street
41   Boston, MA  02127
42
43                         215 Main Street
44                         Brockton, MA 02301
45                         Wednesday, November 4, 2009
46
```

Commonwealth vs. Dustin Erwin

SHEET 2   PAGE 2

**PAGE 2**

E X H I B I T S

17.   Medical Records . . . . . . . . . . . . . . . .   3

CLOSING ARGUMENTS
By Mr. Madden. . . . . . . . . . . . . . . . . . . .   5
By Mr. Cullinan. . . . . . . . . . . . . . . . . . .   19

**PAGE 4**

1  are now going to proceed with the closing arguments of counsel.
2  After the arguments, I will instruct you on the law and you will
3  begin your deliberations.
4      Now, the procedure as to the closing argument differs from
5  the opening statements.  If you recall, the opening statement
6  the Commonwealth proceeded first followed by defense counsel.
7  By rule of the court the order is reversed.  Defense counsel
8  will give his closing argument rather first followed by the
9  Commonwealth and then I will instruct you on the law and you
10 will begin deliberations.
11     Now, as I told you early in the case, just like the opening
12 statements, the closing arguments of the lawyers are not
13 evidence.  The evidence in this case came from the witnesses
14 that testified from the witness stand as well as the exhibits
15 that have been introduced that you'll have an opportunity to
16 examine in the jury room.  However, this is an important part of
17 the trial for the lawyers to summarize important points for you
18 to consider with respect to their respective positions.  So I
19 urge you to give them the same close attention that you have
20 given the rest of this case.
21     Now, I told you it's not evidence; the arguments are not
22 evidence in the case.  Keep in mind that if the lawyers argue
23 points about the facts of this case that do not conform to what
24 your recollection is as jurors, that it is your memory that will
25 govern what the facts of the case are in this case.  So keep

**PAGE 3**

1  (Defendant present.)
2  (Jury present.)
3      (Whereupon, at 9:35 a.m., the testimony continued.)
4      THE COURT:  Good morning, ladies and gentlemen.
5      THE JUROR:  (Collectively) Good morning.
6      THE COURT:  First of all, thank you for returning promptly
7  this morning.  I have to ask you at this point if you've all
8  complied with my order not to discuss this case or to seek out
9  or receive information from any other source.  All right.
10     We're now going to proceed.  Counsel?
11     MR. MADDEN:  The defendant moves to introduce the medical
12 records, which were previously certified.
13     THE COURT:  All right.  Mr. Clerk, the medical records.
14     THE CLERK:  Exhibit Number 17, your Honor.
15     THE COURT:  And for the record, may I see those?
16     THE CLERK:  Yes, sir.
17     THE COURT:  All right.  For the record these are the
18 medical records from Merrimack Valley Hospital for the care and
19 treatment of Dustin Erwin on or about August 10, 2008.  Those
20 will be marked as Exhibit 17 in the case.
21     (The clerk marks the medical records as Exhibit Number 17.)
22     THE COURT:  All right.  The defendant rests at this time?
23     MR. MADDEN:  Yes, your Honor.
24     THE COURT:  All right.  Ladies and gentlemen, you have
25 heard all of the evidence you're going to hear in the case.  We

**PAGE 5**

1  that in mind as you hear the arguments of counsel.
2      At this point in time, Mr. Madden, you may proceed.
3      MR. MADDEN:  Thank you, your Honor.
4           CLOSING ARGUMENT OF THE DEFENDANT
5      MR. MADDEN:  Good morning, again, ladies and gentlemen.
6  Thank you for sitting here, this was a relatively short trial,
7  but there was a lot of information.  And it's important, it's
8  very important for you to keep close attention to what was being
9  said was being shown and you did so as you sat through the day
10 yesterday, occasionally it was clear that you were paying close
11 attention to the case and that's important.  It's important
12 because not only is the evidence important, but it's the way the
13 evidence is delivered.  It's the way people testified, the way
14 the officers testified, the way the civilians testified, because
15 you have to judge not only what they say but whether it's
16 believable.  And even though it was a one-day trial, there was a
17 lot of information.  So I am going to use notes in my closing
18 here because this is a very important day for Mr. Erwin.  Your
19 decision affects the rest of his life (inaudible).
20     Now, to say at the outset none of us would be here or would
21 have been here in the beginning if Detective McDermott had just
22 done his job, and if he had just done his job when Mr. Erwin and
23 his friends left the building, turned around and went back to
24 doing his job, taking care of the inside of the Foxy Lady.  They
25 were asked to leave.  They left.  That should have been the end.

Commonwealth vs. Dustin Erwin

SHEET 3   PAGE 6

**6**

1  It would have been a good night for everybody but it wasn't and
2  that's not what happened.
3      And so we're left with the evidence here. We're left with
4  the facts of what happened for the remainder of the evening on
5  August 10, 2008. And it's up to you now to go through those
6  facts and decide what actually did happen and how you're going
7  to access that. And the judge will give you a roadmap. One of
8  things he's going to tell you is that you have to look at the
9  evidence and you assess the credibility of the witnesses, the
10  believably of the testimony, what your common sense is what your
11  life experiences tell you about whether something's true or not
12  or whether something rings true in your head, whether you can
13  believe what's being said. And you know what in sort of a
14  colloquial way I like to look at it like when you're buying a
15  dozen eggs. You go down there and you look at the eggs. If one
16  or two are cracked, you're not buying that dozen eggs. If one's
17  broken you're not buying them. If I buy a dozen eggs that has a
18  white one in it when you're buying brown eggs or a small one
19  when they're all supposed to all be large, but you're looking
20  for something a product that you can rely on. You're looking
21  for the real picture. I suggest in this case the Commonwealth
22  hasn't proven their case.
23      Now, the two officers take the stand, two seasoned
24  officers, two officers that appeared here not in their police
25  officer outfits but in their coats and ties and testified to

PAGE 7

**7**

1  having anywhere from 13 to 20 years respectively, testifying
2  about things that they wrote reports of that night, wrote
3  reports reminding them of the details, putting all the details
4  down, something they can refer to, something that is in their
5  locker, something that is in the files at the police department
6  so they can look back. So for them, this incident happened the
7  last time they looked at that report. They remembered
8  everything. They remembered it as that report told them to
9  remember it. They remembered it as grabbing the shirt, as
10  twisting, as swaying, as running and that.
11      And then you had Mr. Zavala and Mr. Flinn, two guys who are
12  studying to be teachers, two graduate students who happened to
13  be there on that night some year and a half ago in the middle of
14  the night, who aren't seasoned, who are telling you their best
15  memory. Who they didn't get their stories exactly right. They
16  didn't know the colors of the cars, didn't know the colors of
17  the uniforms, but I'd suggest to you told you the truth as they
18  remembered it.
19      They didn't back away from the fact that this was a
20  bachelor party. They didn't try and sugarcoat the fact that
21  they were drinking beer. They said it. They got to the hotel
22  and the guys were drinking beer. They went to the bar. Mr.
23  Flinn said he wasn't drinking because he didn't have any money.
24  Mr. Flinn told you, you know, adult entertainment places aren't
25  my deal but he went. Mr. Zavala said he had a beer. Mr. Flinn

PAGE 8

**8**

1  said he saw Mr. Erwin have a couple of beers. They're not
2  trying to hide anything. They're telling you the truth. They
3  told you that this was a bachelor party. They told you that
4  they sat there and had lap dances and other things. They told
5  you they had a disagreement with the manager. And when he asked
6  them to leave, they left. They went out to the foyer. They
7  asked one more time why are you kicking us out. This is my
8  bachelor party. And they told you Mr. Erwin was upset about it.
9  They didn't hide that fact from you. They told you the truth.
10  And in so many ways the stories corroborate events and times and
11  things that happened. But I'd suggest that the truth in this
12  case flies squarely in Mr. Zavala's and Mr. Flinn's
13  observations.
14      Both Detective McDermott and Mr. Zavala and Mr. Flinn said
15  they left the building. That's what drew his attention to it.
16  That's what drew Detective McDermott's attention to this client.
17  They left the building. They went out. Mr. Flinn and Mr.
18  Zavala said yeah, there were guys out there smoking cigarettes.
19  That's what Detective McDermott said. There were other people
20  coming and going. There was a lot of traffic down there.
21  Detective McDermott wants you to believe they stood there on
22  that ramp for some 10 or 15 minutes just causing a problem.
23  That didn't happen, ladies and gentlemen. You know that didn't
24  happen. They left. They walked down the ramp and Detective
25  McDermott said finally he came out when they get rid of Mr.

PAGE 9

**9**

1  Erwin. He gave him the finger and he was inside. I'd suggest
2  that didn't happen, because if he was still inside, he had other
3  business to attend to and that's where he should have been and
4  that's where he should have stayed.
5      They left. They went out. They did what they were told to
6  do, leave the building. They weren't happy about it but they
7  did it, and nothing happened until Detective McDermott decided
8  this was going to be a personal thing for him. And he walked
9  down that ramp while these people were marching over to the Wal-
10  Mart (sic) store finding a cab and he started following them.
11      Now, he wants you to believe that Mr. Erwin was screaming
12  and yelling and ranting and raving F you, F this place. You're
13  just a big cop. You're this, that and the other thing. Well,
14  you know what, I'd suggest that to a certain extent Mr. Erwin
15  was saying some things to him and they might not have been the
16  most polite, kind things in the world, and Mr. Flinn and Mr.
17  Zavala told you that. They said yeah, he said after a couple
18  times he said you're what kind of a cop are you, but his main
19  point was what are you following us for. Let's go. We're
20  leaving. What are you following us for? And you know -- and
21  you know, that Detective McDermott was not just sitting there
22  quietly, peacefully walking along, seeing him go. You know he
23  was instigating this thing. You know because of what he did at
24  the end of this thing and you know because of the way he told
25  you it was getting to him that he did it. He was part of this

Commonwealth vs. Dustin Erwin

SHEET 4 PAGE 10

**PAGE 10**

1 problem. There was no problem if he had gone inside and done
2 his job.
3 Now, ladies and gentlemen, one of the cases, one of the
4 charges is trespassing. Well, I'd suggest to you, I'd suggest
5 as a very quick study that charge is not part of this case.
6 Detective McDermott says the whole thing started here in the
7 Walgreenâ€™s parking lot. They were gone. They weren't
8 trespassing. He threw that charge in at the end, because you
9 know hey, I've got to build this case up as much as I can.
10 McDermott follows him; in McDermott's own words he is the
11 aggressor. He goes up to Dustin Erwin and grabs his shirt and
12 starts shaking him. Dustin Erwin did nothing but call him a
13 name. There's no crime in that. His Honor will tell you that.
14 He was the aggressor. He grabbed him and when Dustin Erwin
15 continued to walk away from him and continued to call him a
16 name, he decided okay, that's not enough. So he went back up to
17 him and he maced him.
18 Now, Mr. Zavala and Mr. Flinn didn't see the detective grab
19 his shirt. So I don't know if that happened or didn't happen.
20 But we do know that he maced him and we do know that he maced
21 him for no reason whatsoever other than he was a little bit
22 pissed off by this time. Dustin Erwin was not creating a scene.
23 In fact when McDermott told you that he maced him, he lost track
24 of all the other people that were around him. Where did they
25 all go? He was creating such a scene where did all the people

**PAGE 11**

1 go? Wouldn't everybody be there hey, what's going on? Look at
2 this a big fight. There was no scene. There wasn't a scene
3 until McDermott made it a scene, until he pulled out his weapon
4 and shot Dustin McDermott (sic) in the face; not only Dustin
5 Erwin but hitting Matt Zavala as well. This happened at
6 Walgreenâ€™s, over 100 feet away from the Foxy Lady.
7 And then there's a question what Mr. Erwin did at that
8 point in time, but there's no question that he got out of the
9 spray of mace. And McDermott says he ran 50 or 60 feet. Rob
10 Flinn said he ran 20 feet. Matt Zavala tells you the truth.
11 Hey, I got mace in my eyes. I didn't see where he went. By the
12 time I could clear my eyes and look up, I saw him getting run
13 over by a car. So whatever he did, the next thing you see
14 happen is a police car runs him down, hits him, bang, right in
15 the leg, knocks him over.
16 Now, McDermott told you he ran after Mr. Erwin and as he
17 tackled him they might have hit a car. Well, isn't it just a
18 weird coincidence that that same car that two people saw hit him
19 was right there when McDermott was on top of him? I'd suggest
20 that car hit him. I'd suggest that's what happened, the
21 Brockton Police, Trooper Higginbotham came in and was moving so
22 fast he couldn't stop and he said well, I don't know. We can't
23 speculate on what went on but it hit him and it knocked him down
24 and it did exactly what Rob (sic) Zavala and Rob Flinn and Matt
25 Zavala told you it did and it knock him down and sort of he lost

**PAGE 12**

1 his bearing. And as he's trying to get up, he gets tackled. He
2 gets tackled by McDermott and he gets wrestled to the ground and
3 then Higginbotham is there next him.
4 Now, ladies and gentlemen, Detective McDermott wants you to
5 believe that he was following procedure -- following procedure
6 that he had learned once a year, procedure he had learned some
7 13 years ago on how to subdue a person, how to get him under
8 arrest by giving him one simple flat face punch with the palm of
9 his hand. Boom. And that's what he did. Ladies and gentlemen,
10 you're going to have the medical reports. Now, these things get
11 a little confusing. There's a lot of stuff you can read in
12 here, a lot of things about facial contusions, explanation about
13 his eye being swollen, "right eye very swollen, ice applied,
14 patient alert" (inaudible) "to lower extremities, nausea is
15 gone, other places he's got facial contusions." I would suggest
16 as you read this "multiple contusions to his legs," just look at
17 the diagrams. Someone took the time to draw what happened to
18 Mr. Erwin. And they're the simple things we're looking for and
19 they're about five pages in. Here is his body. Here's the back
20 of his body, leg bites up and down the arm, arm contusion, back
21 contusion, face and neck contusion and then they draw a face
22 separately and they draw the whole side of his face as being
23 bludgeoned -- bludgeoned, not a palm to the face, not one of
24 these deals. Fist pounding away at this man, pounding away and
25 bludgeoning him while he's on the ground after being run over by

**PAGE 13**

1 a car. This was a man who was out of control, McDermott. This
2 is a man whose human emotions overtook his job. This is a man
3 who had lost control of what he was doing as he beat Mr. Erwin
4 down. And I'd suggest to you that if Mr. Erwin was really this
5 monster that everyone said, the six-five, 285 pound monster, he
6 probably could have taken that guy and thrown him, but Mr. Erwin
7 sat there and he took it. And he took it probably because he
8 had just been run over by a car. I'd suggest that tells you
9 about McDermott and the way he acted and the way he overreact in
10 this case. You know what tells you a little bit more about it
11 is Officer Anderson. He tells you he gets a phone call from
12 McDermott, a radio page from McDermott and McDermott told you he
13 did that as he was walking into Walgreenâ€™s parking lot. Well,
14 this party was some 20 feet in front of him walk away from him,
15 and he's saying I'm in pursuit of a suspect. And his voice
16 sounds panicked and distressed, panicked by what? Because he
17 came up and said hey, F you, cop? That makes McDermott panicked
18 and distressed. Nothing's happened to him so far. All he does
19 is walk in behind some guys and he's heard a guy yell at him a
20 few times. Where's the panic? Where's the distress? I suggest
21 if that's true McDermott needs to be retrained. And Anderson
22 certainly needs to be retrained because when he got to that
23 parking lot; did he stop and assess the situation? Did he say
24 okay I got a man down? We've got two cops on top of him, one
25 guy bludgeoning his face, everything's under control. It looks

Commonwealth vs. Dustin Erwin

**14**

1  a little wild but it looks like if I go over there there will be
2  three on one and then, you know, we'll basically have him down?
3  No. He opens the back door of his car, "attack," sends his dog
4  over there to bit the guy to pieces. And you'll see the marks
5  that are still there today and you'll see the bruises from where
6  he got hit by the car. And you'll read if you care to, about
7  the dog bites and the irrigation and the multiple contusions on
8  his legs.
9      These guys were out of control, ladies and gentlemen. This
10 was not a case of A&B on a PO. This was an attack on a civilian
11 person, unjustified and outrageous. However you believe Dustin
12 Erwin was acting that day; however you believe maybe he was a
13 little bit buzzed; whatever he was saying in the parking lot;
14 the bottom line is nothing that happened to him was justified by
15 his actions. Nobody justified getting beaten like that for
16 saying "fuck you cop." Because it's not against the law to do
17 it and his Honor will tell you that. Words alone do not rise to
18 the level of a criminal act. I suggest disturbing the peace and
19 disorderly conduct are more elements that McDermott needed to
20 make up here in order to justify this outrageous act of his.
21     You'll hear the definitions from his Honor and you'll hear
22 that time, place, location are important parts of those two
23 charges. Were there people there that were so outraged by the
24 noise and the threats of the violence that this could amount to
25 an annoyance to the public? Well, I'd suggest to you at one

**PAGE 15**

**15**

1  o'clock in the morning in the commercial district outside the
2  Foxy Lady it's impossible to disturb the peace by yelling. You
3  heard about how loud it is inside. You can't hear a telephone
4  in there. Screaming and yelling, you know, they're not
5  disturbing the peace. That's part of the local -- that's the
6  regular order of business there at one o'clock in the morning,
7  people getting out of the bar. There was no fight until
8  McDermott made it a fight. There was no attack until McDermott
9  attacked this man here.
10     McDermott admitted to you on his police report
11 weapons/force in resisting arrest? "None." Assault and battery
12 on a police officer weapons/force? "None." He had the weapons.
13 He had the training. He had the experience and he had the
14 authority and he abused all four of them. He abused them all
15 and he beat this man down.
16     Your responsibility, as his Honor will explain to you, is
17 that you must find that the Commonwealth has proven their case
18 beyond a reasonable doubt. Beyond a reasonable doubt and it's a
19 standard that was set some 200 years ago in this state by a
20 judge in a case called Webster. And I can't explain it as well
21 as he can, obviously, but it has to do with you believing the
22 evidence convinces you to a moral certainty that leaves you
23 still (inaudible) in your belief that these charges are true.
24 And it must be proven beyond that. And ladies and gentlemen,
25 the Commonwealth simply did not prove this case at all.

**PAGE 16**

**16**

1      The evidence that the Commonwealth gave you from Officer
2  McDermott and Officer Anderson raises some questions, maybe
3  throws out some possibilities, you know, was he too loud? Did
4  he threaten the police? Leaves open to speculation that there
5  may be some possibility, but does not prove this case beyond a
6  reasonable doubt. The Commonwealth presented Detective
7  McDermott, one man, to tell you about a sequence of events that
8  lasted over 10 or 15 minutes of how he was upset about this
9  man's actions. What else did he tell you? He said it started
10 while he was inside the Foxy Lady and Mr. Erwin gave him the
11 finger as well as two or three other people who were working at
12 the Foxy Lady. Well, where are they? They certainly can come
13 take the stand and can corroborate his story about them standing
14 on the ramp there and causing a problem and causing an
15 inconvenience. That is not Mr. Erwin's duty to present. That's
16 the Commonwealth's burden to present to you. They didn't do it.
17 It's not his fault. You can't hold it against him.
18     Where's Sergeant Higginbotham, the man who ran Mr. Erwin
19 down? Well, if it didn't happen, why didn't he come in and say
20 no, I didn't hit him. I stopped just before him. I got out.
21 The guy was out of control. He was fighting with the officer.
22 A man who was on the scene, a police officer that day. Not Mr.
23 Erwin's duty. The Commonwealth's burden. What about the other
24 police officers that were supposedly around this time, the other
25 State Trooper, the guys that were cuffing Matt Zavala and macing

**PAGE 17**

**17**

1  him, the other guys who were telling them if anybody sees
2  anything here, you're under arrest too, where were they? They
3  certainly have information that would clarify some of these
4  questions. It's not Mr. Erwin's duty. It's the Commonwealth's
5  burden. They didn't do it -- they didn't do it. There's too
6  many broken eggs in this dozen, ladies and gentlemen. There is
7  no evidence beyond a reasonable doubt that this case happened at
8  all.
9      Now, on the contrary, Mr. Erwin doesn't have to present
10 witnesses, but people that were there, people that care about
11 him, people that wanted you to know the truth the day they came
12 down here and shared to you what happened in their perspective
13 and yeah they didn't get it perfect. You know, one guy said it
14 happened at twelve. One guy said 12:45. I think Mr. Flinn said
15 that the Brockton Police car with the dog in it was the guy who
16 hit Dustin and hit him somewhere, and the car somewhere between
17 the parking light hit him and he was standing some 20 feet away.
18 Mr. Zavala who had just been maced in the eyes said it was a
19 State Police cruiser and it was a black fender. You know and
20 then Mr. Flinn said the car was blue and Mr. Zavala said it was
21 black, said that it had a Brockton name on it. You know these
22 guys are down there, it happened in 30 seconds, and the next
23 thing you know there's five police cars in the parking lot.
24 Yeah, maybe they didn't get it exactly right and they didn't
25 write reports, but they came down here and they told you what

Commonwealth vs. Dustin Erwin

## 18

1  happened that night.  I would suggest they told you the truth of
2  what did happen that night.
3       Now, my brother will talk to you finally and of course he's
4  going to give you a different spin on how the cops are doing
5  their job and they're trained officers and that this was an
6  outrageous act and it caused such disruption and commotion in
7  the parking lot that they were justified in their actions, but I
8  want you to remember the evidence, the evidence that we're
9  talking about here now.  I want you to remember when you go
10 back, weigh it all.  That's what his Honor told you at the
11 beginning.  Listen to all the evidence.  All the evidence only
12 tells you only one story, and you are trusted to find and
13 deliver a true and just verdict as his Honor told you.  And a
14 true and just verdict in this case is not guilty on all counts.
15 A true and just verdict given the state of the evidence and the
16 lack of evidence that the Commonwealth has produced in this case
17 is a not guilty verdict.  A true and just verdict based on the
18 lack of justification from the beating that this man endured
19 that evening is not guilty.  And a true and just verdict based
20 on the lack of corroboration you have from any police officer to
21 this case is not guilty.
22      I suggest to you when you go back and you look at these
23 pictures and you see how far away from the Foxy Lady this was
24 and when you read these records and you think of the testimony
25 of the witnesses in this case, you will (inaudible) not guilty

## 19

1  on all counts.  Thank you.
2       THE COURT:  Thank you, Mr. Madden.
3       MR. CULLINAN:  Permission to approach?
4       THE COURT:  Yes.
5  (Inaudible discussion at the sidebar.)
6       THE COURT:  All right.  Mr. Cullinan, you may proceed on
7  behalf of the Commonwealth.
8       MR. CULLINAN:  Thank you, your Honor.
9       CLOSING ARGUMENT OF THE COMMONWEALTH
10      MR. CULLINAN:  When we started this case, I told you that
11 it was a case about choices, about choices made by this
12 defendant and no one else.  Defense counsel wants to suggest
13 this is a case about the police, but it's not.  It's about the
14 defendant and the choices that he made that night.
15      He chose to come down from New Hampshire, get a hotel room
16 and start drinking at the hotel room with his friends.  After
17 that they piled into a number of cabs.  I'd suggest to you that
18 the defense witnesses, Mr. Zavala and Mr. Flinn, really don't
19 have a good idea of what happened that night.  One tells you
20 five people were there total.  The other tells you 12.  I want
21 you to think about those things.
22      Now, they go to the strip club and they're there for a few
23 hours.  They're drinking while they're at the strip club and you
24 heard testimony from the defense witnesses that there was a
25 problem.  They were asked to leave by the management.

## 20

1       The first choice - did the defendant just leave?  I suggest
2  to you the evidence shows you that he didn't.  They argued first
3  with the management.  They started to walk out, they argued with
4  more management before they leave.  And that's the area
5  Detective McDermott was in.  The second choice - asked to leave,
6  just go out the door?  No.  They stopped and they argued again.
7  Why?  Because the defendant's been drinking and he's upset.
8  He's pissed off that his night at the strip club is ending
9  early.  This is his last hurrah.  He was buzzed.  He was
10 intoxicated.  He's unsteady on his feet and he's acting that
11 way.  So at this point they've been asked at least twice to
12 leave.
13      Now, you heard from Detective McDermott.  He's been working
14 that detail at the Foxy Lady for several years.  I want you to
15 think back to his testimony about that.  He said in his time at
16 the Foxy Lady, which has come out in evidence is not the most
17 peaceful place in the world, how many arrests did he tell you
18 that he's made?  Two to three arrests.  I want you to think
19 about that and think about what the detective told you and how
20 the defendant's choices that night forced the detective to take
21 action.  Do you really believe the defendant was just walking
22 away, saying nothing, head down with his friends?  Do you think
23 Detective McDermott wanted to get involved with that?  I suggest
24 not.  The defendant slammed through those doors and the
25 detective began watching him at that point because the managers

## 21

1  were watching them.  They huddled on the ramp, which they all
2  showed you they were walking down the handicap ramp, and he's
3  cursing and he's yelling and from the accounts of all the
4  witnesses, there's people outside, there's more people coming
5  in, more people leaving, there's a Walgreen's in the area.  He's
6  loud.  He's yelling and he's drunk.  And think about what the
7  witnesses told you he was saying.  F you; you're not going to
8  arrest me; I can't believe I'm getting kicked out my own
9  bachelor party.  (Inaudible) the witnesses agreed that he was
10 yelling back at the detective.  The detective tells you he asked
11 two to three more times for the defendant to leave that
12 property.  I suggested to you that shows you the defendant just
13 didn't walk away.  The defendant's turned around.  He's looking
14 at the officer.  He's making gestures.  The detective tells you
15 he takes a fighting stance at one point.  He's disturbing the
16 peace.  He's being disorderly on the streets of Brockton at one
17 a.m.  The officer decides at that point the defendant's out of
18 control.  He's needs to take action.  He's got to place him
19 under arrest.  The detective moves towards him, grabs onto his
20 shirt, he indicates his shirt rips at that point.  Now, think
21 about that.  Who's the only person that told you that the shirt
22 ripped?  The detective.  Defense counsel wants you to think that
23 the detective was out of control that he way lying.  Why would
24 he put that in that he ripped someone's shirt if it wasn't the
25 truth?

Commonwealth vs. Dustin Erwin

SHEET 7   PAGE 22

22

1   MR. MADDEN:  Judge, I would object.
2   THE COURT:  The objection's overruled.
3   MR. CULLINAN:  The fact is it happened and the detective
4   told you what happened.  As he moved in to make the arrest, he
5   was swatted away by this six foot, five, 280 pound guy.  Again,
6   do you think the detective wants this headache?  He's working
7   the door.  Why is he concerned about this individual?  Because
8   he's drunk and he's creating a problem on the property with the
9   detective who's on duty.
10   Now, he tries to place him under arrest and the defendant
11   makes another choice.  Does he put his hands behind his back;
12   does he do that?  No.  He swats the officer away, hits him.
13   It's what we call a battery and the judge will instruct you on
14   that and he continues to be belligerent.  At that point, there's
15   one detective there alone with this defendant.
16   Now, the detective told you he's shorter than the
17   defendant, weighed about 175 pounds.  In addition to this
18   defendant being there, according to his friend, his employees,
19   Zavala and Flinn, there's 12 other people with the defendant.
20   The detective was concerned.  There was concern in his voice
21   when he radioed for help, and Officer Darvin Anderson told you
22   that.  He heard that concern in his voice, and he worked with
23   him for a long time and he responded to that area quickly.
24   Now, at that point the detective's still alone.  He uses a
25   technique, which he's taught.  He uses the mace.  He sprays the

PAGE 23

23

1   mace.  And what's the defendant doing at the time he's sprayed
2   with the mace?  Is he turned around?  Is he walking away?  Is he
3   trying to get off the property?  No.  He's facing the detective
4   "F you.  You can't arrest me."  He's pissed off because he got
5   kicked out of this strip club.  He's pissed off and he's
6   embarrassed and he's loud and he's out of control.  Now, he
7   makes a choice at that point.  He gets maced.  Not a pleasant
8   thing.  Mr. Zavala indicated that some of the mace hit him as
9   well.  It stings your eyes.  Did the defendant stop at that
10   point?  Was that the choice he made?  No.  You heard from one of
11   the witnesses that he took a couple of quick steps.  You heard
12   from another witness that he started running away at that point
13   resisting the arrest by the detective.  And the detective told
14   you the defendant started sprinting and he ran after him.
15   Now, it's up to you to decide the credibility of each and
16   every witness and what they have at stake.  And what did the
17   defendant's friends have at stake?  They're his friend.  They
18   were involved in his bachelor party.  He was their boss at some
19   point.  His wife was the boss.  You think they talked about
20   things?
21   Now, the detective was there trying to do his job that
22   night.  He begins chasing after the defendant after he asked
23   that choice to run and he's already called for help.  Now, the
24   detective told you what happened at that point.  He was able to
25   catch up with the defendant.  He was able to take the larger man

PAGE 24

24

1   down to the ground.  And he indicated that a member of the State
2   Police pulled up in his State Police cruiser.  Again, why is the
3   detective going to lie about that?  He told you what happened.
4   He also told you that the K-9 officer, Darvin Anderson, showed
5   up and released his dog.
6   Now, I want you to think about what the defense witnesses
7   said.  Now, Mr. Zavala he indicated he's got mace in his eyes.
8   He doesn't know what's going on.  He's rubbing his eyes.  He's
9   trying to figure out what happened.  And he's telling you he saw
10   someone get hit by a cruiser.  I want you to think about if he
11   was actually able to see that.  I want you to think about if
12   that actually happened.
13   Now, Mr. Flinn, he testified that a white cruiser struck
14   the defendant.  Now, you're allowed to call on your own common
15   experience.  How many white State Police cruisers have you seen?
16   I would suggest to you the defense witnesses don't have the
17   facts right.  They're doing what they can to help the defendant.
18   Further, one of them even said it said Brockton Police right on
19   the side and said that's the cruiser that the dog came out of.
20   You heard from Officer Anderson.  He was on the other side.  He
21   stopped.  He was able to see the State Police cruiser.  He let
22   his dog out from there.  So question whether you believe
23   anything that those two witnesses said.
24   Now, at that point when the defendant's tackled, he's down
25   to the ground.  The detective's struggling with him, trying to

PAGE 25

25

1   get him to comply, trying to get him to put his hands behind his
2   back.  Does the defendant finally come to and say okay here are
3   my hands?  No, he doesn't.  He continues to struggle with the
4   detective, so much so that the trooper who pulled up has to help
5   and the struggle still goes on.  And that's when Gomo, Officer
6   Anderson's dog becomes involved and only at that point does the
7   defendant finally make a good choice to stop resisting, to stop
8   struggling against the police.
9   Defense counsel wants to make this whole thing about the
10   detective.  It's not about the detective.  It's not about
11   Officer Anderson.  It's not about Mr. Flinn.  It's not about Mr.
12   Zavala.  It's about the defendant and the choices he made that
13   night.  He chose to not leave when he was told to.  He chose to
14   strike the detective's arm.  He chose not to comply with the
15   detective's orders when he's trying to place him under arrest,
16   and he chose to continue to struggle with him.
17   You're going to have all the evidence before you.  You're
18   going to have the photos and you can look at that and you can
19   decide whether you believe the defendant was struck by a
20   Brockton Police cruiser as his friends testified or whether he
21   was struck at all.  And when you do that, when you deliberate,
22   I'm going to ask you to return the only true and just verdict of
23   guilty as to all the charges.  Thank you for your time.
24   THE COURT:  Thank you.
25   MR. MADDEN:  May I approach?

Commonwealth vs. Dustin Erwin

SHEET 8   PAGE 26

```
26
 1       THE COURT:  Sure.  I'll see counsel.
 2  (Inaudible discussion at the sidebar.)
 3  (Whereupon, at 10:18 a.m. the closing arguments concluded.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 27

```
27
 1
 2
 3                    C E R T I F I C A T E
 4
 5       I, Kim M. Crandell, Certified Verbatim Court Reporter, do
 6  hereby certify that the foregoing is a true and accurate
 7  transcript of an excerpt from a CD recording of the court
 8  proceedings in the above-entitled matter.
 9       I, Kim M. Crandell, further certify that the foregoing is
10  in compliance with the Administrative Office of the Trial Court
11  Directive on Transcript Format.
12       I, Kim M. Crandell, further certify that I neither am
13  counsel for, related to, nor employed by any of the parties to
14  the action in which this hearing was taken, and further that I
15  am not financially nor otherwise interested in the outcome of
16  the action.
17
18
19
20  _____
21  Kim M. Crandell, CVR
22  Date: March 2, 2011
23  KC Court Reporting
24  140 Warren Street West
25  Raynham, MA  02767
26  508-944-7158
27  kimcrandell@comcast.net
```