EXHIBIT 5

# In The Matter Of:

*Dustin Erwin v.*
*Christopher McDermott, et al.*

*Frank Caswell*
*February 28, 2012*

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



O'BRIEN&LEVINE
Court Reporting Services
*Making Your Case*

Original File Frank Caswell 2-28-12.txt
**Min-U-Script® with Word Index**

1                              Volume:   I

2                              Pages:   1-80

3                              Exhibits:   1-4

4

5              UNITED STATES DISTRICT COURT

6                DISTRICT OF MASSACHUSETTS

7    - - - - - - - - - - - - - - - - - - - - - - - - x

8    DUSTIN ERWIN,

9                          Plaintiff,

10       v.                         Civil Action

11                                  No. 1:11 CV 11328

12   CHRISTOPHER MCDERMOTT, DARVIN

13   ANDERSON, THE CITY OF BROCKTON

14   and FOXY LADY,

15                          Defendants.

16   - - - - - - - - - - - - - - - - - - - - - - - - x

17

18               DEPOSITION OF FRANK CASWELL

19                   February 28, 2012

20                       10:01 a.m.

21               SINSHEIMER & ASSOCIATES

22                   92 State Street

23               Boston, Massachusetts

24           Reporter:  Nancy L. LaCivita

```
 1   APPEARANCES:

 2

 3       SINSHEIMER & ASSOCIATES

 4       By Robert S. Sinsheimer, Esquire

 5       By Michael Harriman, Esquire

 6       92 State Street

 7       Boston, Massachusetts 02114

 8       (617) 722-9954

 9       Counsel for the Plaintiff

10

11       LAW OFFICES OF DAVID BERMAN

12       By David Berman, Esquire

13       100 George P. Hassett Drive

14       Medford, Massachusetts 02155

15       (781) 395-7520

16       Counsel for the Defendant,

17       Foxy Lady

18

19       CITY HALL/ASSISTANT CITY SOLICITOR

20       By Katherine McNamara Feodoroff, Esquire

21       45 School Street

22       Brockton, Massachusetts 02301

23       Counsel for the Defendant,

24       City of Brockton
```

```
1    APPEARANCES CONTINUED:

2

3        LOUISON, COSTELLO, CONDON & PFAFF, LLP

4        By Bradford N. Louison, Esquire

5        101 Summer Street

6        Boston, Massachusetts 02110

7        (617) 439-0305

8        Counsel for the Defendants,

9        City of Brockton

10       Christopher McDermott

11       Darvin Anderson

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                      I N D E X

2   EXAMINATION OF:                              PAGE

3   FRANK CASWELL

4

5     Direct Examination by Mr. Sinsheimer            5

6     Cross-Examination by Mr. Louison              68

7     Cross-Examination by Mr. Berman              72

8     Recross Examination by Mr. Louison           73

9     Redirect Examination by Mr. Sinsheimer       76

10

11                  E X H I B I T S

12  NO.                                           PAGE

13

14  1              Letter dated 1/27/12 w/subpoena        5

15  2A-V    Licenses                            7

16  3          Interrogatories                       19

17  4          Photo                               47

18

19

20

21

22

23

24    *Original exhibits retained by Robert S. Sinsheimer.

P R O C E E D I N G S

* * *

FRANK CASWELL, having been

satisfactorily identified and duly sworn by the Notary

Public, was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. SINSHEIMER:

Q.   State your full name, please.

A.   Frank Caswell.

Q.   Mr. Caswell, how old are you?

A.   70.

Q.   What is your date of birth?

A.   November 3rd, 1941.

Q.   What is your social security number?

A.   XXX-XX-XXXX.

Q.   Are you here pursuant to a subpoena?

       THE WITNESS:  Was I served or were you?

       MR. BERMAN:  I accepted service for you.

Q.   But you are, in fact, here pursuant to a

subpoena for which your counsel has accepted service?

A.   Yes.

       MR. SINSHEIMER:  We'll mark that.

       (Exhibit No. 1 marked for

1    identification.)

2        Q.   Now, you noticed that Exhibit A to that

3    subpoena suggests that you produce documents?

4        A.   Yes.

5        Q.   Did you produce documents?

6        A.   I did.

7        Q.   Is this a set -- the complete set of them?

8        A.   Yes.

9             MR. SINSHEIMER:  I'm going to mark them

10   as a set of documents produced by the witness.

11            (Exhibit No. 2 marked for

12   identification.)

13       Q.   So that set clipped, Exhibit 2, that is the

14   set of documents you produced to comply with the

15   subpoena, correct?

16       A.   Correct.

17       Q.   Now, I gather that you consulted -- just yes

18   or no on this one -- with your attorney with respect to

19   producing these documents, correct?

20       A.   Yes.

21       Q.   Apart from consultation with counsel, did you

22   do anything else to prepare for today?

23       A.   I did not.

24       Q.   Can you just take me through those documents

1  and identify them -- some of them may be obvious, but I

2  want you to do it anyway.  Just tell me what we have in

3  this package, please.

4      A.   Okay.

5      Q.   Are you going to unclip it?

6      A.   Yes.

7      Q.   That's fine.  I'm going to be a little

8  technical for the record because it is one package, but

9  the first document is --

10     A.   Alcoholic beverage license.

11          MR. SINSHEIMER:  Would you put a 2A on

12  that, please.  We are going to label them one by one

13  all the way.

14          (Exhibits 2A through 2V marked for

15  identification.)

16     Q.   So 2A is an alcoholic beverage license?

17     A.   Yes.

18     Q.   Was that enforced on or about August 10,

19  2008?

20     A.   Yes.

21     Q.   Let's go to the next document.  What is 2B?

22     A.   It is a common victualer license.

23     Q.   It means you can sell food?

24     A.   Yes.

1      Q.    Was that enforced on or about August 8, 2010?

2      A.    Yes.

3      Q.    Would you take me through the package now

4  that she has placed letters on each document and tell

5  me letter by letter how you can identify each document,

6  please.

7      A.    Starting from here?

8      Q.    We already did A and B.

9      A.    2C, common victualer.

10     Q.    Of what year?

11     A.    December 2008.  2D, common victualer, 2007.

12 2E entertainment license, music, jukebox and TV

13 December 2007.  2F entertainment, music, jukebox and TV

14 December 2008.  2G entertainment license, music,

15 jukebox and TV, December 2009.  2H entertainment

16 license, music, jukebox and TV, December 2010.

17            2I Annual Report Secretary of State,

18 Frank's of Brockton, Inc. 2011.  2J Annual Report

19 Secretary of State November of '09.  2K Annual Report

20 Secretary of State 11/10.  2L Annual Report for

21 Domestic and Foreign Corporation Secretary of State

22 11/8.  2M Brockton Police report invoice for detail

23 2008.

24     Q.    That's 8/10/2008 that invoice?

1      A.   8/10/2008?

2      Q.   On the upper right that says invoice dated

3  8/10/08?

4      A.   Yes.

5      Q.   $694.94 total due?

6      A.   Yes.  2N common victualer 2011.  2O common

7  victualer 2010.  2P common victualer 2009.  2Q common

8  victualer 2008.  2R rub girl August of -- I guess

9  that's 2008.  I would imagine it has to be.

10      Q.   Your assumption is that that document is the

11  schedule for the week of August 6th through August 12,

12  2008?

13      A.   Yes.  2S bartender -- I'm assuming it's

14  August of 2008.  2T service and hostess August of 2008,

15  6 to 12, floor host and bar backs August of the same

16  week.  2V newspaper article and the enterprise

17  February 2000.  And that will do it.

18      Q.   The set of records, Exhibit 2, are they kept

19  in the regular and ordinary course of business?

20      A.   Yes, they are.

21      Q.   What is the precise legal name of the entity,

22  the business of which -- let me withdraw it.

23              What is the precise legal name of the

24  entity whose business they are kept in?

1       A.    Frank's of Brockton, Inc.

2       Q.    To your personal knowledge, is that a

3   Massachusetts corporation?

4       A.    Yes, it is.

5       Q.    Is it a regular business corporation?

6       A.    Yes.

7       Q.    Who owns the stock?

8       A.    I do.

9       Q.    100 percent of it?

10      A.    Yes.

11      Q.    How long has it been a Massachusetts business

12  corporation?

13      A.    1970.

14      Q.    When certain of the sub letters -- certain of

15  the letters of Exhibit 2 were annual reports, correct?

16      A.    Yes.

17      Q.    Those were annual reports of Frank's of

18  Brockton, Inc.?

19      A.    Yes.

20      Q.    Or some of them were?

21      A.    Correct.

22      Q.    And those are publically available at the

23  Secretary of State's office?

24      A.    Correct.

1       Q.    What is the business of Frank's of Brockton,

2  Inc.?

3       A.    It is a restaurant and nightclub.

4       Q.    When you say it is a restaurant and

5  nightclub, what exactly, if anything, does it own?

6       A.    The operating business.

7       Q.    So Frank's of Brockton, Inc. operates a

8  restaurant and nightclub?

9       A.    Correct.

10      Q.    Which is called what?

11      A.    Frank's -- d/b/a Frank's and d/b/a Foxy Lady.

12      Q.    A couple of these documents, for example, the

13  entertainment license in 2010 -- excuse me -- the one

14  before that --

15      A.    2009?

16      Q.    Yes or 2008.  Expires December 31, 2008.  It

17  says, "Entertainment license Frank's of Brockton, Inc.

18  d/b/a 265 North Pearl Street."  Do you see that?

19               MR. BERMAN:  You mean 265?

20               MR. SINSHEIMER:  That's what I thought I

21  said.

22      A.    Where does it say that?

23      Q.    "Witnessed our hand 12th of December 2007

24  expires December 31, 2008."

1    A.    Oh, d/b/a -- Inc. d/b/a 265 North Pearl

2  Street.   That does not make sense.

3    Q.    That's what it says, though, right?

4    A.    That's what it says.

5    Q.    So when you say it does not make sense, what

6  do you mean?

7    A.    D/b/a.   It's not d/b/a 265 North Pearl

8  Street.   It's d/b/a Frank's or d/b/a Foxy Lady.

9    Q.    What you are saying is --

10   A.    It's a typo.

11   Q.    As you see it, it's a typo?

12   A.    I think anyone would see it as a typo.

13   Q.    Maybe anyone that knows the exact form of the

14 business?

15   A.    Right.

16   Q.    So, the Foxy Lady in Brockton is a restaurant

17 and a nightclub?

18   A.    No, it is not.   Foxy Lady is a nightclub.

19   Q.    Is there a restaurant on the premises?

20   A.    Yes, Frank's.

21   Q.    If you go into the Foxy Lady as a patron, can

22 you buy food?

23   A.    Yes.

24   Q.    Is it your testimony that the restaurant is

13

1   run separately from the nightclub?

2        A.   It's run by the same ownership Frank's of

3   Brockton, Inc. with different managers.

4        Q.   So is the restaurant a separate corporate

5   entity?

6        A.   Frank's of Brockton, Inc. is the entity that

7   has the restaurant and nightclub under its control.

8        Q.   When you say under its control, I'm asking

9   again, is there a separate legal person, or is it

10  simply Frank's of Brockton, Inc. manages it in sort of

11  two departments?

12       A.   Frank's of Brockton, Inc. manages it in two

13  departments.

14       Q.   So from your perspective -- and you are the

15  manager?

16       A.   I'm the manager of the -- yes.

17       Q.   You seem to hesitate for a second.

18       A.   Well, I'm the manager of the license.  I do

19  have managers that work under me also.

20       Q.   What is your legal title with respect to the

21  corporation?

22       A.   President and treasurer.

23       Q.   You own 100 percent of the stock?

24       A.   Correct.

Frank Caswell - February 28, 2012                    **14**

1      Q.    And as president and treasurer, you hire

2   managers that run, on the one hand, the nightclub and,

3   on the other hand, the restaurant?

4      A.    That is correct.

5      Q.    And, at least from your perspective as

6   administrator, you see them as separate operations.

7   That's what you told me a little while ago?

8      A.    They are not separate operations.  Again, I'm

9   the manager of Frank's of Brockton, Inc. overseeing

10  both of them as one -- two d/b/as we have, one for the

11  restaurant and one for the nightclub.  There is a

12  manager for the restaurant, and there is a manager

13  under me.  So, again, I don't see them as separate.

14     Q.    That's what I was trying to find out.  I

15  thought you said so.  I may have misunderstood.  From

16  the point of view of the consumer, someone comes in,

17  it's one operation, correct?

18     A.    They may not see it like that.

19     Q.    Certainly the Foxy Lady engages in marketing

20  and advertising, correct?

21     A.    Correct.

22     Q.    And the general public is advised they can

23  come in and view entertainment and drink, correct?

24     A.    Yes.

1    Q.    And they can have food, right?

2    A.    Yes.

3    Q.    Are the invoices segregated?

4    A.    Yes.

5    Q.    So, in other words, if you buy food, you get

6  a separate check than if you buy drinks.  It's a

7  separate bar tab, so to speak.

8    A.    The guest checks may be together, but the

9  invoices coming into the club are separated.

10   Q.    I meant from the consumer side.  The consumer

11 would get a single check?

12   A.    Correct.

13   Q.    For their evening?

14   A.    Yes.

15   Q.    But from the point of view of purchasing, you

16 treat them as distinct and separate operations?

17   A.    It's still all under Frank's of Brockton, but

18 the invoices are marked Frank's and marked Fox Lady

19 depending who they are for.

20   Q.    Do you own the building?

21   A.    Yes, I do.

22   Q.    Is it owned in the same legal name Frank's of

23 Brockton, Inc.?

24   A.    It is not.

16

1      Q.    What entity owns the building?

2      A.    Frank's of Plymouth, Inc.

3      Q.    Is your understanding that Frank's of

4  Plymouth, Inc. has title to the building?

5      A.    Yes.

6      Q.    Does it have title to the surrounding lot?

7      A.    Part of it.  Part of the lot.

8      Q.    What is the surrounding lot used for?

9      A.    Directly adjacent to the building for parking

10  for the nightclub and for the restaurant.

11      Q.    Is the building that houses the nightclub the

12  only improvement on the lot that you actually own?

13      A.    No, it is not.

14      Q.    What other building is on the lot?

15      A.    There is a now empty movie theater building,

16  and there is a -- well, of Frank's of Plymouth?

17      Q.    Yes.

18      A.    No, that's it.  That's the only building on

19  it.

20      Q.    The movie theater?

21      A.    No.  I'm sorry.  The building that houses

22  Frank's.  It's owned by Frank's of Plymouth.  That's

23  the only building.

24      Q.    So Frank's of Plymouth, Inc., is that a

1  corporation?

2      A.  Yes.

3      Q.  Are you the manager of the corporation?

4      A.  President and treasurer.

5      Q.  Are you a stockholder of the corporation?

6      A.  Yes.

7      Q.  Are you the only stockholder of the

8  corporation?

9      A.  Yes.

10     Q.  And the corporation is in good standing with

11  the Secretary of State's office?

12     A.  Yes.

13     Q.  It owns a parcel of real estate that includes

14  some of the parking lot and the building in which the

15  Foxy Lady operates, correct?

16     A.  Correct.

17     Q.  Now, is it your testimony that there is a

18  related corporation that owns a continuous parcel?

19     A.  Yes.

20     Q.  What is the name of that corporation?

21     A.  Cardinal Plaza, Inc.

22     Q.  What does Cardinal Plaza, Inc. own?

23     A.  It has the former movie theater building.

24     Q.  Which is now empty?

1      A.    Yes.

2      Q.    But it's still standing?

3      A.    Correct, and a strip of stores.

4      Q.    If I use the phrase, quote, strip mall, end

5  quote, that has a meaning in the vernacular to you?

6      A.    Yes.

7      Q.    Okay.  Is it essentially -- no pun intended,

8  by the way, in light of the fact that the Foxy Lady is

9  there --

10     A.    We have strip clams, too.

11     Q.    Fair enough.  Essentially what you have is a

12  strip mall divided into two parcels?

13     A.    Yes.

14     Q.    And most of the mall is in Frank's of

15  Plymouth, held title Frank's of Plymouth?

16     A.    No, none of it.  The mall.  You mean -- are

17  you referring to Cardinal Plaza again?

18     Q.    Yes.

19     A.    Cardinal Plaza is an entity in itself.

20     Q.    Excuse me.  Most of it is owned by Cardinal

21  Plaza?

22     A.    Correct.

23     Q.    And then a segment with the Foxy Lady

24  building is owned by Frank's of Plymouth, Inc.?

1     A.    Correct.

2     Q.    Who are the principals of Cardinal Plaza?

3     A.    I am.

4     Q.    So you own 100 percent of Cardinal Plaza?

5     A.    Yes.

6     Q.    Is there any reason for having title in two

7  separate entities?

8     A.    At the time the property was built -- I mean,

9  purchased at separate times.

10     Q.    When you purchased the segment that is the

11  segment upon which the Foxy Lady operates, was it

12  purchased specifically to build the Foxy Lady?

13     A.    No.

14     Q.    Was there a business that operated in the

15  physical plant of the Foxy Lady before the Foxy Lady

16  was there?

17     A.    Yes.

18     Q.    What was that business?

19     A.    It was a nightclub.

20     Q.    What was the name of it?

21     A.    Frank's.

22              (Exhibit No. 3 marked for

23  identification.)

24     Q.    Exhibit 3 appears to be unsigned answers to

```
 1    interrogatories, this particular one I marked.  Do you
 2    see that?
 3         A.   Yes.
 4         Q.   Answer two, assuming there is a signed one
 5    signed by a guy named Thomas Tsoumas, the Foxy Lady,
 6    Inc. allows the Foxy Lady to use its name on the basis
 7    of an oral agreement.  Do you see that?
 8         A.   Yes.
 9         Q.   Do you know to what facts that is referring?
10              MR. BERMAN:  Sorry.  Object to the form
11    of the question.
12              MR. SINSHEIMER:  Fair enough.  I will
13    withdraw it.
14         Q.   Do you know a guy named Thomas Tsoumas?
15         A.   Yes, I do.
16         Q.   How do you know him?
17         A.   When I first met him?
18         Q.   Anytime.  How do you know him?
19         A.   I know him from being present at a bank
20    closing in Watertown at the Coolidge Bank & Trust.
21         Q.   When?
22         A.   35 years ago, 30 years ago.
23         Q.   Has he been your friend in the interim?
24         A.   He's been a friend.  Have we met and -- yes,
```

1    he has.

2         Q.    He is someone you would call a friend?

3         A.    Yes.

4         Q.    Have you done business with him?

5         A.    Not until the Foxy Lady.

6         Q.    So the answer to my question have you done

7    business with him is yes?

8         A.    Yes.

9         Q.    You have done business with him, and it's

10   your testimony the only business you have done with him

11   was the Foxy Lady?

12        A.    Yes.

13        Q.    What exactly is his relationship, if any, to

14   the Foxy Lady, to your knowledge?

15        A.    In Brockton?

16        Q.    Sure.

17        A.    He's a consultant.

18        Q.    He's a consultant to the Foxy Lady in

19   Brockton?

20        A.    Correct.

21        Q.    How did it come about that you operate

22   Frank's of Brockton, Inc. using the name, quote, the

23   Foxy Lady?

24        A.    Well, way back when in 1990 when we stopped

1   doing our nightclub in the format that we had been

2   doing it in with show bands, I was approached by many

3   people and --

4        Q.   Because you owned the real estate or

5   indirectly owned the real estate?

6        A.   I don't understand.

7        Q.   I'm sorry.  Keep going with your story.

8        A.   I was looking for another business to put

9   into the space that was occupied by Frank's show band

10  club.

11       Q.   Okay.

12       A.   And I was approached by an agent, Robert

13  Brown, who has since passed.  He was a person that

14  would be reaching out to different nightclub owners, I

15  guess for Thomas Tsoumas, for nightclubs.

16            And I don't exactly remember how it took

17  place, but it ended up sitting down and talking with

18  Tommy about possibly putting in a Foxy Lady in my space

19  that I had.

20       Q.   In Brockton?

21       A.   Yes.

22       Q.   Same space we have been talking about since

23  the deposition began?

24       A.   Correct.

1    Q.    When was this meeting?  Did you say around
2  1990?
3    A.    No.  1990 was when the format changed that I
4  had since 1975 in the nightclub, and I had that space
5  that was available to do something else with.  So
6  naturally I wanted to do something else.
7    Q.    So you ran a nightclub called Frank's from
8  '75 to '90, give or take?
9    A.    Yes.
10    Q.    For whatever reason, that club stopped doing
11  business in the manner in which it had been doing?
12    A.    It didn't stop all together.  We changed the
13  format again into classic rock bands, blues bands, but
14  it was not large enough for that type of a venue.
15    Q.    All right.  So, in any event, Robert Brown
16  introduces you to the concept that Thomas Tsoumas may
17  be willing to open a Foxy Lady in that location?
18    A.    No.  It didn't go down that way.
19    Q.    Well, you knew Tsoumas from back 35 years
20  earlier?
21    A.    Yes.  So when I was approached, I wanted to
22  see -- I was befuddled.  I only knew Tom as a person
23  that was in a bank at a closing, and I assumed he had
24  something to do with the legal aspect of it.  And I

1  thought maybe he wanted to put a bank in.  And, of
2  course, that wasn't the case.  When I was told what he
3  did -- see Robert Brown wasn't sent by Thomas Tsoumas
4  to seek out this particular location, but it was his
5  job to scout out and try to find locations that Tom may
6  be interested in.
7       Q.   Brown was searching locations for Tsoumas?
8       A.   Yes.
9       Q.   In just New England?
10      A.   I have no idea.
11      Q.   In any event, he comes upon your location?
12      A.   Correct.
13      Q.   The timing is right for you to at least
14  consider it?
15      A.   At the time I didn't want to, but I reserved
16  judgment until I saw his operation in Rhode Island.
17      Q.   Before that, though, you were introduced,
18  again, to Tsoumas who you met once before?
19      A.   Yes.
20      Q.   And the concept of opening a Foxy Lady in
21  Brockton is discussed?
22      A.   Correct.
23      Q.   And then I gather based on what you just said
24  he invites you down to Rhode Island so you can take a

1    look around to see how it is run?

2        A.    Well, actually, let's back up.  Not opening a

3    Foxy Lady, per se, but opening a nightclub that was

4    going to feature the Solid Gold dancers, all together

5    different from what we operate now, and all together

6    different from what Tommy operates in.

7        Q.    You will have to remind me, the phrase Solid

8    Gold dancers, what is the Solid Gold dancers?

9        A.    It was a program on television, the Solid

10   Gold dancers.  It was really risque for its time on TV.

11   And Tommy owned the name to it.  So what we were going

12   to do is to have a nightclub featuring the Solid Gold

13   dancers.  At the time, it was a good vehicle to use for

14   entertainment.  So that's exactly what I did.

15       Q.    Did it open as the Solid Gold dancers for a

16   while?

17       A.    No.  I went through the process in front of a

18   license commission, and they were fearful that -- the

19   bottom line was they were fearful the Solid Gold

20   dancers would result in nude dancing.

21       Q.    So they were afraid the Solid Gold dancers

22   would become the Foxy Lady in so many words?

23       A.    I don't know that the Foxy Lady was even

24   introduced at that time.

1    Q.    They didn't want nude dancing.

2    A.    They didn't want nude dancing, but I didn't

3 have any plans on introducing nude dancing, but that's

4 what Tommy and I first talked about.

5    Q.    We don't need to spend all day on the

6 history, but at some point the nude dancing aspect of

7 it opened up?

8    A.    Yes, it did.

9    Q.    Do you have a formal license to use the name

10 Foxy Lady?

11    A.    No.  A d/b/a to use the formal license.

12    Q.    Do you pay anything to Tsoumas and/or any of

13 his operation to use the name?

14    A.    No.

15    Q.    How is it that you get to use the name?

16    A.    Well, obviously prior to it opening or even

17 during discussions of it opening, I didn't have any

18 knowledge of running an adult club, and it may seem to

19 an outsider what is to running it.  There is a lot to

20 running it, and I don't know from Shinola about running

21 an adult club.

22            So Tommy -- since it evolved into the

23 city not letting me put the Solid Gold dancers in, it

24 evolved into talking about putting in a Foxy Lady.  And

```
 1   I was receptive to that other than the fact I didn't
 2   know anything about it.  And the only way I would do it
 3   is I could have -- as everyone knows, the nightclub
 4   industry has a stigma that you're not going to church
 5   when you come into the Foxy Lady, but the Foxy Lady was
 6   probably at the time the name in the adult industry
 7   that was more accepted than any other name.
 8                    And I wanted to use it.  I needed some
 9   direction, and so we agreed that I could use it.  And I
10   also agreed and Tommy agreed to be my consultant.  So
11   it all worked out after not just five minutes of
12   talking like we are now, but months and months of years
13   of talking we finally came to sort of an agreement
14   without it being written on a piece of paper because I
15   didn't want it to be that set in stone.
16        Q.    So it's all a handshake essentially?
17        A.    It is.
18        Q.    Do you know, as you sit here, one way or the
19   other whether Mr. Tsoumas or any entity he owns or
20   controls has a formal intellectual property right to
21   the name Foxy Lady?
22        A.    I don't believe he has.
23        Q.    You don't think he has trademarked it?
24        A.    And the reason why I say that is because
```

28

1    there are other Foxy Lady's that he doesn't have any
2    control over.
3        Q.   Do you know where they are?
4        A.   Well, I know in Florida, and there may be one
5    in Connecticut.
6        Q.   So anyway, as you sit here, you're actually
7    not sure.  Is that the most honest precise answer?
8        A.   No.  I'm positively sure there is one in
9    Florida.
10       Q.   No.  With respect to the earlier question
11   whether there is an intellectual property interest, you
12   don't really know for sure one way or the other,
13   correct?
14             MR. BERMAN:  I'm going to object to the
15   form.
16             MR. SINSHEIMER:  I will withdraw it.
17             MR. BERMAN:  It's really a question of
18   law.
19             MR. SINSHEIMER:  No, it isn't.  If
20   someone owns a trademark, that can become a fact very
21   quickly.  So I will ask it that way.
22       Q.   Do you know one way or the other whether the
23   Foxy Lady is trademarked?
24       A.   No.

1  Q. So the answer is you don't know or you

2 believe it's not?  Which is it?

3  A. Probably a little bit of both.

4  Q. Do you pay Tsoumas anything?

5  A. He gets a consultant fee.

6  Q. How much?

7  A. $7,500 a week.

8  Q. What does he do for that?

9  A. He more or less outlined from day one on the

10 operation of the business.  And to this day when laws

11 change or the industry changes, like anything else

12 changes, he makes me aware of it.  He had a partner,

13 Jimmy Durantes who has since passed away.

14  Q. The guy from Florida?

15  A. Yes, who had interest in clubs all over the

16 country and Michael J. Tita, the guru of adult

17 nightclubs.  The industry, like I said, whether or not

18 it pertains to featured entertainers that traveled all

19 over the country like in the beginning when we opened

20 up, Jenna Jameson.

21    Without Tommy Tsoumas having the ability

22 to supply me with the entertainers that are now the

23 biggest in the country, you're not going to do the

24 business available to be able to treat Mr. Tsoumas the

1   way he's being treated with his compensation.

2      Q.   Is there any kind of writing at all between

3   Frank's of Brockton and Tsoumas individually?

4      A.   Pertaining to what?

5      Q.   To his role in the organization.

6      A.   No.

7      Q.   But if I were to pull the checks, there would

8   be a check for 7500 bucks a week?

9      A.   Correct.

10     Q.   Since how long?

11     A.   It was 10,000 a week prior to it being 7500,

12  but we cut it back a little.

13     Q.   Because of the recession?

14     A.   Yes.

15     Q.   Your testimony is he serves as a consultant?

16     A.   Right.

17     Q.   Is one of the things -- let me try again.

18  When you first opened the business, was it your

19  intention to model the business after the Rhode Island

20  Foxy Lady?

21     A.   No.  Each adult club is more or less run on

22  its own merits.  The one in Providence was probably a

23  little more aggressive -- well, a lot more.

24     Q.   Aggressive in what way?

1      A.    In the way they present their entertainment.

2      Q.    Well, that's because they are in Rhode

3 Island, right?

4      A.    Well, they can get away with a lot more,

5 number one.  Number two, I didn't have any interest of

6 being a mirror image of the way he runs his club.

7      Q.    You had said earlier words to the effect --

8 I'm paraphrasing -- that the nightclub business is not

9 exactly going to church, but the Foxy Lady had the best

10 name or something like that.  Do you recall that

11 testimony?

12     A.    Yes.

13     Q.    Is it fair to say in terms of its marketing,

14 the Foxy Lady had succeeded in making itself appear to

15 be a little more mainstream?

16     A.    That is correct.

17     Q.    And that was one of the things that attracted

18 you, if I understand you correctly?

19     A.    That is correct.

20     Q.    And, as a result of that, isn't it true that

21 Tsoumas insisted on certain quality controls in the

22 Brockton location?

23     A.    No.

24     Q.    You pulled them together all by yourself?

1    A.    Quality controls, yes.

2    Q.    So his initial role as a consultant, he did

3  something to suggest to you how the menu worked or how

4  to hire the dancers or drink service or anything like

5  that?

6    A.    How to hire the dancers came into play with

7  he and Jimmy Durantes who, at the time, was his

8  partner.  And Jimmy was more or less the upfront person

9  that I dealt with.  He was a spokesperson for the group

10  in Rhode Island.  They had nothing to do with the food.

11    Q.    Who set up the restaurant side?

12    A.    I did in 1970.

13    Q.    And it was still the same restaurant side

14  when it opened as the Foxy Lady?

15    A.    Correct.

16    Q.    Is it your testimony that part of the way

17  Mr. Tsoumas earns his fee as a consultant today is he

18  is tapped into the entertainment community?

19    A.    Yes.

20    Q.    If I use the phrase in quotes, quote, adult

21  porn star, unquote, is that the community you are

22  talking about?

23    A.    Part of it.

24    Q.    So there is a network that operates out of

```
 1   Vegas that Tsoumas is tapped into?
 2        A.   Actually our agent is from Florida.
 3        Q.   Now, when you do your management work, are
 4   you on site?
 5        A.   Yes.
 6        Q.   What percentage of your business time is
 7   spent on-site in the Brockton location?
 8        A.   Seven days.  I'm there probably seven to
 9   nine hours a day.
10        Q.   Were you there on or about August 10th, 2008?
11        A.   Yes.
12        Q.   Were you present when there was an incident
13   involving my client, Dustin Erwin?
14        A.   I was not.
15        Q.   So, in other words, you had already left.  Is
16   that the case?
17        A.   Yes.
18        Q.   Do you know the names of the people that were
19   on duty that night?
20        A.   I supplied them.
21        Q.   You mean, when you sent these bartender
22   weekly work schedule documents?
23        A.   And the payroll management, whatever.
24        Q.   Can I see Exhibit 2, please?
```

1       A.    (Witness complies.)

2       Q.    So if I look at Exhibit 2, break it down a

3   little bit, Exhibit 2K is rub girls -- excuse me.

4   That's 2R.   2S is bartenders.   2T is service and

5   hostess.   Do you see that?

6       A.    Yes.

7       Q.    When you say you supplied the names, is that

8   what you mean?   You gave me those documents?

9       A.    I supplied also part of the payroll, I think.

10      Q.    Well, those checks to three different people

11  that --

12      A.    No.   The ADP payroll that pertains to

13  management.   Everyone that was on that.

14      Q.    Let's back up.   We also have this exhibit,

15  2M, which is Invoice for Detail, Keating, Scibetta,

16  McDermott, do you see that?

17      A.    Yes.

18      Q.    There is Christopher McDermott.   He got a

19  check for $248?

20      A.    Yes.

21      Q.    He was a bouncer or a security guard that

22  night?

23      A.    No.

24      Q.    Who is McDermott?

1      A.    He's a police officer.

2      Q.    Well, he was serving as a security agent that

3  night?

4      A.    He was serving as a -- paid by the City of

5  Brockton -- police officer on detail.

6      Q.    At the Foxy Lady?

7      A.    Correct.

8      Q.    Do you recall seeing him that evening?

9      A.    No.

10     Q.    Who was the manager on duty that night?

11     A.    John Ferraro.

12     Q.    How do I spell his last name?

13     A.    F-E-R-R-A-R-O.

14     Q.    Is his identifying information in this packet

15  somewhere?

16     A.    His name, no.  That would be on the payroll I

17  gave.

18            MR. BERMAN:  I don't have a payroll.  I

19  should tell you that I got everything yesterday from

20  your office and the payroll information you're talking

21  about wasn't included.

22     A.    Was it asked for, payroll?

23     Q.    Maybe not.  We're not going to be that

24  technical at least right now.  Mr. Berman and I have

```
 1    slightly different views about how these things are
 2    done.  That's okay.  That is what makes lawyering
 3    interesting.  All I want to know right now is if you
 4    know the name of the guy, and the answer is John
 5    Ferraro.
 6         A.    Correct.
 7         Q.    He is still with you?
 8         A.    Yes.
 9         Q.    Do you know where he lives?
10         A.    Abington.
11         Q.    Do you know his exact address?
12         A.    I do not.
13         Q.    Do you know his date of birth?
14         A.    I do not.
15         Q.    How long has he been with you?
16         A.    12 years.
17         Q.    So he's not going anywhere, as far as you
18    know, today?
19         A.    No.
20         Q.    I am correct.  As far as you know, he has no
21    plans to leave the jurisdiction?
22         A.    Correct.
23         Q.    As far as you know, he has no plans to leave
24    your employ?
```

1        A.    He does not.

2        Q.    What is the entity that employs him?

3        A.    The Foxy Lady -- Frank's of Brockton, Inc.

4   d/b/a Foxy Lady.

5        Q.    Is that how his paychecks are cut?

6        A.    I believe it is.

7        Q.    Do you use an outside payroll service?

8        A.    Yes, ADP.

9        Q.    And they cut them in the name of Frank's of

10  Brockton, Inc., as far as you recall?

11       A.    Yes.

12       Q.    They still do?

13       A.    Yes.

14       Q.    They did in August of 2008?

15       A.    Yes.

16       Q.    Is it Ferraro on the restaurant side or

17  entertainment side?

18       A.    Entertainment.

19       Q.    Is he a full-time employee?

20       A.    Yes.

21       Q.    Does he report directly to you?

22       A.    Yes.

23       Q.    Is he the guy who is in charge when you're

24  not there?

```
1        A.    Yes.  Well, he or his underling assistant
2   manager.
3        Q.    Assuming he is on site and you're not, he's
4   the guy in charge?
5        A.    Correct.
6        Q.    He's the highest in the hierarchy below you
7   on the entertainment side?
8        A.    On the entertainment side, yes.
9        Q.    Is he the guy that is responsible for
10  procuring the security service?
11       A.    Yes.
12       Q.    Do you know if he is the guy that contacted
13  Brockton to have the security guards there on or about
14  August 8, 2010?
15       A.    The detail?
16       Q.    You call it a detail.  That's fine.  The
17  detail.
18       A.    That's what they call it.  They don't ask me
19  if I want a security officer.  They ask if I want a
20  detail.
21       Q.    Is it fair to say that was really an ongoing
22  thing, you had a detail every Saturday night?
23       A.    Every Thursday, Friday, Saturday and a day of
24  a football game at Gillette.
```

1    Q.   Did the town require that you hire details as

2 a condition of the licensing?

3              MR. BERMAN:   Brockton is a city.

4              (Discussion off the record.)

5    Q.   So the city of Brockton -- where I worked for

6 three years, as you may not know, as an assistant

7 district attorney.  Physically I worked there.  I

8 didn't work for the town, 32 Belmont Street -- the City

9 of Brockton required you to have a detail as a

10 condition of licensing?

11   A.   Yes.

12   Q.   So essentially that is a routine that is in

13 place?

14   A.   Except when there are holidays or games that

15 John will call up and ask for a detail.

16   Q.   You want an extra couple of guys because

17 we're going to be crowded kind of thing?

18   A.   No, that's not the case.  It's Thursday,

19 Friday and Saturday is a given.  The night before a

20 holiday depending what type of holiday it is, what time

21 of year it is, we will warrant whether or not we will

22 need to have a detail, also what time a football game

23 takes place and where it takes place will determine

24 whether or not we need a detail for that.  It's an

1  ongoing communication that they have between the detail

2  department and the general manager, John Ferraro other

3  than it's a given on Thursday, Friday and Saturday.

4          Q.   Is there any correspondence back and forth

5  between the general manager, Mr. Ferraro, or the town,

6  as far as you know?

7                  MR. BERMAN:   City.

8      A.   Pertaining to what?

9      Q.   Pertaining to the hiring of details.

10     A.   What type of questions?

11     Q.   I'm asking you.  You tell me.

12     A.   No.

13     Q.   Are there any documents at all other than the

14 checks that go out to the individual officers?

15     A.   No.

16     Q.   You're sure?

17     A.   Yes.

18     Q.   Does the Foxy Lady and/or any of the

19 technically named entities that comprise this control

20 group have any written protocol with respect to

21 security at the Foxy Lady?

22     A.   With detail or with anyone?

23     Q.   With anyone.

24     A.   Well, no, the answer to that is no.

1      Q.    Is there any kind of employee manual?

2      A.    No.

3      Q.    Is there any kind of set of employee rules

4   and regulations?

5      A.    No.

6      Q.    If I were to go in there and want a job as a

7   bar back or whatever, is there anything for me to read

8   about how we do things at the Foxy Lady?

9      A.    No.

10     Q.    Nothing whatsoever?

11     A.    No.

12     Q.    All the job training is on-site?

13     A.    That is true.

14     Q.    Anybody that comes in and accepts employment

15   is someone that learns on the job, so to speak?

16     A.    Correct.

17     Q.    Or relies on their own prior experience?

18     A.    Correct.

19     Q.    Do you ever talk to Mr. Ferraro about the

20   alleged incident involving my client, Dustin Erwin?

21     A.    Yes.

22     Q.    When did you first talk to him about it?

23     A.    When Mr. Tsoumas made me aware that he was

24   served a subpoena.

**42**

```
 1        Q.    When was that, recently?
 2        A.    Whenever you served it to him.  I don't
 3   remember the date.
 4        Q.    Where were you and Mr. Ferraro at the time of
 5   this conversation?
 6        A.    In the office.
 7        Q.    In your office on-site?
 8        A.    Yes.
 9        Q.    Who said what to whom?
10        A.    I had told John -- Mr. Ferraro -- that Tommy
11   was served a subpoena for an incident that happened on
12   the date that the subpoena -- August 8th or 9th, 2008
13   and he remembered it.
14        Q.    What did he remember about it?
15        A.    What he told me he remembered was that
16   Mr. Erwin was acting inappropriately saying or doing or
17   whatever things that he shouldn't be doing and he was
18   asked to behave and he kept on refusing.  So we asked
19   him to leave.
20        Q.    Mr. Ferraro --
21        A.    Mr. Ferraro asked him to leave.  Not we.
22        Q.    So Mr. Ferraro told you that he personally
23   asked him to leave?
24        A.    Correct.
```

1      Q.   Did he tell you anything else?

2      A.   Yes.  He said that he agreed.  He left.

3      Q.   Did he say whether he observed anything that

4  followed with the police?

5      A.   Yes.

6      Q.   What did he say?

7      A.   He said the police were inside the vestibule

8  and outside the doors still inside -- like there is two

9  vestibules -- Mr. Erwin was screaming and yelling at

10  the top of his lungs and calling every F letter word he

11  possibly could about the establishment.

12            After he peacefully left, he decided to

13  vent out there in the hallway.  So Officer McDermott

14  went outside and asked him -- according to what John

15  Ferraro said.  I wasn't there.

16      Q.   I understand.  You made it clear you weren't

17  there, but you're talking to Ferraro, and he told you

18  this within the last month or two, right?

19      A.   That is correct.

20      Q.   Continue telling me what he told you.

21      A.   He said the police officer at that time asked

22  him to leave.  He said, listen, that's enough.

23  Customers were coming in and complaining that they were

24  being -- that this is fellow was out there acting like

**44**

```
 1   a blithering idiot.  So the police officer went out and
 2   asked him to leave.  He was saying don't go in that
 3   F'ing place.  They are this and that.  So the police
 4   officer went out and said, come on, will you.
 5              And John told me he begged him to leave
 6   ten times.  He said please leave.  And at one point, he
 7   turned around and hit the officer in the arm.  And so
 8   at that point -- and he was still mouthing off and
 9   customers were coming and he was swearing don't go in
10   that F'ing place.  I would turn around and go out.
11              So he was a disorderly person.
12   Disorderly conduct, he was creating a nuance.  So at
13   that point, McDermott called for backup and he had
14   already at that time when he was hit by this fellow
15   Erwin determined that he was going to take him
16   downtown.  He had enough.  He tried in vain, but he
17   wouldn't listen.
18              So the fellow went down -- scurried down
19   the ramp, but McDermott called for backup.  When the
20   backup came, I guess he was continuing his antics as
21   being a blithering idiot.  The police at that time were
22   going to take him down and he resisted, ended up on the
23   ground and Officer Anderson came.  He had a dog and the
24   fellow was kicking and everything.  Then I got a little
```

1  vague with what John was telling me because -- I don't

2  know -- maybe his sight line was hindered.  I don't

3  know, but it ended up the dog bit him, I guess, and

4  they took him downtown.

5      Q.    Is that everything you remember?

6      A.    There may be more that may flash in.

7      Q.    But that's what you remember right now?

8      A.    That's right.

9      Q.    Did he tell you anything about there being a

10 trial?

11     A.    Did who tell me?

12     Q.    Ferraro.

13     A.    No, he didn't know.

14     Q.    That's what I'm asking.  Did he tell you

15 whether there were any kind of charges that were

16 sustained or not sustained against Mr. Erwin?

17     A.    No.

18     Q.    Did he tell you whether he observed Mr. Erwin

19 sustain any physical injuries?

20     A.    No.

21     Q.    Did he tell you whether or not he saw any

22 pepper spray?

23     A.    I don't remember.

24     Q.    Did he tell you if he smelled or otherwise

46

1   perceived any pepper spray?

2        A.    He was not in the area where all that took

3   place.  So he wouldn't be able to do that.  So, no, he

4   didn't tell me.

5        Q.    You don't know exactly where he was standing

6   except based on what he told you?

7        A.    Yes, I do, and I will tell you why.  We have

8   been instructed by the police department, by the ABCC,

9   by the Brockton License Commission once a patron has

10  been ejected from the establishment, not to intervene.

11  It's police work.  We have nothing to do with it once

12  the police are involved, nothing whatsoever to do with

13  it.

14       Q.    Who has given you that instruction?

15       A.    The police department.

16       Q.    In writing?

17       A.    No.

18       Q.    Can you give me the name of an individual

19  that said that to you?

20       A.    The license commission.

21       Q.    Name of a person.

22       A.    I don't remember the name.  Bud Terry was the

23  first one.

24       Q.    Who is Bud Terry?

1      A.    He was the commissioner, the chairman of the

2   license commission 1970.  I was told from the get-go

3   when I got that license, and I have been told

4   repeatedly over the years the same song and dance,

5   don't get involved, it has nothing to do with us.

6                Once Frank's has asked a patron to leave

7   and he does so peacefully and the police get involved,

8   that's where our cut-off is.

9                (Exhibit No. 4 marked for

10  identification.)

11     Q.    Do you recognize Exhibit 4?

12     A.    Yes.

13     Q.    Can you tell me where you believe Mr. Ferraro

14  was standing when he saw all this stuff?

15     A.    He was -- in the beginning, he was inside the

16  building.

17     Q.    No.  I meant when he saw the stuff you allege

18  happened outside.  Let me withdraw.

19                Your testimony is that he told you what

20  he remembers?

21     A.    Correct.

22     Q.    And this conversation took place recently,

23  within the last two or three months in your office?

24     A.    Is that when it was?  I don't remember

1   exactly when.

2        Q.   It wasn't like close in time to the incident.

3   It was much more close in time to today?

4        A.   Correct.

5        Q.   And he described to you what he saw?

6        A.   Right.

7        Q.   Which you just told us in some length on the

8   record?

9        A.   That is correct.

10       Q.   Did he tell you where he was standing when he

11  saw it?

12       A.   Well, he was standing inside at one point

13  when he saw the police officer begging him to leave.

14       Q.   Okay.

15       A.   John was inside.  And then when he saw the

16  police officer had to go outside and ask him to leave

17  already because he was standing on the ramp, then I

18  guess -- well -- John did tell me that he saw from

19  inside the commotion going on outside.  I think it was

20  -- John told me it was on Walgreen's property next door

21  to us.

22       Q.   So Walgreen's is a tenant of Cardinal Plaza?

23       A.   No.  We don't have anything to do with

24  Walgreen's.

49

1    Q.    There is no relationship at all?

2    A.    I built it.

3    Q.    All right.  Who owns the property where the

4  Walgreen's is?

5    A.    An investor from New York.

6    Q.    Is it a completely separate parcel?

7    A.    Yes.

8    Q.    So it's not the Frank's of Plymouth parcel,

9  it's not the Cardinal Plaza?

10    A.    It is not.

11    Q.    But it is part of the same strip mall?

12    A.    It is not.

13    Q.    Well, to a consumer it may look like it is

14  part of the same property?

15    A.    No.

16    Q.    And you personally don't know whether it took

17  place on the Walgreen's site, you're simply reciting

18  what Mr. Ferraro told you?

19    A.    That is correct.

20    Q.    You have shown me in the packet that is

21  Exhibit 2, you have shown me there are some liquor

22  licenses?

23    A.    Yes.

24    Q.    Who owns them?

```
1        A.    Frank's of Brockton, Inc.

2        Q.    They own them outright or they are financed?

3        A.    There is a mortgage on the property.

4        Q.    Well, is there a mortgage on the land, or is

5   there a financial instrument specifically securitizing

6   the liquor license?

7        A.    On the land.

8        Q.    Is that the only corporate debt?

9        A.    Yes.

10        Q.    So the liquor licenses are assets of the

11   corporation?

12        A.    That is correct.

13        Q.    And they are owned free and clear of any --

14   well, is there a UCC on them, as far as you know?

15        A.    No.

16        Q.    So, as far as you know, the liquor licenses

17   are owned free and clear of the debt?

18        A.    Yes.

19        Q.    And the debt is securitized by the real

20   estate?

21        A.    Right.

22        Q.    And the corporation owns the real estate?

23        A.    Frank's of Plymouth owns the real estate.

24        Q.    It's that mortgage that financed the liquor
```

```
 1   licenses?
 2       A.    Correct.
 3       Q.    Which are owned by Frank's of Brockton?
 4       A.    Correct.
 5       Q.    So if I were to have -- Frank's of Brockton
 6   has no debt?
 7       A.    Well, I'm sure it is cross collateralized.
 8       Q.    Who is the primary lender?
 9       A.    TD Banknorth.
10       Q.    Do they insist on any insurance of any kind
11   whatsoever for any related entity?
12       A.    Well, the building, fire insurance.
13       Q.    Who holds the fire insurance?
14       A.    Hospitality Mutual.  Now or 2008?
15       Q.    Let's start with now.
16       A.    Hospitality Mutual.
17       Q.    What other layers of coverage are there?
18       A.    That would be it.
19       Q.    Is there any Dram Shop insurance?
20       A.    There is.  Now, there is.
21       Q.    But there wasn't in 2008?
22       A.    There was not.
23       Q.    Any umbrella?
24       A.    No.
```

1       Q.    None whatsoever?

2       A.    No.

3       Q.    So, as you sit here today, your understanding

4   of how the business operates, as far as insurance is

5   concerned, regardless of who technically is the named

6   insured, it has hospitality, it has fire insurance

7   which insures the structure essentially and it has Dram

8   Shop insurance?

9       A.    Yes.  Assault and battery, liquor liability,

10  slip and fall.

11      Q.    Does it have what is called a general

12  liability policy?

13      A.    Yes.

14      Q.    Does the general liability policy include the

15  Dram Shop, or is that a separate policy?

16      A.    Separate.

17      Q.    So, as we sit here right now, you know of

18  three policies?

19      A.    Name them.

20      Q.    There is the policy that insures the

21  structure itself which you call the fire policy?

22      A.    Yes.

23      Q.    But it's more than just fire?  If a hurricane

24  comes in --

1    A.   Right.  Right.

2    Q.   -- it insures the standing of the structure?

3    A.   Right.

4    Q.   You get it rebuilt if it burns down?

5    A.   Correct.

6    Q.   There is a policy that we can refer to as

7  general liability?

8    A.   Yes.

9    Q.   Which may include assault and battery, slip

10  and fall?

11    A.   Slip and fall, general liability.  The Dram

12  Shop is a package that you have to take together which

13  includes assault and battery the state mandates.

14    Q.   It also mandates you engage in personnel

15  training with respect to --

16    A.   We do.

17    Q.   What kind of program do you use?

18    A.   TIPS.

19    Q.   Mike Marcantonio, the TIPS program.  Is that

20  his program?

21    A.   That's right.

22    Q.   How long have you worked with

23  Mr. Marcantonio?

24    A.   Since time began when we began servicing

1  liquor.

2      Q.   Is it your testimony that prior to August 8,

3  2010, the TIPS program was in place?

4      A.   Yes.

5      Q.   And the bartenders should have been following

6  it?

7      A.   Yes.

8      Q.   And the other servers should have been

9  following it?

10      A.   Yes.

11      Q.   Do you have any knowledge whatsoever whether

12  Mr. Erwin became intoxicated on the premises?

13      A.   I asked John Ferraro, and he was not

14  intoxicated.

15      Q.   Your testimony is he wasn't intoxicated?

16      A.   Correct.

17      Q.   Do you know whether he was with people?

18      A.   He was with a group.

19      Q.   Do you have records of the TIPS program?

20      A.   Records meaning?

21      Q.   Someone passes, someone --

22      A.   Yes.

23      Q.   Do you keep them all on the premises?

24      A.   No.   They are kept by the individual person

1    who has the certificate.

2         Q.    Passed the course?

3         A.    That's right.

4         Q.    Do you keep records of your payments to TIPS?

5         A.    Yes.

6         Q.    Is it TIPS?  Is that the only program you

7    use?

8         A.    That's the only one.

9         Q.    Now, I think you started to suggest, and I

10   could be wrong, that you didn't have Dram Shop in '08?

11        A.    We did not.

12        Q.    Why is that?

13        A.    We did have it years ago when it was first

14   enacted 25, 30 or 40 years, whenever it was.  It was

15   more or less a license, in my view, Dram Shop to give

16   irresponsible people a payday.  If they knew, for

17   instance, that we had to be the baby-sitter of their

18   drinking habits, they took it to the hilt.

19                They didn't care what happened or what

20   they did because they knew it's my fault.  So there

21   were many instances when we were falsely named, and we

22   weren't responsible for the OUIs.

23        Q.    So is your testimony in response to my

24   question that you allowed the policy to lapse because

1    you felt it was unfair payment?

2         A.    The payment was -- it wasn't feasible.

3         Q.    You didn't want to make the premium?

4         A.    I couldn't.

5         Q.    So you dropped the policy?

6         A.    That's true.

7         Q.    How much was the premium?

8         A.    The day I dropped it -- the year I dropped

9    it, I think it was about to go from 60,000 to 123,000,

10   if memory serves me correctly.

11        Q.    Who was the carrier?

12        A.    I don't remember.

13        Q.    When did you drop it?

14        A.    25 years ago.

15        Q.    Why did you pick it up again recently?

16        A.    It was mandated by the state.

17        Q.    Is that one of the reasons that Mr. Tsoumas'

18   weekly draw was cut back?

19        A.    What reason?

20        Q.    Well, you told me at the beginning of the

21   deposition that Mr. Tsoumas was taking ten grand a

22   month, and then it went down to 7500.  I'm just curious

23   whether there is a correlation to the timing.

24        A.    I lost you.  I don't understand the question.

57

1          Q.    Well, you told me at one point Mr. Tsoumas

2    was taking ten grand --

3          A.    I understand that part.  Then it went down to

4    7500.

5          Q.    So that's 2500 bucks a week.  If you do the

6    math, it's roughly, give or take, a buck and a quarter

7    a year, right, and that seems to roughly correspond to

8    the cost of the Dram Shop.  So I'm just wondering if

9    there was a connection.

10         A.    That wasn't taken into consideration when we

11   did it.

12         Q.    All right.  Regardless of whether you had

13   Dram Shop coverage or not in 2008, what kinds of

14   coverages did the various businesses have in 2008?

15               MR. BERMAN:  What various businesses do

16   you mean?

17               MR. SINSHEIMER:  Any business,

18   individual person, legal person, entity, partnership,

19   anything at all that was in any way affiliated with the

20   operation of the Foxy Lady.

21         Q.    What kind of coverages to protect the Foxy

22   Lady and/or its principals, partners, associates,

23   anything at all, what was there in 2008?

24         A.    The fire insurance policy.

Frank Caswell - February 28, 2012

58

1    Q.   Sure.  What else?

2    A.   That's it.

3    Q.   That's it?

4    A.   I think.

5    Q.   There was no general liability policy at all?

6    A.   No.

7    Q.   Nothing to protect you from slip and falls?

8    A.   No.

9    Q.   How often has the Foxy Lady been sued in the

10   last five years?  The one in Brockton I'm talking

11   about.

12   A.   Well, we had a -- let's see -- twice.

13   Q.   Not counting this one, by the way.

14   A.   Twice.

15   Q.   What kinds of suits?

16   A.   An independent contractor, slash, employee

17   suit.

18   Q.   Was the company represented by insurance

19   counsel or by other counsel?

20   A.   By private counsel I was.

21   Q.   So some employee sued the company based on

22   some kind of an alleged employment discrimination?

23   A.   Correct.

24   Q.   What other kinds of suits?

Frank Caswell - February 28, 2012

1      A.    There was a slip and fall.

2      Q.    Was that covered by insurance?

3      A.    No.

4      Q.    Did the company represent itself?

5      A.    Yes.

6      Q.    Where was that filed?

7            THE WITNESS:  Where was it filed?

8            MR. BERMAN:  I can't answer the question

9 for you.  I know the answer.

10           MR. SINSHEIMER:  Was it Brockton

11 Superior or Brockton District Court, one of those two?

12 I will accept counsel's answer if counsel is willing to

13 tell me.  He doesn't have to.

14           MR. BERMAN:  I'm not even sure this is

15 relevant.

16           MR. SINSHEIMER:  I'm not either.  I'm

17 asking anyway.

18           MR. BERMAN:  It was filed -- there is

19 something called Rule 26B.

20           MR. SINSHEIMER:  Which says you can ask

21 questions well beyond the scope of legal admissibility.

22 We both know that.

23           MR. BERMAN:  But, in any event, it was

24 in Suffolk Superior Court, and I did represent Frank's

1  of Brockton, Inc.

2      A.    Okay.   There is your answer.

3      Q.    Those are the only things you can recall

4  right now?

5      A.    Yes.

6      Q.    The policy that was in place in August of

7  2008, you called it the fire policy, for lack of a

8  better term?

9      A.    What do you want to call it?

10     Q.    I don't know.  I never saw the paper.

11  Whatever it was, who was the carrier?

12     A.    At the time, it could have been Liberty

13  Mutual.  I'm not sure.

14     Q.    Have you made any demand upon them with

15  respect to this lawsuit?

16     A.    For fire?

17     Q.    For anything.

18     A.    No.

19     Q.    Have you approached any insurance company

20  whatsoever in any way, shape or form with respect to

21  this lawsuit?

22     A.    No.

23     Q.    Is it your understanding, as you sit here

24  today, that there is simply no insurance coverage that

61

1    any entity related to the Foxy Lady, Inc. has that

2    couldn't possibly cover Mr. Erwin were he able to prove

3    his case?

4        A.    Correct.

5        Q.    Just yes or no, and you don't have to answer

6    if your attorney instructs you not to.  Have you

7    consulted counsel with respect to that issue as well?

8                 MR. BERMAN:  I'm going to direct the

9    witness not to answer that.

10                MR. SINSHEIMER:  You can if you want,

11   but I think it's in everyone's best interest if counsel

12   looked into it.  Let us take five minutes with an eye

13   toward expediting this process.

14                MR. BERMAN:  Sounds good to me.

15                (Recess taken.)

16   BY MR. SINSHEIMER:

17       Q.    I have just a few more questions.  Did you

18   ever pull any receipts from August 8, 2010, meaning,

19   consumer receipts to see how much any particular patron

20   spent that evening?

21       A.    I did not.

22       Q.    I think you said you learned about the

23   incident after speaking to Mr. Tsoumas after he got

24   served, something like that?

```
 1        A.    Correct.

 2        Q.    Do you mean served with a lawsuit itself?

 3        A.    Yes.

 4        Q.    When was that?

 5        A.    I don't remember the date.

 6        Q.    I'm not talking about the exact date.  When

 7   roughly can you give me your best present recollection

 8   as to when the conversation took place?

 9        A.    When or where?

10        Q.    When.

11        A.    I think it was a day or two after he got

12   served.

13        Q.    Again, in relation to today, your best

14   present recollection how long ago was that?

15        A.    Few months.

16              THE WITNESS:  Was it?

17              MR. BERMAN:  I can't help you.

18        A.    I don't remember exactly.

19        Q.    You turned and asked your lawyer.  Is it your

20   memory it was a few months?  That's the best memory you

21   have?  Even if you're not sure, I'm asking for your

22   best present recollection.

23        A.    That's it.  My best present recollection is

24   that I don't really know the exact date.
```

1   Q.   I didn't ask the exact date.  About when did

2   you talk to Tsoumas?

3   A.   I don't remember that date.  Sorry.

4   Q.   I'm not asking exactly.  I'm asking about

5   when.

6   A.   Within the past six months.

7   Q.   Where were you?

8   A.   We were in the office at the Foxy Lady.

9   Q.   Was Mr. Berman with you?  Just yes or no.

10  A.   No.

11  Q.   What did you say to him, and what did he say

12  to you?

13  A.   When he showed me the suit?

14  Q.   Yes.

15  A.   He said to me that he was going to contact

16  counsel.

17  Q.   On behalf of the Foxy Lady generally?

18  A.   On behalf of himself, I believe, because he

19  obviously is the Foxy Lady, Inc. and that was he, not

20  I.

21  Q.   Right.  Foxy Lady, Inc. is he?

22  A.   Yes.  So that's why he was going to call

23  counsel.

24  Q.   You indicated that you believed the actual

1   physical contact between my client and certain police

2   officers or some of it happened on property owned by

3   Walgreen's?

4       A.   That's what I was told by John Ferraro.  It

5   could have been not quite or maybe it was, but John

6   Ferraro -- I don't know whether or not he is aware

7   exactly where the property line starts and ends.

8       Q.   Is there any physical line of demarkation

9   that is visual to the average person?

10      A.   No.

11      Q.   It just looks like a continuous parking lot,

12  right?

13      A.   Yes.

14      Q.   You indicated you personally had something to

15  do with the development of the property that became

16  Walgreen's?

17      A.   Yes.

18      Q.   Which is now owned by New York investors?

19      A.   Correct.

20      Q.   At any point in time, was there a connection

21  between the properties?

22      A.   Yes.

23      Q.   When was that?

24      A.   Prior to me selling it to the investors.

1    Q.   When was that?

2    A.   It happened several years ago.

3    Q.   Did you formally subdivide it?

4    A.   Correct.

5    Q.   They purchased it primarily to lease to

6  Walgreen's, as far as you know?

7    A.   I had that lease -- I had put the building

8  up, leased it to Walgreen's and sold it as a package.

9    Q.    Is there a management company that does the

10  property management for the entire set of parcels?

11    A.   For mine?

12    Q.    If I understand, there is at least three

13  continuous parcels that are served by what would look

14  to the consumer as a single big parking lot; am I

15  correct?

16    A.    I think they know -- and I will tell you why

17  I think they know it's a separate entity because for

18  years there was a bank on that building, and then there

19  was a law office on it.

20             And then it was always not part of my

21  property, but I had property surrounding it.  That

22  piece of property was land locked more or less.

23    Q.   What I'm really --

24    A.   But it didn't appear to be mine.  It appeared

Frank Caswell - February 28, 2012

1  to be the person who owned that building that I tore

2  down and put the Walgreen's up, it appeared to be that

3  property.  So when that was going up, would you think

4  that was me doing it, no.

5     Q.   Apart from what someone may think --

6     A.   Well, that's what you said.

7     Q.   Is there a property manager separate and

8  apart from the operation of the Foxy Lady?

9     A.   No.

10    Q.   Who does the plowing?

11    A.   A fellow by the name of Ed Foley for me.

12    Q.   Is he a single individual that has a plow?

13    A.   He's a contractor.  He has a crew.

14    Q.   Is he paid separately by each entity?

15    A.   He doesn't do Walgreen's.

16    Q.   Who does the plowing for Walgreen's?

17    A.   I have no idea.

18    Q.   So when he comes in, does he do both Cardinal

19  Plaza and Frank's of Plymouth?

20    A.   Yes, he does.

21    Q.   Is there a separate property management

22  entity that manages those two properties?

23    A.   No.

24    Q.   Is there any separate property management

1    entity in any way involved whatsoever in the management

2    of the physical plant on which the Foxy Lady does

3    business?

4         A.    No.

5         Q.    Foxy Lady does its own management?

6         A.    Yes.

7         Q.    Just to be really clear, and you will forgive

8    me for being repetitive, you weren't there on August 8,

9    2010, correct?

10        A.    I was, but not at the time of the incident.

11        Q.    Fair enough.  You were there earlier in the

12   evening, did not see the incident?

13        A.    Correct.

14        Q.    Did you have any interaction with Mr. Erwin

15   at all?

16        A.    I did not.

17        Q.    If he was sitting right here, would you have

18   any way of identifying him?

19        A.    I would not.

20        Q.    And everything you told us about what you

21   believe happened, you heard from Mr. Ferraro?

22        A.    Yes.

23        Q.    Apart from your lawyers, have you talked to

24   anyone else about it?

1        A.    I have not.

2              MR. SINSHEIMER:   That's all I have.

3    Thank you.

4                    CROSS-EXAMINATION

5    BY MR. LOUISON:

6        Q.    Mr. Caswell, my name is Brad Louison.   I

7    represent the City of Brockton, McDermott and Anderson.

8    I just have a couple of questions I would like to

9    clarify that I have taken notes on throughout the

10   deposition this morning.

11             Are you the owner or an officer or

12   director of any other corporations other than a public

13   corporation?

14       A.    I am not.

15       Q.    And I know we talked about Frank's of

16   Brockton, Inc., Frank's of Plymouth, Inc., Cardinal

17   Plaza, Inc., but can just you clarify for me the Foxy

18   Lady, Inc., is there such a corporation?

19       A.    I have been made aware when I saw that

20   lawsuit that there was, but prior to that, I didn't

21   know there was.

22       Q.    Do you have anything to do with the

23   corporation by the name of Foxy Lady, Inc.?

24       A.    I do not.

1    Q.    Do you have any knowledge what it is?

2    A.    I do not.

3    Q.    Do you know whether or not it has anything to

4  do with the business that you're the manager of?

5    A.    It has not.

6    Q.    Now, my understanding is for purposes of the

7  application for liquor licenses, there has to be a

8  manager listed.  Are you the manager listed for the

9  liquor license?

10   A.    Yes, I am.

11   Q.    Now, with regard to insurance, do you know

12 whether or not in this particular lawsuit any of the

13 corporations that are named as defendants are insured

14 currently?

15             MR. BERMAN:  Well, there is only the

16 corporation named right now.

17             MR. LOUISON:  I know there was

18 originally a Foxy Lady, Inc. name, there was a Frank's

19 of Brockton, Inc.

20             MR. BERMAN:  Well, Frank's of Brockton

21 hasn't been named yet.  There has been a motion to

22 substitute it.

23   Q.    Do you know whether or not there is any

24 insurance on this claim?

1    A.    No.

2    Q.    You don't know or you know there isn't?

3    A.    There isn't.

4    Q.    Now, we talked about the detail officers, and

5  it is your understanding or my question to you is does

6  the City of Brockton require as a condition of the

7  license to have police officers?

8    A.    Yes.

9    Q.    And, as you discussed, I think you said they

10 require them on Thursday, Friday and Saturday nights?

11   A.    Correct.

12   Q.    And they also require them on various other

13 nights depending on football games or holidays?

14   A.    They don't require them on those days.  I

15 guess they leave it up to us to determine whether or

16 not we are going to need one based on the time of the

17 game or the type of holiday, whether or not it's a

18 holiday everyone will be out of town or it is a holiday

19 that people are sticking around their house.

20   Q.    Is there a required number of detail

21 officers?

22   A.    No.

23   Q.    What is the number of detail officers you

24 have on various nights?

71

1       A.    Just one.

2       Q.    Are you limited to Brockton police officers

3  for the details?

4       A.    I don't know that.  We have never attempted

5  to use anything but.

6       Q.    You never had Stoughton or state police?

7       A.    No.

8       Q.    Do you have to have a fireman on duty?

9       A.    We do not.

10       Q.    There was an address for one of the

11  corporations at 20 Wayside Lane, Canton, is that your

12  home address?

13       A.    No.  That has nothing to do with me.

14       Q.    Do you know what that address is?

15       A.    I believe it is the address of Thomas

16  Tsoumas.

17       Q.    I know there were a couple of officers,

18  directors names.  One is Jean Caswell.

19       A.    That's my wife.

20       Q.    And William Wainwright.  Who is he?

21       A.    That is the corporate attorney.

22       Q.    He is also listed as the treasurer,

23  secretary?

24       A.    No.  I'm the president and treasurer.  Maybe

72

1   the secretary.

2       Q.   He was listed on Frank's of Brockton, Inc.

3   annual report as secretary?

4       A.   Right.

5       Q.   Other than being the secretary and the

6   attorney for the corporation, does he have any other

7   role in the operation of businesses?

8       A.   He does not.

9            MR. LOUISON:  All right.  That's all I

10  have.

11           MR. BERMAN:  Thank you.

12           MR. SINSHEIMER:  That's all.

13           MR. BERMAN:  I have one question.

14                CROSS-EXAMINATION

15  BY MR. BERMAN:

16      Q.   When you were telling the things that

17  Mr. Ferraro had told you, did you omit anything that he

18  had told you about the incident of that night?

19      A.   I did.

20      Q.   What did you omit?

21      A.   I forgot the part and now that -- I omitted

22  the part that John -- after he saw that Mr. Erwin was

23  having a verbal confrontation with the detail, he

24  suggested to the group that was inside with Mr. Erwin

1    that -- he went inside and he said to the fellow, he

2    said, listen, your buddy outside -- he didn't know his

3    name -- is getting himself into trouble with the

4    police.  He is out there arguing and swearing and

5    calling the police names and what have you.

6              He said if I were you guys, I would go

7    out there and try to intervene and try to separate them

8    and stop them, get him on his way, smarten him up, tell

9    him he's not going to do anything but get himself in

10   trouble.  So the fellow did go outside and the fellow

11   tried to get in between the police officer because

12   Erwin was more or less in his face.

13             So he was trying to back him off from

14   the police officer to get him out of there.  Erwin took

15   his buddy and threw him to one side so he could still

16   pursue his argument with the police officer, and that

17   is when all hell broke loose and he hit the police

18   officer and he called for backup and went down after

19   him and Anderson came, the dog came and Old McDonald

20   had a farm.  It was all over.

21             MR. BERMAN:  No further questions.

22                 RECROSS EXAMINATION

23   BY MR. LOUISON:

24        Q.   And there was no videotape of this premises

1    outside?

2         A.    We have a videotape system, yes.  And if we

3    have a request for it within 30 days -- but if not, it

4    continues over itself.  We have 14 different cameras in

5    and out of the building that could be helpful if

6    someone had made a request for it, but nobody did.  So

7    it's all gone.

8         Q.    Did you ever have a practice at the business

9    of barring people from returning in the future?

10        A.    Yes.

11        Q.    Can you describe your policy?

12        A.    If there is a person that is a disgruntled

13   customer, for instance, we don't let in for whatever

14   reason -- maybe they came from Gillette stadium and

15   they had enough and we refused their admittance.  Maybe

16   they got a little touchy-feely with one of the girls.

17   Maybe they mouthed off.  Maybe they this.  Maybe they

18   that.  We will ask them to leave and don't come back.

19   We will remember them.  Do we put indelible mark on

20   them?  No.

21        Q.    You don't give formal no trespassing letters

22   or anything like that?

23        A.    No.

24        Q.    Do you know whether there was anything done

1  with regard to this patron Erwin?

2       A.   No.   We just asked him to leave and he left

3  peacefully.

4       Q.   Has he ever been back to the Foxy Lady, to

5  your knowledge, since?

6       A.   Not to my knowledge.   I don't know.

7       Q.   You had earlier said when you were describing

8  your knowledge of what happened in the incident that

9  Erwin was asked to leave because he was mouthy or

10 something.   Do you have any more detail about the

11 reason he was asked to leave?

12      A.   Nothing other than what I already said.   I

13 would have to again -- John is there today.   I can go

14 back and ask him and call you.

15      Q.   No, that's fine.

16           MR. BERMAN:   You will do no such thing.

17      Q.   But you don't know whether he was getting

18 obnoxious with the entertainers?

19      A.   I think that's the reason.   I think.

20      Q.   And he told you that he didn't think he was

21 intoxicated?

22      A.   That's right.

23      Q.   Do you know whether he had ordered any

24 alcoholic beverages?

1      A.    He may have had one or two beers John told

2    me.   Again, I don't really know exactly.

3                    MR. LOUISON:   Thanks.

4                    MR. SINSHEIMER:   Let me quickly follow

5    that up.

6                    REDIRECT EXAMINATION

7    BY MR. SINSHEIMER:

8      Q.    Just to make the record clear, everything you

9    testified about the confrontation is something you

10   heard from Mr. Ferraro, right?

11     A.    That's correct.

12     Q.    All those answers you gave to Mr. Louison a

13   minute ago, you were reciting what Mr. Ferraro has told

14   you?

15     A.    Yes.

16     Q.    You were not reciting any personal knowledge?

17     A.    No.

18     Q.    And now my last question having looked at

19   Exhibit 2R, what is a rub girl?

20     A.    She gives a rub (indicating.)

21     Q.    That's what I thought, but I figured we would

22   put it on the record.

23                    (Off the record.)

24     Q.    You've mentioned a number of times a

1   gentleman named Thomas Tsoumas?

2       A.   Yes.

3       Q.   He is the guy that acts as a consultant,

4   correct?

5       A.   That is correct.

6       Q.   And is paid, as of now, roughly $7,500 a

7   week?

8       A.   Correct.

9       Q.   Was he there on August 8, 2010?

10      A.   That would be -- the 8th would be a what?

11      Q.   Strike that.  Was he there on August 10th?

12      A.   Is that a Friday or a Saturday?

13      Q.   I'm not sure.

14      A.   Well, you would have to tell me.

15      Q.   You spoke to him when he got served, right?

16      A.   Yes, I did.  Well, not that day, but a day or

17   two later.

18      Q.   Did he tell you whether or not he knew

19   anything about the alleged incident?

20      A.   He did not know anything about it.  I'm

21   sorry.  He did tell me that.

22      Q.   That's what he told you.  He had no

23   knowledge.  He didn't know where it was coming from,

24   correct?

1          A.    That is correct.

2          Q.    Is he involved in any way in the actual

3    management of the business?

4          A.    No.

5          Q.    Is he involved in any way of procuring the

6    details?

7          A.    No.

8          Q.    Is he involved in any way in the TIPS

9    training?

10         A.    No.

11         Q.    Is he involved in any way in the service of

12   alcohol?

13         A.    No.

14              MR. SINSHEIMER:   Okay.   I have no

15   further questions.   I don't need him tomorrow.

16              (Whereupon the deposition was concluded

17   at 11:42 a.m.)

18

19

20

21

22

23

24

```
1                 C E R T I F I C A T E

2             I, FRANK CASWELL, do hereby certify that

3    I have read the foregoing transcript of my testimony,

4    and further certify that said transcript is a true and

5    accurate record of said testimony (with the exception

6    of the following corrections listed below:)

7    Page       Line              Correction

8

9

10

11

12

13

14

15

16

17

18

19   Signed under the pains and penalties of perjury this

20         Day of                          , 2012.

21

22

23                    FRANK CASWELL

24
```

```
1    COMMONWEALTH OF MASSACHUSETTS    )

2                                            )

3    SUFFOLK, SS.                            )

4

5              I, Nancy L. LaCivita, Professional

6    Shorthand Reporter and Notary Public in and for the

7    Commonwealth of Massachusetts, do hereby certify that

8    FRANK CASWELL, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me, and that

10   such deposition is a true record of the testimony given

11   by such witness.

12             I further certify that I am neither

13   related to or employed by any of the parties in or

14   counsel to this action, nor am I financially interested

15   in the outcome of this action.

16             IN WITNESS WHEREOF, I have hereunto set

17   my hand and Notarial Seal this 11th day of March, 2012.

18

19                         Nancy L. LaCivita

20                         Nancy L. LaCivita

21                         Notary Public

22

23   My commission expires:

24   January 18, 2019
```